**No. 25-3347**

# In the United States Court of Appeals for the Seventh Circuit

XU LUN, a pseudonym,
*Plaintiff-Appellant,*

v.

MILWAUKEE ELECTRIC TOOL CORPORATION,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Wisconsin
Case No. 2:24-cv-00803-BHL (The Hon. Brett H. Ludwig)

## OPENING BRIEF OF PLAINTIFF-APPELLANT


THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

ADAM FARRA
TIMES WANG
FARRA & WANG PLLC
1543 Champa Street
Suite 400
Denver, CO 80202
(202) 505-5989

JENNIFER D. BENNETT
GUPTA WESSLER LLP
235 Montgomery Street
Suite 629
San Francisco, CA 94104
(415) 573-0336
*jennifer@guptawessler.com*

WILLIAM E. PARSONS
HAWKS QUINDEL, S.C.
409 E. Main Street
P.O. Box 2155
Madison, WI 53703
(608) 523-8478


April 24, 2026

*Counsel for Plaintiff-Appellant*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3347

Short Caption: Xu Lun v. Milwaukee Electric Tool Corporation et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Xu Lun, a pseudonym

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Farra & Wang PLLC; Hawks Quindel, S.C.; Gupta Wessler LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Thomas Scott-Railton Date: 1/5/26

Attorney's Printed Name: Thomas Scott-Railton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 2001 K Street NW
Suite 850 North, Washington, DC 20006

Phone Number: (202) 888-1741 Fax Number: N/A

E-Mail Address: thomas@guptawessler.com

Save As | Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3347

Short Caption: Xu Lun v. Milwaukee Electric Tool Corporation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party s main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Xu Lun (a pseudonym)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Farra & Wang PLLC; Hawks Quindel, S.C.; Gupta Wessler LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
N/A

ii) list any publicly held company that owns 10% or more of the party s, amicus or intervenor s stock:
N/A

(4) Provide information required by FRAP 26.1(b) Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney s Signature: /s/ Jennifer D. Bennett Date: April 24, 2026

Attorney s Printed Name: Jennifer D. Bennett

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 235 Montgomery Street, Suite 629
San Francisco, CA 94104

Phone Number: (415) 573-0336 Fax Number: (202) 888-7792

E-Mail Address: jennifer@guptawessler.com

rev. 12/19 AK

Save As | Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3347

Short Caption: Xu Lun v. Milwaukee Electric Tool Corporation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Xu Lun (proceeding under pseudonym)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Farra & Wang PLLC; Hawks Quindel, S.C.; Gupta Wessler LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Adam Farra Date: April 27, 2026

Attorney's Printed Name: Adam Farra

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 1543 Champa Street, Suite 400

Denver, CO 80202

Phone Number: (202) 505-5989 Fax Number: N/A

E-Mail Address: afarra@farrawang.com

Save As Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3347

Short Caption: Xu Lun v. Milwaukee Electric Tool Corporation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party s main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Xu Lun (proceeding under pseudonym)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Farra & Wang PLLC; Hawks Quindel, S.C.; Gupta Wessler LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party s, amicus or intervenor s stock:

N/A

(4) Provide information required by FRAP 26.1(b) Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney s Signature: /s/ Times Wang Date: April 27, 2026

Attorney s Printed Name: Times Wang

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 1543 Champa Street, Suite 400

Denver, CO 80202

Phone Number: (202) 505-5989 Fax Number: N/A

E-Mail Address: twang@farrawang.com

rev. 12/19 AK

Save As | Clear Form

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3347

Short Caption: Xu Lun v. Milwaukee Electric Tool Corporation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party s main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Xu Lun (proceeding under pseudonym)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Farra & Wang PLLC; Hawks Quindel, S.C.; Gupta Wessler LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party s, amicus or intervenor s stock:

N/A

(4) Provide information required by FRAP 26.1(b) Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney s Signature: /s/ William E. Parsons Date: April 27, 2026

Attorney s Printed Name: William E. Parsons

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: 409 East Main Street / P.O. Box 2155

Madison, Wisconsin 53701-2155

Phone Number: (608) 257-0040 Fax Number: (608) 256-0236

E-Mail Address: wparsons@hq-law.com

## TABLE OF CONTENTS

Table of authorities ....... iii

Introduction ....... 1

Jurisdictional statement ....... 3

Statement of issues ....... 4

Statement of the case ....... 4

A. Statutory background ....... 4

B. Factual background ....... 9

C. Procedural history ....... 12

Standard of review ....... 15

Summary of argument ....... 15

Argument ....... 21

I. The TVPRA applies extraterritorially ....... 23

A. A statute applies extraterritorially where the ordinary tools of statutory interpretation reveal a clear indication that Congress intended it to do so ....... 23

B. The text of the TVPRA clearly indicates that it applies extraterritorially, including when civilly enforced ....... 28

C. Statutory context, history, and precedent confirm that Congress was not legislating with purely domestic concerns in mind ....... 33

D. The district court's rejection of this strong textual and historical evidence cannot be squared with precedent from the Supreme Court or this Court ....... 37

II. This suit seeks only to hold Milwaukee Tool accountable for its domestic conduct as a beneficiary of forced labor ....... 44

A. Holding Milwaukee Tool accountable for benefiting from forced labor in the United States is a domestic application of the statute ....... 45

B. The district court improperly ignored subsection 1589(b)'s focus ..... 50

Conclusion ..... 52

## TABLE OF AUTHORITIES

### Cases

*A.A. v. Omnicom Group, Inc.*,
2026 WL 504904 (S.D.N.Y. 2026) .......... *passim*

*Abafita v. Aldukhan*,
2019 WL 6735148 (S.D.N.Y. 2019) .......... 37, 44

*Adhikari v. Daoud & Partners*,
697 F. Supp. 2d 674 (S.D. Tex. 2009) .......... 37, 44

*Adhikari v. Kellogg Brown & Root, Inc.*,
845 F.3d 184 (5th Cir. 2017) .......... 17, 35, 36, 43

*Aguilera v. Aegis Communications Group, LLC*,
72 F. Supp. 3d 975 (W.D. Mo. 2014) .......... 37, 44

*C.T. v. Red Roof Inns, Inc.*,
2021 WL 602578 (S.D. Ohio 2021) .......... 37, 44

*F.C. v. Jacobs Solutions Inc.*,
790 F. Supp. 3d 1158 (D. Colo. 2025) .......... *passim*

*G.G. v. Salesforce.com, Inc.*,
76 F.4th 544 (7th Cir. 2023) .......... 15

*Kellogg Brown & Root Services, Inc. v. U.S., ex rel. Carter*,
575 U.S. 650 (2015) .......... 40

*Motorola Solutions, Inc. v. Hytera Communications Corp.*,
108 F.4th 458 (7th Cir. 2024) .......... *passim*

*Motorola Solutions, Inc. v. Hytera Communications Corp.*, 145 S. Ct. 1182 (2025) .......... 13

*National Tax Credit Partners, L.P. v. Havlik*,
20 F.3d 705 (7th Cir. 1994) .......... 48

*Pfizer, Inc. v. Government of India*,
434 U.S. 308 (1978) .......... 32

*Ratha v. Phatthana Seafood Co.*,
2016 WL 11020222 (C.D. Cal. 2016) .......... 8, 31, 41

*Ratha v. Rubicon Resources, LLC*,
168 F.4th 541 (9th Cir. 2026) ........ 8, 18, 31, 36

*RJR Nabisco v. European Community*,
579 U.S. 325 (2016) ........ *passim*

*Rodriguez v. Pan American Health Organization*,
29 F.4th 706 (D.C. Cir. 2022) ........ 7, 49, 52

*Roe v. Howard*,
917 F.3d 229 (4th Cir. 2019) ........ *passim*

*United States ex rel. Hawkins v. ManTech International Corp.*,
752 F. Supp. 3d 118 (D.D.C. 2024) ........ *passim*

*United States v. Elbaz*,
52 F.4th 593 (4th Cir. 2022) ........ 49

*United States v. Gonzales*,
520 U.S. 1 (1997) ........ 29

*WesternGeco LLC v. ION Geophysical Corp.*,
585 U.S. 407 (2018) ........ *passim*

**Statutes**

18 U.S.C. § 1581 ........ 4

18 U.S.C. § 1583 ........ 32

18 U.S.C. § 1585 ........ 30

18 U.S.C. § 1586 ........ 30

18 U.S.C. § 1589 ........ *passim*

18 U.S.C. § 1595 ........ *passim*

18 U.S.C. § 1596 ........ *passim*

18 U.S.C. § 1837 ........ 26

18 U.S.C. § 1961 ........ 24, 38

18 U.S.C. § 1962 ........ 24, 38

18 U.S.C. § 1964 ........ 25, 31, 38

18 U.S.C. § 3271 .......... 30

28 U.S.C. § 1291 .......... 4

28 U.S.C. § 1331 .......... 3

35 U.S.C. § 271 .......... 46, 47

35 U.S.C. § 284 .......... 46

Defend Trade Secrets Act of 2016,
Pub. L. No. 114-153, 130 Stat. 376 .......... 27

Justice for Victims of Trafficking Act of 2015,
Pub. L. No. 114-22, 129 Stat 227 .......... 40

Punishing Financial Gain from Trafficked Labor,
Pub. L. No. 110-457, 122 Stat. 5044 .......... 49

Trafficking Victims Protection Act of 2000,
Pub. L. No. 106-386, 114 Stat. 1464 .......... *passim*

Trafficking Victims Protection Reauthorization Act of 2003,
Pub. L. No. 108-193, 117 Stat. 2875 .......... 6, 7, 33

**Other authorities**

CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA, *Hearing: Corporate Complicity: Subsidizing the PRC's Human Rights Violations*, at 32:00 (YouTube, Jul. 11, 2023) .......... 12

H.R. Rep. No. 108-264, pt. 2 (2003) .......... 6

*H.R. 3244 - Victims of Trafficking and Violence Protection Act of 2000*, Congress.gov .......... 5

William N. Eskridge,
*Interpreting Law: A Primer on How to Read Statutes and the Constitution* (2016) .......... 34

## INTRODUCTION

Congress enacted the Trafficking Victims Protection Act to combat the scourge of modern slavery in its many forms, from forced labor to sex trafficking. Congress understood that trafficking is a transnational problem with serious domestic consequences—and that to eliminate forced labor, the statute must target the companies that benefit from it, not just the individuals that hold the prod. So over the years, Congress has repeatedly amended and reauthorized the statute to expand remedies for victims, fill gaps, and ensure that U.S. persons can be held accountable for profiting from forced labor overseas.

This is the kind of case Congress had in mind. Milwaukee Tool, an American company headquartered in Wisconsin, wanted to sell gloves to Americans at American prices, but it did not want to pay American workers. So it moved production overseas, where it could take advantage of cheap, forced labor in a Chinese prison. As a result, Xu Lun, a political prisoner, was forced to work 11–13 hours a day, every day, making Milwaukee Tool gloves. He and many others risked brutal punishments, including beatings and electronic shocks, if they did not meet grueling quotas. In profiting from the use of forced labor, Milwaukee Tool violated the Trafficking Victims Protection Reauthorization Act's express prohibition on "benefit[ing], financially or by receiving anything of value, from participation in a venture which has engaged in" forced labor. 18 U.S.C. § 1589(b).

Congress has expressly provided that victims like Mr. Xu can sue for any offense under the TVPRA, including subsection 1589(b)'s prohibition on profiteering from forced labor. And Congress also expressly provided that "the courts of the United States have extra-territorial jurisdiction over any offense" under subsection 1589(b) when the defendant is a U.S. person. *Id.* § 1596(a).

The district court, however, dismissed Mr. Xu's claims as impermissibly extraterritorial—even though Milwaukee Tool is a U.S. company that benefited in the United States, where it sold its gloves produced with forced labor. That was wrong twice over, either of which is sufficient to reverse.

*First*, the TVPRA's text and structure demonstrate that courts have extraterritorial jurisdiction over any forced labor offense by a U.S. person—whether criminally or civilly enforced. Its text, context, express purpose, and statutory history all strongly support this conclusion. Congress included a broad extraterritoriality provision and broad civil cause of action as part of an interlocking scheme to target the U.S. beneficiaries of the quintessentially international phenomenon of human trafficking and forced labor. And Congress's concern with forced labor overseas is reflected in express findings and purposes that Congress enacted into law. Perhaps unsurprisingly, then, the district court's contrary decision conflicts with the vast weight of authority.

*Second*, even if the TVPRA did not apply extraterritorially, Mr. Xu's claim is not extraterritorial. Subsection 1589(b) of the TVPRA prohibits benefiting from participation in a forced-labor venture. And Milwaukee Tool benefited in the United States. When the conduct relevant to a statutory provision's focus takes place domestically, that constitutes a domestic application of the statute, even if other relevant conduct takes place overseas. Here, subsection 1589(b)'s text, context, and statutory history all show that the provision is focused on punishing profiting from forced labor. Congress enacted the provision not just to fill an existing gap in the statute, but also in recognition of the domestic harm to U.S. workers and competitors when a U.S. company is able to use cheap forced labor abroad. And Milwaukee Tool's conduct relevant to that focus—selling gloves made with forced labor—took place on U.S. soil.

On the district court's reading of the TVPRA, a victim cannot bring suit in U.S. courts against a U.S. company for its conduct in the United States to reap the lucrative benefits of making and selling goods with cheap forced labor. That is not the statute Congress passed.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this matter under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, namely 18

U.S.C. § 1581 *et seq.*, and because 18 U.S.C. § 1595(a) provides that such actions may be brought "in an appropriate district court of the United States." This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1291. This appeal is taken from the order granting Defendant Milwaukee Electric Tool Corporation's motion to dismiss, and the final judgment in this action, entered on December 1, 2025. SA-25–26. The notice of appeal was timely filed on December 30, 2025. App-52.

## STATEMENT OF ISSUES

**1.** Whether a court has extraterritorial jurisdiction over a civil lawsuit based on the violation of subsection 1589(b) of the TVPRA, which prohibits benefiting from forced labor—an offense over which the TVPRA expressly grants extraterritorial jurisdiction.

**2.** Whether a lawsuit under subsection 1589(b) of the TVPRA, which prohibits benefiting from forced labor, is a domestic application of the statute where the defendant is a U.S. company that benefited in the United States.

## STATEMENT OF THE CASE

### A. Statutory background

**1.** At the dawn of the 21st century, Congress recognized that despite the many advances society had made over the past centuries, "slavery continue[d] throughout the world." Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386,

§ 102(b)(1), 114 Stat. 1464, 1466.[1] Trafficking—both sex trafficking and forced labor—Congress explained, "is a modern form of slavery," imposed on hundreds of thousands of people a year. *Id.* § 102(b)(1). To combat this, Congress enacted the Trafficking Victims Protection Act with widespread bipartisan support. *H.R. 3244 - Victims of Trafficking and Violence Protection Act of 2000*, Congress.gov, https://www.congress.gov/bill/106th-congress/house-bill/3244/all-actions.

Congress codified the purposes of the Act in the legislation itself. It explained that "[t]rafficking ... is not limited to the sex industry." Pub. L. No. 106-386, § 102(b)(3). Rather, "[t]his growing transnational crime also includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide." *Id.*

Congress stressed that while these are "transnational crime[s]," they have "national implications." *Id.* § 102(b)(3), (24). "[F]orced labor has an impact on the nationwide employment network and labor market." *Id.* § 102(b)(12). If companies can use forced labor abroad to make goods sold in the United States, they will not hire American workers. And businesses that refrain from using forced labor will be unable to compete.

---

[1] Unless otherwise specified, all internal citations, quotation marks, and alterations are omitted from quotations throughout this brief.

Congress recognized that fighting this international blight required action at home and abroad. In enacting the TVPA, therefore, Congress not only established international initiatives to deter trafficking and aid its victims abroad; it also codified new offenses prohibiting trafficking—including forced labor—to be enforced in American courts. *See, e.g.*, *id.* §§ 104, 106–107, 112; *see also id.* § 103(8) (defining "severe forms of trafficking" to include forced labor).

**2.** Since the TVPA's enactment, Congress has repeatedly acted to fill gaps in the statute by expanding the offenses barred by the statute, its application to U.S. persons who participate in or benefit from trafficking overseas, and victims' ability to enforce these prohibitions.

In 2003, Congress passed and President George W. Bush signed into law the Trafficking Victims Protection Reauthorization Act of 2003, which reauthorized the TVPA and expanded its scope. Pub. L. No. 108-193, 117 Stat. 2875. In the statute itself, Congress explained that "[t]rafficking in persons continue[d] to victimize countless men, women, and children in the United States and abroad." *Id.* § 2(1). And efforts to combat trafficking abroad were stymied by "[c]orruption among foreign law enforcement authorities." *Id.* § 2(5).

Among the "most important of the [reauthorization statute's] provisions" was thus an amendment authorizing victims of specified offenses (including forced labor) to bring civil suits in United States courts. H.R. Rep. No. 108-264, pt. 2, at 11 (2003);

*see* Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878. Initially, this civil cause of action only applied to a subset of the statute's offenses: "An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator." Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878.

A few years later, Congress expanded the statute yet again. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044. Congress added an additional forced labor offense, specifically targeted at "Punishing Financial Gain from Trafficked Labor." *Id.* § 222(b)(3). Though the statute has always prohibited forced labor, the amended statute also prohibits "knowingly benefit[ing] … from participation in a venture which has engaged in the providing or obtaining of [forced labor]." *Id.* (codified at 18 U.S.C. § 1589(b)).[2]

This provision deters forced labor by seeking to minimize the market for it, while at the same time "protect[ing] commercial entities that decline to benefit from forced labor and may be harmed by competition from products or services garnering implicit subsidies from forced labor." *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 n.5 (D.C. Cir. 2022).

---

[2] This brief will refer to the amended statute as the TVPRA and the original as the TVPA.

As part of this same set of amendments, Congress expressly granted courts "extra-territorial jurisdiction over" most TVPRA offenses, including forced labor and benefiting from forced labor, when "an alleged offender is a national of the United States" or "present in the United States." Pub. L. No. 110-457, § 223, 122 Stat. 5044, 5071 (codified at 18 U.S.C. § 1596(a)). This explicit grant of extraterritorial jurisdiction was enacted in the wake of cases in which courts had dismissed civil suits based on extraterritorial conduct, holding that the statute lacked such a grant. *Ratha v. Phatthana Seafood Co.*, 2016 WL 11020222, at *5 (C.D. Cal. 2016).

Finally, to ensure that the statute's civil right of action covered the entirety of the statute's scope, Congress expanded it to ensure that victims of *any* offense codified in the TVPRA could bring suit. Pub. L. No. 110-457, § 221(2)(a)(i) (codified at 18 U.S.C. § 1595). This change reflected that "Congress intended every criminal act to have a civil-remedy counterpart." *Ratha v. Rubicon Res., LLC*, 168 F.4th 541, 554 (9th Cir. 2026) (en banc).

**3.** As it stands today, the TVPRA not only bars forced labor, but subsection 1589(b) bars "knowingly benefit[ing] ... from participation in a venture which has engaged in [forced labor]." Section 1595's cause of action authorizes victims of TVPRA offenses, including subsection 1589(b), to bring suit. And section 1596 provides U.S. courts with "extra-territorial jurisdiction" when the offender is a U.S. person or present in the United States. *Id.* § 1596(a).

### B. Factual background

**1.** Milwaukee Tool is a well-known American power tool company headquartered in Brookfield, Wisconsin. App-14. In addition to tools, the company also sells work gloves. App-26. And while the company's competitors often "grab some [gloves] off the shelf, slap their logo on it, and say, 'We have gloves now,'" Milwaukee Tool takes pride in controlling the design and manufacture of its gloves. App-26–27.

In 2005, Milwaukee Tool sought to "deeply cut" the production costs for its gloves. App-11. It did so by shifting production to China—and once there, using forced labor. App-11, 21–27, 37. Milwaukee Tool and its Chinese parent company used a shell company to engage a supplier, Shanghai Select, to have the gloves produced at Chishan Prison in Hunan Province, China. App-13–14, 21, 23–24

During this time, Milwaukee Tool remained involved in the production process. Before its labor practices were subject to scrutiny, Milwaukee Tool "touted" its "ownership of the design and manufacturing processes." App-26. Milwaukee Tool and its Chinese parent company prided themselves on "devoting more attention and care to the manufacturing process than [their] competitors," including "closely examin[ing] every detail" of "supply chain logistics." App-37–39; *see also* App-26.

Here, this hands-on approach also included: "coordinat[ing] logistics with Shanghai Select and Chishan Prison"—including to export the gloves to the United

States—as well as "establish[ing] a feedback loop with Shanghai Select and Chishan Prison to address quality control issues." App-46–47; *see also* App-24. And because of the proprietary technology involved in making Milwaukee Tool gloves, they required "bespoke manufacturing processes." App-47.

**2.** Laborers imprisoned at Chishan Prison were forced to work seven days a week, 11–13 hours a day making Milwaukee Tool gloves. App-24. Plaintiff Xu Lun was one of the workers forced to make Milwaukee Tool gloves at Chishan Prison. Mr. Xu was targeted by the Chinese government because he worked for a non-governmental organization that advocated for oppressed populations within China. App-21. He was convicted of "subversion of state power" and served part of his sentence at Chishan Prison. App-22.

Chishan Prison has its own manufacturing facilities, where prisoners are forced to make Milwaukee Tool gloves. App-21 *see also* App-22 (detailing experience of another political prisoner sentenced to Chishan Prison and forced to labor making Milwaukee Tool gloves because of his pro-democracy advocacy). The prison has machines that are "specially designated to cut" Milwaukee Tool glove fabric. App-22–23. The gloves are emblazoned with the Milwaukee Tool logo, and their label lists Milwaukee Tool's Brookfield, Wisconsin address. App-22–23. It was widely known among prisoners that the gloves were being made for export to the United States. App-23.

The conditions in the manufacturing facilities were grueling. The factories were cramped, lacked ventilation, and had no heating or air conditioning, which was particularly brutal in the hot, humid summers. App-24–25. And they were constantly filled with fabric dust, which led many of the prisoners to develop respiratory problems. App-24. The prisoners were forced to work 11–13 hour days, every day, with only 1–3 days off per month. *Id.* They were not allowed to talk freely or even use the bathroom freely. App-25. And despite operating dangerous machinery, prisoners were not given any safety training, so workplace injuries were common. *Id.* A common injury was when prisoners' fingers were punctured by the embroidering machines, which led to many losing their fingernails from repeated injuries. *Id.* The prison administrators would blame the prisoners for their injuries and punish them as a result. *Id.*

Each prisoner had to meet a daily production quota. App-23. For example, workers cutting fabric had a daily quota of 450–500 pairs; those sewing gloves were required to make 200 pairs a day. *Id.* Prisoners who refused to work, did not work hard enough, or did not meet their daily quota were punished. App-25. Some of the lightest punishments included being forced to squat for long periods of time, banned from family visitation, or forbidden to use the bathroom. *Id.* More severe punishment included solitary confinement, beatings, and electric shocks with electric rods. App-25–26.

**3.** Because of this forced labor, U.S. Customs and Border Protection blocked the importation of Milwaukee Tool gloves manufactured by Shanghai Select, the Chinese company Milwaukee Tool works with to produce the gloves. App-11, 47. Walmart stopped selling them. App-46. And Milwaukee Tool was investigated by the bipartisan Congressional-Executive Commission on China. App-10–11, 29–30; *see* CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA, *Hearing: Corporate Complicity: Subsidizing the PRC's Human Rights Violations*, at 32:00 (YouTube, Jul. 11, 2023), https://www.youtube.com/watch?v=vJTXpRLqgGg (Rep. Chris Smith describing the evidence of forced labor as "very, very damaging"). But before they were caught, using forced labor was tremendously profitable for Milwaukee Tool, allowing it to "deeply cut costs" by paying the workers who made its gloves almost nothing. App-11, App-25.

### C. Procedural history

Once he was finally released, Mr. Xu filed this lawsuit in the Eastern District of Wisconsin, where Milwaukee Tool is headquartered. App-14. As relevant here, Mr. Xu brought claims again Milwaukee Tool under subsection 1589(b) of the TVPRA, which prohibits "knowingly benefit[ing] … from participation in a venture which has engaged" in forced labor. 18 U.S.C. § 1589(b). Milwaukee Tool moved to dismiss, arguing that Mr. Xu was seeking to apply the TVPRA extraterritorially, which—it argued—the statute does not permit in civil cases. SA-12.

The district court granted Milwaukee Tool's motion. *First*, the court held that the TVPRA's express grant of extraterritorial jurisdiction does not apply when the statute is enforced civilly. SA-14–21. The court recognized that section 1596 provides that "the courts of the United States have extra-territorial jurisdiction over any offense," including the offense of benefiting from forced labor. SA-15 (quoting 18 U.S.C. § 1596(a)). This "clearly and affirmatively indicate[s]" that the TVPRA's prohibition on benefiting from forced labor "applies to conduct occurring outside the United States." SA-16. According to the court, however, the reference to "any offense" applies only to the criminal prosecution of those offenses, not civil suits. *Id.* The court did not attempt to square that conclusion with the TVPRA's use of the term "offense" to refer to violations of the statute when they are civilly enforced. 18 U.S.C. § 1595(c)(2). The court held that "something more" was needed. SA-17. But it rejected the same kinds of evidence from statutory context, structure, history and purpose that this Court has previously held indicates extraterritorial reach. SA-17; *see Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 482–83 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1182 (2025). In reaching its conclusion, the court acknowledged that it was splitting from the Fourth and Fifth Circuits. SA-20–21.

*Second*, the court also rejected Mr. Xu's argument that his suit is not an extraterritorial application of the statute in the first place—which would be sufficient for his suit to proceed even if the TVPRA did not apply extraterritorially. Even

though Mr. Xu's suit is based on a U.S. company's U.S. conduct in reaping benefits in the United States through U.S. sales, the court held that Mr. Xu's suit was an extraterritorial application of the statute. SA-22.

To determine whether a suit is an extraterritorial or domestic application, the court recognized that it must determine whether the conduct relevant to the statute's focus occurred domestically. SA-23. And the court acknowledged that under the Supreme Court's decision in *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407 (2018), this focus inquiry must look to "the type of violation that occurred." SA-24. As *WesternGeco* explained, that means looking to the specific statutory provision that is the basis for the suit to "determine whether the application of the statute *in the case* is a domestic application." 585 U.S. at 414 (emphasis added).

But although Mr. Xu is suing Milwaukee Tool for violating subsection 1589(b)—which prohibits benefiting from participation in a venture engaged in forced labor—the court did not attempt to determine the focus of that subsection. SA-24. Instead, the court attempted to determine the focus of section 1589 generally—even though that section contains multiple provisions and different offenses that target different conduct. 18 U.S.C. § 1589. Ignoring Congress's focus in enacting subsection 1589(b) specifically, the court concluded that section 1589's overarching focus is on forced labor generally. SA-24. As a result, although the type of violation that Mr. Xu alleged—benefiting from forced labor—occurred in the United States, the court held

that all that matters is where the forced labor occurred. *Id.* Based on this, the court concluded that this suit was an extraterritorial application of the statute. *Id.*

On December 30, 2025, Mr. Xu filed this appeal.[3]

## STANDARD OF REVIEW

This Court "review[s] de novo both a district court's legal conclusions and its dismissal of a complaint for failure to state a claim under Rule 12(b)(6)." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 551 (7th Cir. 2023). In this analysis, the Court "treat[s] the complaint's factual allegations as true and draw[s] factual inferences in the plaintiff['s] favor." *Id.*

## SUMMARY OF ARGUMENT

Congress enacted and then repeatedly strengthened the TVPRA to address a problem that by its nature transcends borders. The resulting statute is designed to address the conduct of a U.S. company that benefited in the United States from its U.S. sales of products that were produced by forced labor—even if it outsourced that labor overseas. In holding otherwise, the district court erred in two ways, either of which is sufficient to reverse. *First*, contrary to the district court's conclusion, the TVPRA does apply extraterritorially in civil cases. *Second*, even if it did not, this lawsuit is not seeking an extraterritorial application of the statute because Milwaukee Tool's relevant conduct occurred domestically.

---

[3] Mr. Xu also brought suit against Milwaukee Tool's Chinese parent company, TTI, but the appeal against TTI was voluntarily dismissed. ECF 19.

**I. A.** While courts presume that "Congress generally legislates with domestic concerns in mind," the presumption against extraterritoriality can be overcome by a "clear indication of extraterritorial effect." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 336 (2016). Courts employ "the usual tools of statutory interpretation"—text, context, and history—to determine if Congress has given a sufficiently clear indication that it sought to regulate "conduct occurring outside the United States." *Motorola*, 108 F.4th at 482, 486. "An express statement of extraterritorial application is the clearest instruction Congress could give," but it is not required. *Id.* at 481. For example, the fact that a statutory provision expressly and directly incorporates "violations of predicate statutes that do expressly apply extraterritorially" also "clearly indicates" that Congress intended the provision to have "extraterritorial effect." *RJR Nabisco*, 579 U.S. at 340. Courts also look to "[c]ongressionally enacted legislative purposes and findings," which can show that "Congress was concerned with actions taking place outside of the United States." *Motorola*, 108 F.4th at 482–83.

**B.** While an express statement of extraterritorial application is "not essential," *RJR Nabisco*, 579 U.S. at 340, the TVPRA has one. Under section 1596, "the courts of the United States have extra-territorial jurisdiction over *any* offense" under a range of TVPRA provisions when the defendant is a U.S. person. 18 U.S.C. § 1596(a) (emphasis added). And the TVPRA uses the term "offense" to refer to any violation of the statute, whether civilly or criminally enforced. 18 U.S.C. § 1595(c)(2). By its plain

text, then, the TVPRA provides courts extraterritorial jurisdiction over civil lawsuits to enforce offenses committed by U.S. persons.

But that is not the only way in which Congress clearly indicated extraterritoriality. Section 1595, the statute's civil cause of action, directly incorporates extraterritorial violations of the TVPRA. *RJR Nabisco*, 579 U.S. at 338. Under the Supreme Court's decision in *RJR Nabisco*, that incorporation "provid[es] strong textual evidence of its extraterritorial effect when applied to those predicates." *Roe v. Howard*, 917 F.3d 229, 241 (4th Cir. 2019).

**C.** If this were not enough, the statute's "purpose, structure, history, and context … all support the extraterritorial application of § 1595 for an appropriate predicate offense." *Id.* The TVPRA's "stated purpose"—enacted in the text of the statute—"and accompanying congressional findings demonstrate that Congress enacted it to address the problem of human trafficking throughout the world." *Id.* at 242; *see also, e.g.*, *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 201 (5th Cir. 2017). That's just the kind of evidence that this Court has concluded can "buttress[]" the conclusion that a statute's civil cause of action applies extraterritorially. *Motorola*, 108 F.4th at 482.

Statutory history points in the same direction. At the same time that Congress expressly granted U.S. courts extraterritorial jurisdiction over offenses, Congress expanded section 1595's cause of action to ensure that it encompassed *any* violation

of the statute. *See supra* 8. In doing so, Congress sought for "*every* criminal act to have a civil-remedy counterpart," *Ratha*, 168 F.4th at 554, including extraterritorial ones.

Putting all this together, as the overwhelming majority of courts have concluded, the TVPRA applies extraterritorially—whether it is civilly or criminally enforced. *See infra* 36–37.

**D.** The district court broke with this consensus based on a reading of the Supreme Court's decision in *RJR Nabisco* that this Court has already rejected. The court disregarded the "obvious textual clue" that section 1595's cause of action directly incorporates extraterritorial predicates. *RJR Nabisco*, 579 U.S. at 338, 346–47. It did so based on *RJR Nabisco*'s conclusion that RICO's civil cause of action was not extraterritorial. SA-16–17. But that conclusion "depended on factors that do not apply to § 1595 of the TVPA." *Howard*, 917 F.3d at 243. Unlike the TVPRA, "RICO's civil remedy provision … does not directly incorporate any extraterritorial predicates." *Id.* Further, section 1595's civil cause of action applies to all underlying violations without limitation, unlike RICO's civil cause of action, which contained significant limitations. *See Motorola*, 108 F.4th at 483.

The district court also misread section 1596's express extraterritoriality provision. The court concluded that its use of the term "offense" indicates that it applies "only [to] criminal violations, not civil ones." SA19–20. But this Court already rejected this argument in *Motorola*, 108 F.4th at 485–86. And the TVPRA itself uses

the word "offense" to refer to violations of the statute that are being enforced civilly, 18 U.S.C. § 1595(c)(2). The court also relied on the fact that section 1596's grant of extraterritorial jurisdiction lists certain offenses to which it applies, but does not mention section 1595's civil cause of action. SA-19. But it "would not have made sense" to list section 1595 as an "offense": It's not an offense itself, but a method of enforcement that "creates a civil remedy for an offense, that is, any violation of [the TVPRA]." *United States ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118, 133 n.16 (D.D.C. 2024).

Even if the district court were correct that "something more" was necessary besides the clear textual indications in sections 1595 and 1596, the district court disregarded exactly the kind of evidence that this Court accepted in *Motorola*, 108 F.4th at 482: statutorily enacted purposes and findings demonstrating that Congress intended the statute to have extraterritorial reach.

**II.** Even if the TVPRA's extraterritorial scope could be atextually limited to criminal suits, however, this lawsuit could nevertheless proceed because Mr. Xu does not seek to apply the statute extraterritorially. A statutory claim is not extraterritorial where "conduct relevant to the statute's focus occurred in the United States." *Motorola*, 108 F.4th at 473. That is this case.

**A.** To determine whether a plaintiff seeks a domestic application of a statute, the Supreme Court has instructed that courts must look to the specific provision that

is "the basis for" the plaintiff's claim. *WesternGeco*, 585 U.S. at 415. Where a provision provides a remedy for a violation of the statute, the remedy provision and the underlying violation "work[] in tandem," and courts consider them together. *Id.*

Here, Mr. Xu relies on section 1595's cause of action to bring suit for an underlying violation of subsection 1589(b), the statute's prohibition on benefiting from forced labor. Like other remedy-granting provisions, the "focus" of section 1595's civil cause of action is the underlying violation. *Id.* at 414–15. And because there are "several ways" that the TVPRA can be violated, courts must "look to the type of [violation]" that is the basis for the suit. *Id.* Here, that's subsection 1589(b), which prohibits "knowingly benefit[ing], financially or by receiving anything of value, from participation in a venture which has engaged" in forced labor. 18 U.S.C. § 1589(b). Based on its plain text, "[t]he conduct that § [1589(b)] regulates—*i.e.,* its focus," *WesternGeco*, 585 U.S. at 415, is "benefit[ing] … from" forced labor, 18 U.S.C. § 1589(b). Here, Milwaukee Tool's conduct relevant to that focus indisputably occurred in the United States, where the U.S.-based company sold its gloves and reaped the profits. App-14, 37. Suing over this conduct is therefore a domestic application of the statute.

**B.** The district court only reached the contrary conclusion because it refused to analyze the focus of subsection 1589(b). Instead, with little analysis, the court decided to determine the focus of section 1589 generally, even though that section contains subsections outlining different offenses targeting different conduct. 18

U.S.C. § 1589. But the Supreme Court requires courts to analyze the focus of the specific statutory violation that provides the basis for the suit. *WesternGeco*, 585 U.S. at 414. Otherwise, "it would be impossible to accurately determine whether the application of the statute *in the case* is a 'domestic application.'" *Id.* (emphasis added). Indeed, in *WesternGeco* itself, the Supreme Court reversed the court of appeals for doing exactly what the district court did here: ignoring the specific subsection the plaintiff alleged was violated, and relying instead on a more general provision. *Id.* at 409, 412.

## ARGUMENT

Milwaukee Tool claims that a victim of forced labor cannot bring suit in a U.S. court against a U.S. company that profited in the United States through U.S. sales, so long as the company outsources the labor itself overseas. But as the overwhelming majority of courts to address this question have concluded, the TVPRA targets U.S. persons benefiting from forced labor both at home and abroad. It therefore does not immunize U.S. companies from civil liability for profiting *in* the United States through participation *from* the United States in forced labor or trafficking elsewhere.

In evaluating extraterritoriality, courts apply a "two-step framework." *Motorola*, 108 F.4th at 480. "At the first step, courts should ask … whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* If it does,

that ends the inquiry; the statute applies extraterritorially. But if not, "courts should proceed to the second step: determining whether the conduct relevant to the statute's focus occurred in the United States or in a foreign country." *Id.* at 473. That inquiry rests on the specific statutory provision that the defendant allegedly violated. If conduct relevant to the focus of that provision occurred in the United States, then the claim is not extraterritorial—even if the suit also relies on conduct committed abroad. *Id.* Courts have "discretion" to begin with the second step of the analysis if doing so would result in a more limited holding. *WesternGeco*, 585 U.S. at 413.

Here, Mr. Xu's claim may proceed at either step. At step one, the TVPRA gives the necessary "clear indication" that its civil cause of action for a wide range of transnational trafficking offenses involving U.S. persons does not stop at the Nation's borders. *RJR Nabisco*, 579 U.S. at 340. But even if that were not the case, at step two, Mr. Xu's claim is a domestic application of the statute. Subsection 1589(b)'s prohibition on benefiting from participation in a forced-labor venture is focused on *profiting* from forced labor, not directly perpetrating it. And Milwaukee Tool profited in the United States. Mr. Xu seeks to hold Milwaukee Tool accountable for the *domestic* benefit it received from its *United States-based* participation in a venture to profit off gloves made by forced labor by selling them in the United States.

## I. The TVPRA applies extraterritorially.

The TVPRA is an expressly extraterritorial statute that Congress enacted to address a problem that, by its nature, often transcends borders. Over the years, Congress has repeatedly expanded the statute's scope and the remedies it provides to victims of trafficking, including forced labor. Today, section 1595 permits victims to civilly enforce any offense covered by the statute. And section 1596 expressly grants U.S. courts jurisdiction over the offense of benefiting from forced labor that occurs overseas.

The district court, however, held that this grant of extraterritorial jurisdiction only applies when an offense is criminally enforced, not when a victim brings a civil enforcement action. The vast majority of courts have held otherwise. And with good reason: The text, history, and purpose of the statute all demonstrate that the prohibition on benefiting from forced labor applies extraterritorially, regardless of whether it is civilly or criminally enforced.

### A. A statute applies extraterritorially where the ordinary tools of statutory interpretation reveal a clear indication that Congress intended it to do so.

Although "Congress generally legislates with domestic concerns in mind," that's not always the case. *RJR Nabisco*, 579 U.S. at 336. And the ordinary presumption that statutes only apply domestically is overcome where Congress gives a "clear indication of extraterritorial effect." *Id.*

To determine whether Congress has given such an indication, courts employ "the usual tools of statutory interpretation." *Motorola*, 108 F.4th at 482. "An express statement of extraterritorial application is the clearest instruction Congress could give." *Id.* at 481. But it is "not essential." *RJR Nabisco*, 579 U.S. at 340. "Assuredly context can be consulted as well," and it can be "dispositive." *Id.* Courts therefore look to text, history, and purpose to determine Congress's intent. In this circuit, two precedents guide this inquiry: the Supreme Court's decision in *RJR Nabisco* and this Court's decision in *Motorola*.

**1.** In *RJR Nabisco*, the Supreme Court analyzed whether RICO applies extraterritorially. 579 U.S. at 325, 329. The Court first examined a provision that "set[] forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate an enterprise." *Id.* at 330 (citing 18 U.S.C. § 1962). Although "RICO itself does not refer to extraterritorial application," the Court held that these prohibitions nevertheless apply to at least some extraterritorial conduct. *Id.* at 340. That's because RICO defines "racketeering activity to encompass dozens of state and federal offenses." *Id.* at 329–30, 340 (citing 18 U.S.C. § 1961). And some of those offenses "*do* expressly apply extraterritorially." *Id.* at 340. That incorporation of extraterritorial predicates, the Court held, is "dispositive." *Id.* "Short of an explicit declaration, it is hard to imagine

how Congress could have more clearly indicated that"—at least as to those predicates—RICO's prohibitions apply extraterritorially. *Id.*

The Court then turned to determining whether the RICO provision that provides a private right of action for those "injured in [their] business or property by reason" of a RICO violation applies to extraterritorial injuries. *Id.* at 346. The Court concluded that the statute lacked a clear indication of extraterritoriality as to that provision. *Id.* at 345. Unlike RICO's substantive prohibitions on racketeering activity, the "injured in business or property" provision does not directly incorporate extraterritorial predicates. *Id.* at 349–50; 18 U.S.C. § 1964(c); *see Howard*, 917 F.3d at 243. At most, it incorporates RICO's substantive prohibitions, which in turn incorporate dozens of other crimes, only some of which are extraterritorial. And even then, the provision does not simply incorporate RICO's substantive prohibitions; it requires an injury to business or property. This limitation, the Court explained, suggests that the civil-remedy provision "is not coextensive with [RICO's] substantive prohibitions." *RJR Nabisco*, 579 U.S. at 350. Under these circumstances, the Court concluded, "[s]omething more is needed" to support extraterritoriality. *Id.* And the statute lacks "foreign-oriented language" or any other indication that its civil-remedy provision might apply to extraterritorial injuries. *Id.* at 350, 352–53 & n.12. In other words, *RJR Nabisco* makes clear that an express statement of extraterritoriality or the direct incorporation of expressly extraterritorial predicates

can be sufficient to demonstrate extraterritoriality. But neither is required. Where they are missing, however, "something more" is needed. *Id.* at 350.

**2.** This Court in *Motorola* then illustrated how to apply *RJR Nabisco* to a civil cause of action like the one here. In that case, the question was whether the Defense of Trade Secrets Act's private right of action applies extraterritorially. To answer this, this Court looked to statutory text, context, and history. *Motorola*, 108 F.4th at 481. While the statute's civil cause of action does not itself contain an express statement of extraterritorial scope, there is an "express extraterritoriality provision" elsewhere in the statute. *Id.* It provides that "'[t]his chapter also applies to conduct occurring outside the United States if ... an act in furtherance of the offense was committed in the United States.'" *Id.* at 482 (quoting 18 U.S.C. § 1837(2)). This Court explained that "the most straightforward reading of th[is] statutory text"—which does not distinguish between civil and criminal enforcement of the offenses under the statute—is that it extends to the civil cause of action as well. *Id.*

The defendant, relying on *RJR Nabisco*, tried to argue that the extraterritoriality provision was limited "only to criminal matters." *Id.* On this reading, under *RJR Nabisco*, a civil cause of action cannot apply extraterritorially unless the provision setting forth that cause of action *itself* contains the clear indication of extraterritoriality. *Id.* at 484. But, this Court explained, that "misreads *RJR Nabisco*." *Id.* *RJR Nabisco* makes clear that a statutory provision can apply

extraterritorially based on other provisions—indeed, it "determined the extraterritoriality of RICO's criminal provisions" based on their relationship to "predicate offenses," which aren't even in RICO itself. *Id. RJR Nabisco*'s analysis of RICO's civil provision didn't change that basic principle. *Id.* Instead, *RJR Nabisco* held that RICO's civil cause of action contained "limiting language" as to the predicate offenses it covered that indicated a "limited … extraterritorial reach of RICO's private right of action as compared to its criminal provisions." *Id.* at 483.

The defendant in *Motorola* also argued that because the DTSA's extraterritoriality provision uses the term "offense," it "refer[s] only to criminal violations." *Id.* at 485. This Court again rejected that argument, explaining that the statutory context and history of the DTSA showed that Congress used the term "offense … [to] encompass civil violations." *Id.*

And this Court found further evidence in statutory context that showed Congress was "concerned with actions taking place outside of the United States." *Id.* at 482–83. This Court pointed to "other references to extraterritorial conduct in the DTSA," including "legislative purposes and findings" providing that "trade secret theft occurs in the United States and around the world" and that "trade secret theft, wherever it occurs, harms the companies that own the trade secrets and the employees of the companies." *Id.* at 482–83 (quoting Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 5, 130 Stat. 376, 383–84). This Court also pointed to

statutory reporting requirements for government officials regarding trade secret theft "outside of the United States." *Id.* at 483. This evidence served to "buttress[]" this Court's conclusion that the DTSA's private right of action applied extraterritorially. *Id.* at 482. Based on this text and context, this Court concluded that the statute's civil cause of action covered "conduct occurring outside the United States." *Id.* at 486.

### B. The text of the TVPRA clearly indicates that it applies extraterritorially, including when civilly enforced.

The text of the TVPRA demonstrates that Congress intended that the statute's prohibition on benefiting from forced labor apply extraterritorially, whether it is civilly or criminally enforced. The TVPRA creates offenses that prohibit a range of conduct, including benefiting from forced labor. 18 U.S.C. § 1589(b). Section 1595's cause of action authorizes the victim of any of those offenses to sue the perpetrator. And section 1596 grants courts extraterritorial jurisdiction over the offense of benefiting from forced labor, when a U.S. person is involved, without any limitation as to whether that offense is being enforced civilly or criminally.

**1.** While an express statement of extraterritorial application is "not essential," *RJR Nabisco*, 579 U.S. at 340, the TVPRA has one. Under section 1596 of the statute, "the courts of the United States have extra-territorial jurisdiction over *any* offense" under a range of TVPRA provisions (including benefiting from forced labor), when the defendant is a U.S. national, permanent resident, or present in the United States.

18 U.S.C. § 1596(a) (emphasis added).[4] This broad statutory text grants "extra-territorial jurisdiction" to U.S. courts over "any offense," without any limitation as to whether enforcement is civil or criminal. *Id.* And section 1595's civil cause of action provision explicitly uses the term "offense" to refer to a violation of the TVPRA that is being enforced civilly. 18 U.S.C. § 1595(c)(2); *see also F.C. v. Jacobs Sols. Inc.*, 790 F. Supp. 3d 1158, 1182–83 (D. Colo. 2025) (explaining that "the TVPRA's civil provision specifically uses the term[] 'offense'" to refer to the basis for civil claims (quoting *Hawkins*, 752 F. Supp. 3d at 134 n.16)). "Read naturally," then, section 1596's grant of extraterritorial jurisdiction over "*any*" listed offense tells us that it encompasses an offense "of whatever kind"—including when they are enforced civilly. *United States v. Gonzales*, 520 U.S. 1, 5 (1997).

**2.** Another "obvious textual clue" is that section 1595's cause of action directly and clearly incorporates every predicate violation of the TVPRA without limitation—offenses that are themselves extraterritorial. *RJR Nabisco*, 579 U.S. at 338. Section 1595 grants a right of action for any "violation of this chapter." 18 U.S.C. § 1595(a). These underlying violations "apply extraterritorially, either expressly or by way of other provisions delineating their extraterritorial application." *Howard*, 917 F.3d at 242. Some of these substantive provisions *only* apply extraterritorially, such

---

[4] For the sake of brevity, this brief will use "U.S. persons" to describe the U.S. nationals, permanent residents, and defendants present in the United States who are covered by section 1596's grant of extraterritorial jurisdiction.

as "the transportation of slaves from any foreign country or place to another." 18 U.S.C. § 1586. Others expressly include extraterritorial conduct "on any foreign shore" or "on the high seas." *Id.* § 1585. Section 1596 expressly grants courts extraterritorial jurisdiction over many other TVPRA provisions. *Id.* § 1596(a). And section 3271 similarly provides extraterritorial scope when federal government employees are involved. *Id.* § 3271(a).

Under *RJR Nabisco*'s framework, the fact that "§ 1595 *directly* incorporates predicate offenses that govern foreign conduct, provid[es] strong textual evidence of its extraterritorial effect when applied to those predicates." *Howard*, 917 F.3d at 241 (emphasis added). As with the criminal RICO provision "in *RJR Nabisco*, the 'most obvious textual clue' rebutting the presumption against extraterritoriality is that the statute includes 'a number of predicates that plainly apply to at least some foreign conduct.'" *A.A. v. Omnicom Grp., Inc.*, 2026 WL 504904, at *17 (S.D.N.Y. 2026) (quoting *RJR Nabisco*, 579 U.S. at 338); *see Jacobs*, 790 F. Supp. 3d at 1180–81 (same).

Indeed, the textual relationship between section 1595's civil cause of action and extraterritorial predicates is even more direct than the relationship between the criminal liability provision in RICO and its predicates. "'The extraterritoriality of the RICO criminal provisions was purely derivative'"—incorporating by reference crimes across the U.S. (and state) codes, some of which happened to apply extraterritorially. *Jacobs*, 790 F. Supp. 3d at 1182 (quoting *Hawkins*, 752 F. Supp. 3d at

132). The TVPRA, on the other hand, "'prohibits conduct at home and abroad *itself*, and not by reference to other statutes.'" *Id.* In doing so, "Congress has clearly indicated that it intends the TVPRA, unlike" statutes like RICO "that are silent on extraterritorial jurisdiction, to be a unified statutory scheme of interlocking provisions that provides extraterritorial jurisdiction over specific predicate offenses." *Id.* (quoting *Ratha*, 2016 WL 11020222, at *6).

And unlike the civil cause of action in RICO, section 1595's cause of action does not limit the kinds of violations for which it provides a remedy. Congress made clear that it intended RICO's civil cause of action to be considerably narrower in scope than the predicate violations by limiting the provision to violations that resulted in injuries to business or property—without giving any indication that it contemplated extraterritorial injuries. 18 U.S.C. § 1964(c). As this Court has explained, under *RJR Nabisco*, Congress's decision to add a non-extraterritorial limitation to the civil cause of action, not present in its criminal prohibitions, limited the "extraterritorial reach of RICO's private right of action as compared to its criminal provisions." *Motorola*, 108 F.4th at 483. Section 1595, however, applies without limitation to any violation of the TVPRA. As courts have explained, this ensures that "any violation of the human-trafficking chapter would give rise to civil liability." *Ratha*, 168 F.4th at 554. "That is, Congress intended *every* criminal act to have a civil-remedy counterpart." *Id.*

**3.** And that is far from the only relevant "foreign-oriented" language. *RJR Nabisco*, 579 U.S. at 352–53 n.12. As the Supreme Court explained in *RJR Nabisco*, a cause of action can indicate extraterritorial application when it explicitly authorizes suit by a category of people that includes victims abroad. *Id.* (citing *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 313 (1978)). Thus, for example, in *Pfizer*, the Court held that the Clayton Act's private right of action is extraterritorial because it grants the right to sue to a "person," and Congress used "person" in the Clayton Act to include foreign companies. *RJR Nabisco*, 579 U.S. at 352–53.

Similarly, the TVPRA authorizes "victim[s]" of trafficking to bring suit, 18 U.S.C. § 1595(a). And throughout the statute, the word "victim" is used to mean both domestic and foreign victims of both domestic and foreign trafficking. *See, e.g.*, Pub. L. No. 106-386, §§ 103(14), (24), 114 Stat. 1464, 1471; *id.* § 102(b)(20) ("[V]ictims of trafficking are frequently unfamiliar with the laws, cultures, and languages of *the countries* into which they have been trafficked." (emphasis added)); *id.* § 102(b)(17) ("[V]ictims are often illegal immigrants in the destination country."); 18 U.S.C. § 1583(b)(1) (using "victim" in context of offense that applies extraterritorially). And the legislation enacting section 1595's cause of action expressly "address[ed] the challenges that remained 'in responding to the needs of victims of trafficking in the United States *and abroad*.'" *Omnicom*, 2026 WL 504904, at *17 (quoting Trafficking

Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 2(2), 117 Stat. 2875, 2875 (emphasis added)).

The same goes as to the kinds of defendants who can be sued under section 1595. Section 1595 authorizes suit against the "perpetrator," 18 U.S.C. § 1595(a), which Congress also used to describe those involved in "international trafficking," Pub. L. No. 106-386, § 102(b)(24), 114 Stat 1464, 1469 (noting that because "[t]rafficking in persons is a transnational crime with national implications," the statute seeks "[t]o deter international trafficking and bring its perpetrators to justice").

In sum, the TVPRA's express grant of extraterritorial jurisdiction in section 1596, its direct incorporation of extraterritorial predicates in the private right of action provision, and that provision's foreign-oriented language show that Congress intended to extend extraterritorial jurisdiction over extraterritorial offenses, even when civilly enforced.

### C. Statutory context, history, and precedent confirm that Congress was not legislating with purely domestic concerns in mind.

Even if these clear textual indications were not enough, "the purpose, structure, history, and context of the TVPA[,] all support the extraterritorial application of § 1595 for an appropriate predicate offense." *Howard*, 917 F.3d at 242. In enacting and repeatedly strengthening the TVPRA, Congress made clear that it was not solely "legislat[ing] with domestic concerns in mind." *RJR Nabisco*, 579 U.S.

at 336. Instead, from top to bottom, the TVPRA shows that Congress was seeking to confront a *transnational* crisis of human trafficking. And Congress did so through an integrated statutory scheme that extends to U.S. persons involved in (and profiting from) forced labor and other trafficking violations, including those that take place overseas.

**1.** Start with the "[c]ongressionally enacted legislative purposes and findings." *Motorola*, 108 F.4th at 482. "[P]urpose clauses are enacted into law as part of the statute and they provide authoritative context for reading the entire statute." *Id.* (quoting William N. Eskridge, *Interpreting Law: A Primer on How to Read Statutes and the Constitution* 105–06 (2016)). And in *Motorola*, this Court "buttressed" its conclusion that the Defense of Trade Secrets Act's private right of action applies extraterritorially with "other references to extraterritorial conduct in the DTSA." 108 F.4th at 482. That included the statutorily enacted findings and statements of purpose, along with reporting requirements for the government about trade secret theft "outside of the United States." *Id. at* 483.

So too here. "The TVPA's stated purpose and accompanying congressional findings demonstrate that Congress enacted it to address the problem of human trafficking 'throughout the world.'" *Howard*, 917 F.3d at 242 (quoting Pub. L. No. 106-386, §§ 101–02, 114 Stat. 1464, 1466–69). Congress expressly identified "deter[ring] international trafficking" and combating "significant violations of labor, public

health, and human rights standards worldwide" as key goals. Pub. L. No. 106-386, § 102(b)(3), (24), 114 Stat 1464, 1466, 1469.

The TVPA also "contains numerous provisions authorizing funds and programs to support international efforts to address [this] global problem." *Howard*, 917 F.3d at 242; *see also, e.g.*, Pub. L. No. 106-386, § 107(a), 114 Stat 1464, 1474) (providing "assistance for victims in other countries"). Congress thus "expressly contemplated overseas endeavors," *Adhikari*, 845 F.3d at 201, to "address the global problem of human trafficking," *Omnicom*, 2026 WL 504904, at *17. And Congress also created reporting requirements focused on trafficking overseas. *See, e.g.*, Pub. L. No. 106-386, §§ 103(11), 105(d)(2)–(3), 114 Stat 1464, 1470, 1473–74 (setting up an "[i]nteragency task force to monitor and combat trafficking" that was tasked with "[m]easur[ing] and evaluat[ing] progress of the United States and other countries in the areas of trafficking prevention, protection, and assistance to victims of trafficking," as well as collecting "significant research and resource information on domestic and international trafficking").

Just as in *Motorola*, these provisions make "clear that Congress was concerned with actions taking place outside of the United States," helping to rebut the presumption against extraterritoriality. *Motorola*, 108 F.4th at 483. And because "Congress was clearly concerned with international rather than purely domestic matters," "unduly limiting" victims' ability to bring extraterritorial civil suits "risks

frustrating its animating purpose"—not to mention violating its textual command. *Howard*, 917 F.3d at 242.

**2.** Statutory history also strongly supports this conclusion. In 2008, Congress expanded the private right of action to ensure that "that *any*" offense "would give rise to civil liability." *Ratha*, 168 F.4th at 554. And at the same time, Congress enacted section 1596 to expressly grant courts extraterritorial jurisdiction over those offenses, including forced labor. Pub. L. No. 110-457, § 223, 122 Stat. 5044, 5071. This "detailed line-editing … indicates that Congress carefully" crafted the statute to ensure that its provisions—including the extraterritoriality provision and the private right of action—worked together as part of a unified scheme to deter and punish what it had recognized was a transnational scourge. *Motorola*, 108 F.4th at 485; *see also, e.g.*, *Howard*, 917 F.3d at 242 ("Viewed as a whole, the TVPA represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims.").

**3.** Given the text, history, and enacted purpose of the statute, it is little surprise that "[t]he overwhelming majority of courts to consider the issue agree" that section 1595 applies extraterritorially. *Omnicom*, 2026 WL 504904, at *17 (collecting cases). That includes the Fourth and Fifth Circuits, which are the only courts of appeals to have directly addressed this question to date. *See Howard*, 917 F.3d at 242; *Adhikari*, 845 F.3d at 204–05. But they are far from alone. *See, e.g.*, *Jacobs*, 790 F. Supp. 3d

at 1182–83; *Hawkins*, 752 F. Supp. 3d at 132; *C.T. v. Red Roof Inns, Inc.*, 2021 WL 602578, at *4 (S.D. Ohio 2021); *Abafita v. Aldukhan*, 2019 WL 6735148, at *5 (S.D.N.Y. 2019); *Aguilera v. Aegis Commc'ns Grp., LLC*, 72 F. Supp. 3d 975, 978–79 (W.D. Mo. 2014); *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 683 (S.D. Tex. 2009). This Court should join them.

### D. The district court's rejection of this strong textual and historical evidence cannot be squared with precedent from the Supreme Court or this Court.

The district court held otherwise because it disregarded the text, history, and codified purpose of the statute in favor of a reading of *RJR Nabisco* that this Court has already rejected.

**1.** According to the district court, under *RJR Nabisco*, "each section [of a statute] must rebut [the] presumption [of extraterritoriality] *on its own*," without regard to the rest of the statute. SA-17 (emphasis in original). The district court seemingly took this to mean that under *RJR Nabisco*, it "does not matter" that section 1595's civil cause of action directly and clearly incorporates extraterritorial predicates. SA-16–17.

This Court has already rejected that understanding of *RJR*. *Motorola*, 108 F.4th at 484 (explaining that this view "misreads *RJR Nabisco*, which determined the extraterritoriality of RICO's criminal provisions by considering a variety of other criminal statutes used as predicate offenses for RICO"). While *RJR Nabisco* did

explain that civil causes of action don't *automatically* extend as far as the underlying prohibited conduct, it did not require ignoring the "obvious textual clue" that a provision directly incorporates extraterritorial predicates. 579 U.S. at 338, 346–47.

Instead, as numerous courts have held, "*RJR Nabisco*'s treatment of RICO's private right of action 'depended on factors that do not apply to § 1595 of the TVPA.'" *Jacobs*, 790 F. Supp. 3d at 1182 (quoting *Howard*, 917 F.3d at 243). As explained above, RICO's civil cause of action "makes no reference to any extraterritorial provision whatsoever." *Howard*, 917 F.3d at 243. Instead, there is a daisy-chain of cross-references that give no indication Congress was legislating with foreign concerns in mind. The statute's civil cause of action, 18 U.S.C. § 1964(c), references the criminal liability provision, *id.* § 1962, which in turn requires a cross-reference to a definitions provision, *id.* § 1961, which in turn references dozens of crimes scattered throughout the U.S. Code and state law, *id*.

Not only that, but the scope of RICO's civil cause of action was significantly narrower than its criminal prohibitions: Only those "injured in [their] business or property" by an underlying violation of section 1962's criminal provision could bring a claim—an injury the statute gave no indication Congress contemplated being extraterritorial. 18 U.S.C. § 1964(c). It was in this context that the Supreme Court explained that the mere fact that a civil cause of action indirectly applied to provisions "govern[ing] conduct in foreign countries" was "not enough." *RJR*

*Nabisco*, 579 U.S. at 350. "Something more is needed," and in RICO there was nothing more. *Id.*

The TVPRA provides far more than this. Unlike RICO, which doesn't mention extraterritorial scope, the TVPRA's section 1596 grants extraterritorial jurisdiction over any listed TVPRA offense—without any limitation as to how those offenses are enforced. *See supra* 28–29. Section 1595's cause of action uses foreign-oriented language and applies clearly and directly to extraterritorial conduct. *See supra* 29–31. It also contains no limit on the underlying conduct for which it provides a remedy, and as this Court explained, this lack of "limiting language in the … private right of action …, which define[s] the remedies more broadly than RICO's private right of action," "distinguish[es] *RJR Nabisco*." *Motorola*, 108 F.4th at 483.

**2.** The district court held that although section 1596 grants extraterritorial jurisdiction over "any offense" under certain statutory provisions, it silently limits that grant to "any offense" under those provisions when criminally enforced. SA19–20. According to the district court, section 1596's use of the term "offense" indicates that the provision applies "only [to] criminal violations, not civil ones." SA-20. But as explained above, the TVPRA uses the word offense to refer to violations, both when criminally and civilly enforced. *See supra* 28–29 (noting that the civil cause of action provision uses the term offense to refer to civil enforcement).

In holding otherwise, the district court relied on a reading of the Supreme Court's decision in *Kellogg Brown & Root Services, Inc. v. United States ex rel. Carter*, 575 U.S. 650 (2015), that this Court has already rejected. *Kellogg Brown* stated that "while the term 'offense' is sometimes used" to refer to civil violations, it was not used for civil violations in Title 18 of the U.S. Code. *Id.* at 659. But, as this Court explained in *Motorola*, this "was a description of title 18" when *Kellogg Brown* was decided, "not a sweeping command that the word may never be used in title 18 to refer to a civil violation." *Motorola*, 108 F.4th at 485–86. And after *Kellogg Brown* was decided, Congress amended section 1595's civil cause of action to use the term "offense" explicitly to refer to civil violations. *See* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, § 120, 129 Stat 227, 247. The district court's statutory history, which only focused on Congress's use of "offense" in prior versions of the statute, omitted this key amendment. SA-20. But, as this Court has already explained, Congress's subsequent "use of the term 'offense' to encompass … civil violations" controls the meaning of the term in the statute, not the Court's statement in *Kellogg Brown* about the prior state of law. *Motorola*, 108 F.4th at 485–86.

The district court also concluded that because section 1596 does not explicitly "mention … Section 1595," the provision granting a private right of action, that private right of action must not be extraterritorial. SA-20. But as court after court has explained, that doesn't make sense. Section 1596 does not grant extraterritorial

jurisdiction over methods of enforcement. It grants extraterritorial jurisdiction over "'"offenses,'" regardless of how those offenses are enforced. *Omnicom*, 2026 WL 504904, at *17 (quoting *Hawkins*, 752 F. Supp. 3d at 133); *Ratha*, 2016 WL 11020222, at *6 ("[T]o hold that the jurisdictional grant of Section 1596 excludes the remedies provided in Section 1595 would be … illogical."); *Jacobs*, 790 F. Supp. 3d at 1181–82 (same).

Finally, the district court also asserted that a reference in another provision of section 1596 to "prosecution[s]" implicitly limits section 1596(a)'s unqualified grant of extraterritorial jurisdiction over offenses to offenses when criminally enforced. SA-19. Section 1596(b) limits prosecutions for extraterritorial conduct when a foreign prosecution is pending. 18 U.S.C. § 1596(b). That provision serves to avoid conflict with other pending prosecutions, but the fact that it doesn't expressly limit civil actions is not an indication that section 1596 only applies in criminal cases: The statute already had a similar limitation for civil causes of action, 18 U.S.C. § 1595(b), so there was no need to add another one in section 1596. And if Congress wanted to grant extraterritorial jurisdiction for criminal but not civil cases, it would not have explicitly granted jurisdiction over "*any* offense" under a range of TVPRA predicates then obliquely take it away. 18 U.S.C. § 1596(a) (emphasis added).

**3.** Even if the district court were right that "something more" is needed besides section 1595 and section 1596's clear indications of extraterritorial scope, SA-17, the TVPRA's congressionally enacted purpose and statutory history certainly provide it.

The district court, however, rejected this evidence—the very kind of additional evidence this Court and others have recognized demonstrates extraterritorial scope.

For the district court, "Congress's intent to broadly address human trafficking and forced labor does not mean the TVPA must be applied without regard to … the presumption against extraterritoriality." SA-18. But this misunderstands the role of such evidence. Statutorily enacted expressions of congressional purpose aren't about ignoring the presumption against extraterritoriality but satisfying its requirements—they help demonstrate that Congress was not legislating with solely domestic concerns in mind, just as in *Motorola.* 108 F.4th at 482.

The district court asserted that this "same argument … could be made about RICO, a statute enacted to combat the major problem of criminal racketeering and organized crime." SA-18. But the court identified no statutorily enacted expressions of congressional concern about *overseas* conduct in RICO like those present in both the DTSA in *Motorola* and the TVPRA here. *See, e.g.*, *Howard*, 917 F.3d at 243 ("[T]he TVPA more clearly targets foreign conduct than any provision of RICO, as demonstrated by its international scope and Congress's repeated expansions of its extraterritorial reach."). Indeed, unlike the TVPRA, RICO "does not refer to extraterritorial application." *RJR Nabisco*, 579 U.S. at 340.

On the district court's approach, it would seem that only an express statement of extraterritoriality in the civil cause of action would be sufficient—but that is exactly what is not required. *See Motorola*, 108 F.4th at 480.

**4.** The district court also relied on an implausible alternate account of the statute's history to conclude that Congress didn't intend section 1595's cause of action to be extraterritorial. On the district court's view, if Congress had intended extraterritoriality, it would have amended section 1595 after *RJR Nabisco* to expressly add "language regarding extraterritorial application of Section 1595." SA-18. The fact that it didn't, the court hypothesized, was "a deliberate decision that … Section 1595 applies only to domestic conduct." *Id.* But there was no need for Congress to include any additional express statement in section 1595's cause of action: Section 1596 of the statute already explicitly provided extraterritorial jurisdiction—without limitation as to how offenses are enforced. *See supra* 28–29. And section 1595 already contained numerous other clear indications of extraterritoriality that *RJR Nabisco* identified, including the direct incorporation of extraterritorial predicates and "foreign-oriented language." 579 U.S. at 338, 352–53 & n.12.

Not only that, but when Congress made other amendments to section 1595, every court of appeals and the overwhelming majority of district courts that reached the question had held that section 1595 applied extraterritorially. *See Howard,* 917 F.3d at 242 (2019); *Adhikari*, 845 F.3d at 204–05 (2017); *Red Roof Inns*, 2021 WL 602578, at *4

(2021); *Abafita*, 2019 WL 6735148, at *5 (2019); *Aguilera*, 72 F. Supp. 3d at 978–79 (2014); *Adhikari*, 697 F. Supp. 2d at 683 (2009). So if Congress had been considering *RJR Nabisco* and how courts would view extraterritoriality, it would not have concluded that *more* was needed to ensure extraterritorial application—instead, it would have been reassured that courts were already getting it right.

## II. This suit seeks only to hold Milwaukee Tool accountable for its domestic conduct as a beneficiary of forced labor.

Even if the TVPRA's extraterritorial scope could be atextually limited to criminal suits, however, this lawsuit could nevertheless proceed because Mr. Xu does not seek to apply the statute extraterritorially. A statutory claim is not extraterritorial where "conduct relevant to the statute's focus occurred in the United States." *Motorola*, 108 F.4th at 473. This does not require that *all* the conduct occur in the United States, just "conduct relevant to the statute's focus." *RJR Nabisco*, 579 U.S. at 337.

Here, Mr. Xu is bringing a claim against Milwaukee Tool under subsection 1589(b), which prohibits "knowingly benefit[ing], financially or by receiving anything of value, from participation in a venture which has engaged" in forced labor. 18 U.S.C. § 1589(b). The text, context, and statutory history of that provision all demonstrate that the provision's focus is on *benefiting* from participating in an enterprise engaged in forced labor. Milwaukee Tool benefited from forced labor in

the United States: It sold gloves—and profited from those sales—in the United States.

### A. Holding Milwaukee Tool accountable for benefiting from forced labor in the United States is a domestic application of the statute.

In determining the relevant statutory focus, the Supreme Court has held that courts must look to the specific provisions that form the basis of the plaintiff's claim—rather than attempting to determine a single focus for the statute as a whole. *WesternGeco*, 585 U.S. at 415. But they "do not analyze the provision at issue in a vacuum." *Id.* at 414. "If [a] statutory provision ... works in tandem with other provisions," such as when one provision creates a cause of action to enforce another provision, those provisions "must be assessed in concert." *Id.* Here, that means evaluating the focus of section 1595's cause of action in light of the underlying statutory violation of subsection 1589(b) for benefiting from participation in a forced-labor venture.

**1.** The Supreme Court's decision in *WesternGeco* illustrates the requisite analysis. The plaintiff, WesternGeco, sued a U.S. company for patent infringement for shipping components from the United States "to companies abroad" that used those components to create a product indistinguishable from WesternGeco's. *Id.* at 411. WesternGeco sought damages for lost foreign profits under the Patent Act's damages provision, which provides that "court[s] shall award the claimant damages

adequate to compensate for the infringement." 35 U.S.C. § 284. And the infringement in question was a violation of 35 U.S.C. § 271(f)(2), which prohibits patent infringement by supplying specialized components from the United States to other countries to be combined in an infringing manner. The court of appeals held that WesternGeco could not recover for lost foreign sales under subsection 271(f)(2), because the statute's "general infringement provision" in section 271(a) did not apply extraterritorially. *WesternGeco*, 585 U.S. at 412.

The Supreme Court reversed, holding that WesternGeco was seeking a domestic application of the statute. The Court reasoned in multiple steps.

*First*, it began with the remedies provision of the Patent Act, which was the basis for the damages WesternGeco sought. *Id.* at 414. This provision provides for "damages adequate to compensate for the infringement." 35 U.S.C. § 284. The Court explained that this provision serves "to afford patent owners complete compensation for infringements." *WesternGeco*, 585 U.S. at 408. The "focus" of that provision was, therefore, "the infringement." *Id.*

*Second*, because there were "several ways that a patent can be infringed," to "determin[e] how the statute has actually been applied," the Court needed to "look to the type of infringement that occurred." *Id.* at 414–15. The court of appeals had looked to the "general infringement provision," 35 U.S.C. § 271(a), which was focused on infringements within the United States. *WesternGeco*, 585 U.S. at 409. But

WesternGeco was suing under a different statutory provision aimed at a "different scenario[]": subsection 271(f)(2), which applied to U.S. conduct that was involved in creating and selling an infringing product overseas. *Id.* at 410, 415. Because that specific subsection "was the basis for WesternGeco's infringement claim and the lost-profits damages that it received," it was necessary to the determine the focus of subsection 271(f)(2) specifically. *Id.* at 415.

*Third*, the Court determined the focus of subsection 271(f)(2): "[t]he conduct that § 271(f)(2) regulates—*i.e.*, its focus—is the domestic act of 'suppl[ying] in or from the United States.'" *Id.* (quoting 35 U.S.C. § 271(f)(2)). Accordingly, "in a case involving infringement under § 271(f)(2)," the focus was "on the act of exporting components from the United States." *Id.*

*Finally*, the Court concluded, the conduct related to that focus—the shipping of the components—occurred in the United States. *Id.* at 415. As a result, even though WesternGeco was suing for damages incurred from lost foreign sales, the Court held that it sought a domestic application of the statute. *Id.* at 415–16.

Over the course of this analysis, the Court emphasized the importance of determining the focus of the specific provision that was the basis for the plaintiff's suit. Otherwise, "it would be impossible to accurately determine whether the application of the statute *in the case* is a domestic application." *Id.* at 414 (emphasis added). "And determining how the statute has actually been applied is the whole

point of the focus test." *Id.* Indeed, otherwise, courts would be stuck with the impossible task of trying to discern a singular "focus" of entire sections of statutes—or even whole statutes—with a range of different provisions regulating different forms of conduct. "[S]tatutes—more accurately, the persons who wrote and voted for the statutes—often have multiple purposes." *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 707 (7th Cir. 1994). It is hard to imagine how courts could navigate the speculative and amorphous effort of discerning a single statutory focus out of multi-provision statutes and complex legislative balancing acts. By focusing the analysis on specific provisions with specific elements that make out "the type of [violation] that occurred," *WesternGeco* avoids this. 585 U.S. at 415.

**2.** Applying *WesternGeco*, the analysis here is straightforward.

*First*, Mr. Xu brings suit under section 1595, the TVPRA's private right of action, which provides a remedy for "a violation of this chapter." 18 U.S.C. § 1595(a). Like the damages provision in *WesternGeco*, section 1595 is "merely the means by which the [TVPRA] achieves its end of remedying" violations of the statute. 585 U.S. at 416. So "[t]o determine the focus of [section 1595] in a given case, we must look to the type of [predicate violation] that occurred." *Id.* at 415.

*Second*, again like *WesternGeco*, there are "several ways" that the TVPRA can be violated. *Id.* at 415. Not only do different sections prohibit different forms of trafficking, but even section 1589's provision regarding forced labor offenses includes

different types of violations. 18 U.S.C. § 1589. Here, Milwaukee Tool violated subsection 1589(b), which applies to a defendant who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in" forced labor. 18 U.S.C. § 1589(b). Because subsection 1589(b) is "the basis for [Mr. Xu's] claim," a court must determine the focus of subsection 1589(b). *WesternGeco*, 585 U.S. at 415.

*Third*, as to subsection 1589(b)'s focus: "The conduct that § [1589(b)] regulates—*i.e.*, its focus," *WesternGeco*, 585 U.S. at 415, is "benefit[ing] … from participation in a venture which has engaged in" forced labor, 18 U.S.C. § 1589(b). "[B]enefits" is the operative verb that makes out a violation, *id.*; it is "the actus reus that is punishable by federal law," *United States v. Elbaz*, 52 F.4th 593, 603–05 (4th Cir. 2022). *See Rodriguez*, 29 F.4th at 716 ("financial benefit" is the "gravamen" of a suit under subsection 1589(b)). Other context provides further support for the conclusion that benefiting is the focus of subsection 1589(b). Congress enacted subsection 1589(b) in an amendment with the heading "Punishing Financial Gain from Trafficked Labor," further confirming that its focus was on the financial benefiting itself. Pub. L. No. 110-457, § 1583(b)(3), 122 Stat. 5044, 5068.

*Fourth*, given this focus, Mr. Xu has clearly alleged that "the conduct relevant to the statute's focus occurred in the United States," and therefore "the case involves a permissible domestic application even if other conduct occurred abroad." *RJR*

*Nabisco*, 579 U.S. at 337. Milwaukee Tool is a U.S. company headquartered in Wisconsin. App-14. Milwaukee Tool sold gloves, produced with forced labor, into its "largest market": "the United States." *Id.* By selling into this large, domestic market, Milwaukee Tool reaped the profits in the United States. App-37. It was therefore in the United States that Milwaukee Tool "benefit[ed][] financially" "from participation in a venture which has engaged in" forced labor. 18 U.S.C. § 1589(b).

Thus, under *WesternGeco*, this suit presents a domestic application of subsection 1589(b).

### B. The district court improperly ignored subsection 1589(b)'s focus.

The district court reached the opposite conclusion because it declined to examine the focus of the specific violation alleged: "benefit[ing] … from participation in a venture which has engaged in" forced labor, 18 U.S.C. § 1589(b). Instead, the district court only determined the focus of section 1589 generally, even though that section includes multiple different violations, and concluded that that this general section was focused on "forced labor." SA-24. That approach cannot be squared with *WesternGeco.*

**1.** The district court's concentration on section 1589 as a whole operated at too high of a level of generality. Section 1589 does not set out a single violation with specific elements—it has distinct provisions that "address[] different scenarios." *WesternGeco*, 585 U.S. at 410. Subsection (a) prohibits engaging in forced labor, such

as by "obtain[ing] the labor or services of a person … by means of force." 18 U.S.C. § 1589(a). The district court may be correct that focus of that subsection is obtaining forced labor. However, subsection (b) addresses the "different scenario[]" of a defendant that benefits from participation in a forced-labor venture. And under *WesternGeco*, because there are "several ways" that section 1589 can be violated, "[t]o determine the focus … in a given case, [courts] *must* look to the type of [violation] that occurred." 585 U.S. at 415 (emphasis added).

In declining to determine the specific focus of subsection 1589(b), the district court invoked the principle that statutory provisions should not be analyzed "in a vacuum." SA-24 (quoting *WesternGeco*, 585 U.S. at 414). But this language from *WesternGeco* was explaining that when a suit relies on two separate provisions "work[ing] in tandem"—such as a provision setting out a violation and a provision setting out a remedy for that violation—the two must be "assessed in concert." *WesternGeco*, 585 U.S. at 414. Here, the provisions that must be "assessed in concert" are the provision authorizing a civil remedy for violations of the statute, and the specific violation alleged, benefiting from forced labor.

In fact, the Supreme Court in *WesternGeco* reversed a decision that had taken the approach the district court took here: attempting to discern the purpose of a statutory section generally, rather than focusing on the specific provision violated. *WesternGeco*, 585 U.S. at 412, 414–15.

**2.** If anything, the other provisions of section 1589 only reinforce the conclusion that subsection 1589(b)'s focus is on the conduct of benefiting from participation in a venture engaged in forced labor. As noted, subsection (a) targets "the use of forced labor." SA-24. Congress subsequently added subsection 1589(b) to address a gap in the statute—the harm caused to American workers and American companies that don't use forced labor, and to ensure there would not be a market for products made with forced labor. Pub. L. No. 106-386, § 102(b)(12), 114 Stat. 1464, 1467 (explaining that "forced labor has an impact on the nationwide employment network and labor market"); *see also Rodriguez*, 29 F.4th at 716 n.5 (subsection 1589(b) "protects commercial entities that decline to benefit from forced labor and may be harmed by competition from products or services garnering implicit subsidies from forced labor").

In sum, the district court erred by failing to follow *WesternGeco*'s clear instruction that the focus analysis must look the specific type of violation that occurred. And applying that approach, Mr. Xu's suit under subsection 1589(b) for Milwaukee's Tool financial benefiting from its participation in a venture engaged in forced labor is a domestic application of the statute.

## CONCLUSION

The decision below should be reversed.

Respectfully submitted,

/s/ *Jennifer D. Bennett*
JENNIFER D. BENNETT
GUPTA WESSLER LLP
235 Montgomery Street
Suite 629
San Francisco, CA 94104
(415) 573-0336
*jennifer@guptawessler.com*

THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*thomas@guptawessler.com*

ADAM FARRA
TIMES WANG
FARRA & WANG PLLC
1543 Champa Street
Suite 400
Denver, CO 80202
(202) 505-5989

WILLIAM E. PARSONS
HAWKS QUINDEL, S.C.
409 E. Main Street
P.O. Box 2155
Madison, WI 53703
(608) 523-8478

April 24, 2026

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,316 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

April 24, 2026

*<u>/s/ Jennifer D. Bennett</u>*
JENNIFER D. BENNETT

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Seventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jennifer D. Bennett*
JENNIFER D. BENNETT

## CIRCUIT RULE 30(d) STATEMENT

This brief and appendix comply with Circuit Rule 30(d) because all materials required by Cir. R. 30(a) and (b) are included in the appendix.

*/s/ Jennifer D. Bennett*
JENNIFER D. BENNETT

**No. 25-3347**

# In the United States Court of Appeals for the Seventh Circuit

XU LUN, a pseudonym,
*Plaintiff-Appellant,*

v.

MILWAUKEE ELECTRIC TOOL CORPORATION,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Wisconsin
Case No. 2:24-cv-00803-BHL (The Hon. Brett H. Ludwig)

## PLAINTIFF-APPELLANT'S SHORT APPENDIX

THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

ADAM FARRA
TIMES WANG
FARRA & WANG PLLC
1543 Champa Street
Suite 400
Denver, CO 80202
(202) 505-5989

JENNIFER D. BENNETT
GUPTA WESSLER LLP
235 Montgomery Street
Suite 629
San Francisco, CA 94104
(415) 573-0336
*jennifer@guptawessler.com*

WILLIAM E. PARSONS
HAWKS QUINDEL, S.C.
409 E. Main Street
P.O. Box 2155
Madison, WI 53703
(608) 523-8478

April 24, 2026

*Counsel for Plaintiff-Appellant*

# INDEX OF SHORT APPENDIX


| ECF and Tab No. | Document | Page |
|---|---|---|
| 53 | Order granting defendant's motion to dismiss | SA-1 |
| 54 | Final judgment | SA-26 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

XU LUN,

Plaintiff,

v.

Case No. 24-cv-0803-bhl

MILWAUKEE ELECTRIC TOOL CORPORATION
and TECHTRONIC INDUSTRIES COMPANY LIMITED,

Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY**

---

Plaintiff Xu Lun, a Taiwanese national who is proceeding pseudonymously, claims officials in a Chinese prison unlawfully forced him to perform labor while he was imprisoned for his political activism. (ECF No. 28.) Invoking the civil enforcement provisions in the Trafficking Victims Protection Act (the TVPA), 18 U.S.C. §§1581–1597, Xu Lun seeks to hold Defendants Milwaukee Electric Tool Corporation (Milwaukee Tool) and Techtronic Industries Company Limited (Techtronic Industries) liable, claiming they illegally benefitted from their participation in a venture that used forced labor. (*Id.* ¶9.) Both Defendants have moved to dismiss. (ECF Nos. 29 & 31.) Techtronic Industries argues that it is not subject to personal jurisdiction in this Court. (ECF No. 32 at 13–24.) It also joins Milwaukee Tool in arguing that Xu Lun's factual allegations are insufficient to state a claim under the TVPA, and, even if his allegations were sufficient, the alleged conduct occurred in China and thus falls outside the TVPA's civil enforcement provisions. (*Id.* at 24–35; ECF No. 30.)

Because the Court must first confirm its jurisdiction, *see Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 967 n. 1 (7th Cir. 2013) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 (1998)), it will begin by addressing whether it has personal jurisdiction over Techtronic Industries. On that issue, the Court agrees that there are insufficient contacts between Techtronic Industries and this forum to permit personal jurisdiction here. Accordingly, Techtronic Industries' motion to dismiss will be granted on this ground. Turning to Milwaukee Tool, the Court agrees

that under the Supreme Court's teachings on extraterritoriality in *RJR Nabisco v. European Community*, 579 U.S. 325 (2016), the TVPA's criminal provisions apply extraterritorially, but its civil remedy does not. Accordingly, Milwaukee Tool's motion to dismiss will also be granted.

**BACKGROUND ALLEGATIONS**

Plaintiff Xu Lun is a Taiwanese activist who was imprisoned in Chishan Prison in China after being arrested for political activism. (ECF No. 28 ¶¶12, 36–38.) Defendant Milwaukee Tool is a power tool corporation headquartered in Wisconsin and a wholly owned subsidiary of Defendant Techtronic Industries. (*Id.* ¶20.) Techtronic Industries is a Hong Kong corporation that, among other things, contracts with Chinese manufacturers and engineers to obtain cheap goods to drive down costs for its subsidiaries. (*Id.* ¶¶13, 20–21.)

While imprisoned in China, Xu Lun and other prisoners were forced to manufacture gloves bearing the Milwaukee Tool logo. (*Id.* ¶¶37, 43.) The prisoners were subjected to long hours and poor conditions and received little to no compensation. (*Id.* ¶¶47–53.) Xu Lun regularly witnessed fellow inmates being threatened or punished if they refused to work, did not work hard enough, or did not meet their production quotas. (*Id.* ¶54.) Techtronic Trading Ltd. (Techtronic Trading), another wholly owned subsidiary of Techtronic Industries, exported the gloves made with forced labor to Milwaukee Tool for sale to consumers in the United States. (*Id.* ¶¶14, 46.)

**ANALYSIS**

**I. Techtronic Industries Is Not Subject to Personal Jurisdiction in this Court.**

Techtronic Industries moves to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Under Rule 12(b)(2), once a defendant asserts a lack of personal jurisdiction, the plaintiff bears the burden of establishing that the jurisdictional requirements are satisfied. *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (citing *Purdue Rsch. Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). At the motion to dismiss stage, a plaintiff need only make a *prima facie* showing of jurisdiction. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012) (citing *Purdue Rsch. Found.*, 338 F.3d at 782). The Court takes plaintiff's asserted facts as true, and any factual disputes must be resolved in the plaintiff's favor. *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423–24 (7th Cir. 2010).

Personal jurisdiction over a defendant in a particular forum can be established either generally or specifically. *See id.* at 425 ("Personal jurisdiction can be either general or specific, depending on the extent of the defendant's contacts with the forum state."). "In either case, the

ultimate constitutional standard is whether the defendant had 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In 1993, the Rules Committee added Federal Rule of Civil Procedure 4(k)(2) as another basis for personal jurisdiction. Under Rule 4(k)(2), a court may exercise personal jurisdiction over a foreign defendant that has sufficient contacts with the United States as a whole, but whose contacts are so scattered among the various states that no individual state would have a basis to assert jurisdiction. *See Abelesz v. OTP Bank*, 692 F.3d 638, 656 n.8 (7th Cir. 2012).

Citing the allegations of the amended complaint and well-established caselaw, Techtronic Industries argues that it is not subject to general or specific personal jurisdiction in this Court. (ECF No. 32 at 13–24.) In response, Xu Lun invokes Rule 4(k)(2) and argues that Techtronic Industries has sufficient minimum contacts with the United States as a whole to satisfy the requirements for personal jurisdiction. (ECF No. 41 at 46–58.) Because Techtronic Industries lacks sufficient contacts to subject itself to personal jurisdiction in this Court, whether analyzed on general or specific personal jurisdiction grounds or under Rule 4(k)(2), its motion to dismiss will be granted.

### A. Techtronic Industries Lacks Sufficient Contacts with Wisconsin to Support General or Specific Personal Jurisdiction.

Techtronic Industries insists that its contacts with Wisconsin are insufficient to support either general or specific personal jurisdiction in this Court. (ECF No. 32 at 13–24.) With respect to *general* jurisdiction, it points out that it is incorporated in and maintains its principal place of business in Hong Kong. (*Id.* at 14–15.) It acknowledges that it is related by corporate structure to Milwaukee Tool, a Wisconsin-based company, but insists the two entities are separately incorporated and legally distinct. (*Id.* at 16–21). It further argues that it is not subject to *specific* personal jurisdiction in this Court because it lacks sufficient minimum contacts with Wisconsin, and even the small number of contacts it has to the forum state are unrelated to this litigation. (*Id.* at 22–24.)

Xu Lun does not directly address the requirements for general or specific personal jurisdiction or Techtronic Industries' contacts with Wisconsin in his briefing. Instead, he invokes Rule 4(k)(2) and focuses his argument on Techtronic Industries' contacts with the United States as a whole. (*See* ECF No. 41 at 46–58.) By failing to address Techtronic Industries' general and

specific personal jurisdiction arguments, Xu Lun has waived any argument on these grounds and has effectively conceded that Techtronic Industries does not have sufficient minimum contacts with Wisconsin to support personal jurisdiction. *See Loc. 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 783 (7th Cir. 2007) (arguments not raised in response to a motion to dismiss are waived). Regardless, the record confirms that Techtronic Industries lacks contacts sufficient to support either general or specific jurisdiction in this Court.

General personal jurisdiction exists where the defendant's contacts with the forum state are "so continuous and systematic" as to render them "essentially at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Int'l Shoe*, 326 U.S. at 317). For an incorporated business entity like Techtronic Industries, general jurisdiction is appropriate in the state of the entity's incorporation and the location of its principal place of business, usually its headquarters. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *see also Goodyear*, 564 U.S. at 924. There is no dispute that Techtronic Industries is incorporated in and maintains its principal place of business is in Hong Kong. Techtronic Industries' only connection to Wisconsin appears to be its relationship to its subsidiary Milwaukee Tool. But "personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). The law requires allegations and evidence that the parent company exercises an "unusually high degree of control" over the subsidiary, or that the subsidiary's "corporate existence is simply a formality." *Abelesz*, 692 F.3d at 658–59 (quoting *Purdue Rsch. Found.*, 338 F.3d at 788 n. 17).

Xu Lun alleges in the amended complaint that Techtronic Industries has employees who manage supply chain for Milwaukee Tool, a Vice President of Purchasing for Milwaukee Tool, and employees with business cards bearing both company's logos. (ECF No. 28 ¶¶22–23, 26–28.) He further alleges that Milwaukee Tool accounts for 70% of Techtronic Industries' revenue, that the two companies have jointly asserted claims in other litigation, and that potential suppliers for Milwaukee Tool are routed to Techtronic Industries' website if based in Asia. (*Id.* ¶¶29; 84–89.) Even read liberally, none of these allegations support an inference that Techtronic Industries exercises an unusually high degree of control over its subsidiary. Accordingly, the Court agrees

with Techtronic Industries that there is no basis to assert general personal jurisdiction over Techtronic Industries here.

To establish specific personal jurisdiction, a plaintiff must show that its claims against the defendant "arise out of the defendant's constitutionally sufficient contacts with the state." *See uBID, Inc.*, 623 F.3d at 425. Unlike general personal jurisdiction, a finding of specific personal jurisdiction allows the suit to proceed only with respect to claims that are "sufficiently related" to the defendant's contacts with the forum state. *Id.* at 426. The Seventh Circuit has established a three-prong test for specific jurisdiction. *B.D. by & through Myers v. Samsung Sdi Co. (Samsung II),* 143 F.4th 757, 765 (7th Cir. 2025). First, the Court considers whether the defendant has purposefully availed itself of the privilege of conducting activities within the forum state. *Id.* (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Second, the plaintiff must establish an "adequate connection" between the defendant's activities in the forum state and the underlying lawsuit. *Id.* at 766. This relatedness inquiry requires that the suit "arise out of or relate to" the forum contacts. *Id.* (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017)). Third, and finally, specific personal jurisdiction "must accord with notions of fairness." *Id.*

Xu Lun has not identified any basis to conclude that Techtronic Industries has any contacts with Wisconsin, aside from his allegations regarding Techtronic Industries' relationship with its subsidiary Milwaukee Tool. It is unclear how the mere presence of a subsidiary could satisfy the purposeful availment requirement. As noted above, the jurisdictional contacts of a subsidiary are not, without more, inherently imputed to the parent company. *See Purdue Rsch. Found.*, 338 F.3d at 788 n.17 (citing *Reimer Express World*, 230 F.3d at 943–44). And even if Xu Lun could show that Techtronic Industries' relationship with Milwaukee Tool constituted purposeful availment, it is unclear how Xu Lun's claims could be considered to "arise out of or relate to" these contacts with the forum state. Techtronic Industries is thus also correct that Xu Lun has not alleged a basis to assert specific jurisdiction over it in Wisconsin.

### B. Xu Lun's Invocation of Rule 4(k)(2) Fails Because Techtronic Industries' Contacts with The United States Are Not Sufficiently Related to Xu Lun's Underlying TVPA Claim.

Xu Lun asserts that Techtronic Industries is subject to personal jurisdiction in this Court based on Techtronic Industries' overall contacts with the United States under Rule 4(k)(2). (*See* ECF No. 41 at 47–55.) As noted above, Rule 4(k)(2) allows the Court to exercise personal

jurisdiction over a defendant based on its contacts with the United States as a whole, as distinct from its contacts with the forum state. *See Abelesz*, 692 F.3d at 660. To establish jurisdiction under Rule 4(k)(2), a plaintiff must show that (1) his claim is based on federal law, (2) the defendant is not subject to personal jurisdiction in any other state, and (3) the exercise of jurisdiction is consistent with the laws of the United States and with the Constitution. *Reimer Express World*, 230 F.3d at 940. The rule does not eliminate the minimum contacts requirement. *See Abelesz*, 692 F.3d at 660. Rather, Rule 4(k)(2) "permits the aggregation of contacts nationwide for the unusual situation where a defendant's contacts with any given state are not extensive enough to support that state's exercise of personal jurisdiction, but there are sufficient minimum contacts with the nation as a whole." *Id.*

The first two requirements for invoking Rule 4(k)(2) are easily shown here. Xu Lun's sole claim arises under federal law (the TVPA). And Techtronic Industries has not identified a state where Xu Lun could pursue his claims. *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001), *as amended* (July 2, 2001) ("A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed."). As to the latter point, because Techtronic Industries contends that it cannot be sued in the forum state but has not identified any other state where suit is possible, the Court can deem the second requirement satisfied. *Id.* The dispositive question is therefore the third requirement: whether Techtronic Industries' contacts with the United States as a whole are constitutionally sufficient to support specific personal jurisdiction.

While Rule 4(k)(2) applies a broader geographic standard for which contacts are relevant, it does not relax the minimum contacts requirement. *Abelesz*, 692 F.3d at 660 ("[T]he *minimum* in the "minimum contacts" that are constitutionally sufficient to support general or specific jurisdiction is the same." (emphasis in original)). The Court thus applies the Seventh Circuit's three-prong test for specific jurisdiction, but instead of looking at Techtronic Industries' contacts with Wisconsin, it looks at its contacts with the United States as a whole. Accordingly, to carry his burden on the third Rule 4(k)(2) requirement, Xu Lun must make a *prima facie* showing that (1) Techtronic Industries purposefully availed itself of the privilege of conducting business in the United States, (2) his underlying TVPA claim arises out of or relates to Techtronic Industries' contacts with the United States, and (3) the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *See Samsung II*, 143 F.4th at 765–66.

Invoking the "stream of commerce" theory, Xu Lun asserts that Techtronic Industries has purposefully availed itself to the United States court system by supplying gloves made with forced labor to Milwaukee Tool for sale to American consumers. (ECF No. 41 at 48–50.) The Supreme Court first articulated the "stream of commerce" theory in *World-Wide Volkswagen Corp. v. Woodson*, explaining that a defendant "that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum" state has purposefully availed itself to the jurisdiction of the forum state. 444 U.S. 286, 297–98 (1980). The Seventh Circuit continues to recognize the stream of commerce theory and has confirmed that "a defendant purposefully avails itself of a forum if it 'is aware that the final product is being marketed in the forum[.]'" *Samsung II*, 143 F.4th at 767 (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 117 (1987) (Brennan, J., concurring in part and concurring in the judgment)).

Application of the stream of commerce theory here is tricky. The amended complaint alleges that one of Techtronic Industries' affiliates, Techtronic Trading, a mere "company on paper" without separate facilities or operations, exported work gloves to another Techtronic Industries' affiliate, Milwaukee Tool, in the United States. (ECF No. 28 ¶¶14–17, 19, 46.) Xu Lun also proffers customs data showing that Techtronic Trading shipped gloves from China to the United States for Milwaukee Tool between 2016 and 2019. (*See* ECF No. 41-2 at 2–65.) Accordingly, Xu Lun's allegations concerning Techtronic Industries' role in placing products into the stream of commerce are all indirect. For its part, Techtronic Industries insists that it is a separate entity from Techtronic Trading, but it does not meaningfully address Xu Lun's allegations that it exercises an usually high degree of control over its affiliate. For purposes of this motion, the Court will assume that Techtronic Trading's shipping of the gloves to the United States satisfies the purposeful availment requirement as to Techtronic Industries.

Xu Lun's specific jurisdiction arguments nevertheless fail because he has not shown that Techtronic Industries' contacts with the United States are related to this litigation. Xu Lun is adamant that Techtronic Industries' shipping of gloves made with forced labor to the United States is related to his underlying TVPA claim. (ECF No. 41 at 50.) He claims that Techtronic Industries violated the TVPA by benefiting from the sale of gloves made with forced labor. (*Id.*) According to Xu Lun, because those sales could not have occurred without Techtronic Industries shipping the

gloves to the United States, the contacts are sufficiently related to his underlying claim. (*Id.*) The Court disagrees.

The Seventh Circuit has emphasized that "[w]hether specific personal jurisdiction exists turns on 'the relationship among the defendant, the forum, and the litigation.'" *Samsung II*, 143 F.4th at 765 (quoting *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014)). Although "'a strict causal relationship' is not necessary," "the relatedness inquiry 'incorporates real limits' aimed at protecting foreign defendants from being haled into distant courts for claims only tangentially related to their forum contacts." *Id.* at 766 (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021)). This relatedness requirement is why "the stream of commerce theory is typically associated only with products liability suits." *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576 (7th Cir. 2020).

The Seventh Circuit's teaching in *J.S.T. Corp.* is instructive. In *J.S.T. Corp.*, an Illinois corporation sued its competitors for misappropriating trade secrets after proprietary design specifications for its 183-pin connectors (an electrical adapter used in manufacturing cars) were stolen by a third party and then sold to the defendants. *Id.* at 573–74. The defendants used the proprietary design specifications to make knockoff pin connectors and sold them at a reduced price to the third party, who went on to sell them to car manufacturers. *Id.* at 574. The defendants moved to dismiss for lack of personal jurisdiction, pointing out that their only connection to the forum was that the cars containing the knockoff pin connectors were sold in Illinois along with sales in other states, nationwide. *Id.* at 574–75. The Seventh Circuit rejected plaintiff's attempt to assert personal jurisdiction based on the stream of commerce theory, concluding that the sale of the knockoff pin connectors in the forum was not sufficiently related to the plaintiff's underlying trade secrets misappropriation claim. *Id.* at 576. The Court of Appeals noted that the stream of commerce theory typically applies only in products liability cases because in such cases, the sale to consumers in the forum is highly relevant to the relationship between the defendant, the forum, and the underlying claim. *Id.* (citing *Walden*, 571 U.S. at 283–84). It then explained that sales to consumers in the forum "will not have the same relevance to specific jurisdiction in every suit." *Id.* Because the misappropriation of trade secrets was not "intrinsically linked" to the consumer transactions in the forum, the stream of commerce theory did not support personal jurisdiction. *Id.* It further noted that any sales to Illinois consumers may have driven demand for the knockoff products but concluded that these consumers had "virtually nothing to do with" the defendants'

alleged misconduct. *Id.* at 578. Any damages to plaintiff's bottom line caused by downstream sales of the knockoff pin connectors were insufficiently related to the trade secrets claim. *Id.* at 577. Rather, the appropriate consideration was whether the defendant's *conduct* was connected with the forum. *Id.* (citing *Walden*, 571 U.S. at 285–86). Although courts look to the elements of the claim at issue, this should not be a "mechanical scan for anything that courts label an 'element.'" *Id.* at 577–78. Instead, courts must consider the elements to see what "light … they cast on 'the relationship between the defendant, the forum, and the litigation.'" *Id.* at 578 (quoting *Walden*, 571 U.S. at 283–84). Because the defendants did not acquire, disclose, or use the trade secrets in Illinois, and the unauthorized acquisition, disclosure, and use by the defendants would have occurred "long before" the product reached the consumers in the forum, any link between the sales in the forum and the misappropriation of trade secrets at issue was too attenuated to establish specific jurisdiction. *Id.* at 576–77.

The logic of *J.S.T. Corp.* requires the same outcome here. Xu Lun alleges that Techtronic Industries shipped gloves that were manufactured using forced labor to the United States for sale to American consumers. While Techtronic Industries' (or its affiliates') placing of the gloves into the stream of commerce would drive demand for the gloves, thus encouraging Techtronic Industries to continue buying gloves manufactured with forced labor, this is insufficient to support personal jurisdiction. As in *J.S.T. Corp.*, the consumers of those gloves have "virtually nothing to do with" Techtronic Industries' alleged misconduct, and it is that conduct that is central to the analysis. Like the defendants' conduct in *J.S.T. Corp.*, Techtronic Industries' placing of the gloves into the stream of commerce is not "intrinsically linked" to the underlying claim that the plaintiff is seeking to litigate. 965 F.3d at 576, 578. Just as none of the misappropriation at issue in *J.S.T. Corp.* occurred in Illinois, none of Techtronic Industries' alleged TVPA violations occurred in the United States. Moreover, the alleged forced labor happened "long before an offending product ever comes into contact with a consumer" in the United States. *Id.* at 577. The connection between Techtronic Industries' contacts with the United States and Xu Lun's claim is thus too attenuated to establish specific jurisdiction.

Xu Lun resists this conclusion, arguing that Techtronic Industries received a benefit from its participation in a venture that used forced labor, in violation of the TVPA, and because that benefit was realized in the United States, it is sufficiently related to his claim. (ECF No. 41 at 50, 55.) There are two problems with this argument. First, Xu Lun has not demonstrated that

Techtronic Industries realized a benefit from the sale of the gloves in the United States. It is undisputed that Techtronic Industries is incorporated in and based in Hong Kong. Xu Lun appears to be attributing the alleged benefit derived by Milwaukee Tool here in the United States to Techtronic Industries. But as discussed above, the jurisdictional contacts of a subsidiary are not, without more, inherently imputed to the parent company. *See Purdue Rsch. Found*, 338 F.3d at 788 n.17 (citing *Reimer Express World*, 230 F.3d at 943–44). And second, this argument is foreclosed by *J.S.T. Corp.* As the Seventh Circuit explained, the Court must the examine the elements of the underlying claim in the light that they cast on the relationship between the defendant, the forum, and the litigation. *J.S.T. Corp.*, 965 F.3d at 578 (citing *Walden*, 571 U.S. at 283–84). In that inquiry, the core focus is "always on the defendants' conduct[.]" *Id*. The amended complaint alleges that Techtronic Industries benefitted from forced labor performed by Xu Lun and other prisoners in China. Techtronic Industries' alleged conduct that forms the basis of Xu Lun's lawsuit is unrelated to its contacts with the United States.

Beyond the shipping of gloves, Xu Lun further asserts that Techtronic Industries has purposefully availed itself to the United States by purchasing Milwaukee Tool, having a Chief Executive Officer based in the United States, having a "Head Quarter office" in Florida and offices throughout the United States, having United States employees, and doing business in the United States. (ECF No. 41 at 49–50.) But Xu Lun fails to make any argument as to how these contacts are related to Xu Lun's underlying TVPA claim. The mere presence of a wholly owned subsidiary, offices, or employees in the United States, without any attempt to tie those facts to the allegations of forced labor in China, does not satisfy Xu Lun's burden as plaintiff of establishing that Techtronic Industries' contacts with the United States are sufficiently related to his lawsuit.

The Seventh Circuit has warned that courts must scrutinize the relationship between forum contacts and lawsuits to police the boundary between general and specific personal jurisdiction. *Samsung II*, 143 F.4th at 771 ("The looser the connection becomes, the more an exercise of specific personal jurisdiction will start to look like one of general personal jurisdiction. And at a certain point, the core distinction between the two will collapse altogether." (internal quotations omitted)). Xu Lun has not shown that Techtronic Industries' contacts with the United States are sufficiently related to his underlying claims to support specific personal jurisdiction under Rule 4(k)(2). Because the Court does not have personal jurisdiction over Techtronic Industries, the motion to dismiss for lack of personal jurisdiction will be granted.

### C. Xu Lun Is Not Entitled to Jurisdictional Discovery Because He Has Not Made a Colorable Showing of Personal Jurisdiction.

Xu Lun alternatively moves for leave to conduct jurisdictional discovery. (ECF No. 42.) Jurisdictional discovery is proper if the plaintiff establishes a "colorable" showing of personal jurisdiction. *B.D. by & through Myer v. Samsung SDI Co., Ltd. (Samsung I)*, 91 F.4th 856, 864 (7th Cir. 2024). The Court considers the entire record and must draw all inferences in favor of the plaintiff when considering whether to allow jurisdictional discovery. *See Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 878 (7th Cir. 2006). The Seventh Circuit has cautioned that "[f]oreign nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists." *Reimer Express World*, 230 F.3d at 946.

Xu Lun first argues that he has made a colorable showing of specific personal jurisdiction under Rule 4(k)(2), and requests discovery into Techtronic Industries' role in designing, manufacturing, shipping, and marketing the gloves for sale in the United States. (ECF No. 43 at 2–3.) He further argues that he has made a colorable showing of personal jurisdiction based on Techtronic Industries' relationship with Milwaukee Tool and seeks discovery on any agreements between them relevant to the manufacture, distribution, and sale of the gloves. (*Id.* at 2–4.) As discussed above, even taking Xu Lun's allegations as true, Techtronic Industries' shipping of the gloves into the United States is not sufficiently related to the underlying TVPA claim. No amount of discovery will change that.

Xu Lun further asserts that he has made a colorable showing that Techtronic Industries has a "Head Quarter office" in Florida, which could arguably be its principal place of business, which could subject it to general jurisdiction in this Court. (*Id.* at 4; ECF No. 41-23 at 8.) Xu Lun is mistaken. Were Techtronic Industries headquartered in Florida, it would be subject to general personal jurisdiction in the courts in Florida, not Wisconsin. If that were the case, Rule 4(k)(2) would not apply.

Finally, Xu Lun requests discovery into whether Techtronic Industries has an alter-ego relationship with Milwaukee Tool, sufficient to subject it to general personal jurisdiction in Wisconsin. (ECF No. 43 at 4–6.) This request will be denied because Xu Lun has not made a colorable showing that Techtronic Industries exercises an unusually high degree of control over Milwaukee Tool.

For these reasons, Xu Lun's motion for jurisdictional discovery will be denied. Moreover, the Court finds that allowing for jurisdictional discovery would be futile. As discussed below, the amended complaint fails to state a claim on which relief may be granted because the TVPA's civil remedy provisions do not apply extraterritorially to Xu Lun's allegations of forced labor in China. The Court will not subject Techtronic Industries to extensive discovery in order to determine whether personal jurisdiction exists for a claim that fails as a matter of law in any event.

## II. Xu Lun Has Not Established that the TVPA's Civil Remedy Applies Extraterritorially to Allegations of Forced Labor in China.

Xu Lun brings a single claim, alleging that Defendants violated 18 U.S.C. §1589. This section of the TVPA criminalizes the use of "forced labor." Xu Lun alleges that the conditions he experienced while being forced to work as a prisoner in China violate Section 1589 and that Defendants are liable to him in a civil lawsuit under 18 U.S.C. §1595 because they knowingly benefited from participation in a venture that used forced labor. Milwaukee Tool argues that Xu Lun's TVPA claim fails as a matter of law because Section 1595 does not extend a civil remedy to allegations of illegal conduct that takes place extraterritorially. It argues that because the alleged forced labor that Xu Lun describes occurred in China, not domestically, he cannot maintain a claim under Section 1595. (ECF No. 30 at 13–17).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. When deciding a Rule 12(b)(6) motion to dismiss, the Court must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Roberts v. City of Chi.*, 817 F.3d 561, 564 (7th Cir. 2016) (citing *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013)). A complaint will survive if it "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. The Supreme Court Has Emphasized that Federal Statutes Are Presumed Not to Apply Extraterritorially.

The Supreme Court has long recognized that federal law is presumed to apply only domestically, and that foreign conduct is generally governed by foreign law. *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007); *Morrison v. Nat. Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). Accordingly, courts must interpret federal laws to apply only to domestic conduct

"[a]bsent clearly expressed congressional intent to the contrary[.]" *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (citing *Morrison*, 561 U.S. at 255).

In *RJR Nabisco*, the Supreme Court addressed whether a group of foreign plaintiffs (members of the European Commission) could pursue civil claims for damages based on alleged violations of the Racketeer Influence and Corrupt Organizations Act (RICO), 18 U.S.C. §§1961–1968, that occurred outside the United States. *Id.* at 332–33. The district court dismissed the plaintiffs' complaint, concluding that RICO did not apply to extraterritorial conduct, but the Second Circuit reversed. *Id.* at 333–34. After granting certiorari, the Supreme Court reversed the Court of Appeals and reinstated the dismissal, concluding that RICO's civil cause of action did not reach foreign conduct. The Court highlighted the long history of the presumption against extraterritoriality and set out a two-step framework for determining whether a statute overcomes the presumption. *Id.* at 335–37. First, courts must determine "whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* at 337. If Congress clearly and affirmatively intended for the statute to have extraterritorial effect, the analysis is complete, subject only to any express limitations in the statutory text. *Id.* at 337–38. The second step applies only if the statute does not clearly indicate that Congress intended for its application outside the United States. In that circumstance, courts must look to the statute's "focus" to determine whether the case involves a permissible domestic application of the statute. *Id.* at 337.

The Court demonstrated how this two-step approach applies in the context of RICO, a federal statutory regime that includes both substantive criminal provisions and a separate civil remedy. With respect to RICO's criminal provisions, the Court explained that Subsections 1962(a), (b), and (c) identify a series of prohibited activities, and that Subsection 1962(d) makes it unlawful to conspire to commit any of these prohibited activities. *Id.* at 330. Each of these substantive prohibitions requires proof of a "pattern of racketeering activity," meaning the offender must have committed at least two underlying crimes included in an enumerated list in Section 1961(1)(A)–(G). *Id.* These enumerated crimes are often referred to as "predicate offenses" or "predicate acts" because they form the basis of the RICO offense. *See id.* at 329–30. The Court noted that although Section 1962 did not itself state that it applied to extraterritorial conduct, the statute defined "racketeering activity" to incorporate several underlying "predicate" offenses that "plainly apply to at least some foreign conduct." *Id.* at 338. The Court therefore concluded that RICO's criminal provisions overcame the presumption against extraterritoriality. *Id.* at 339

("Congress's incorporation of these (and other) extraterritorial predicates into RICO gives a clear, affirmative indication that §1962 applies to foreign racketeering activity—but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially."). The Court concluded that the plaintiffs' complaint properly alleged violations of RICO's substantive criminal prohibitions, even if they were extraterritorial, given that the predicate offenses underlying the RICO claims themselves applied extraterritorially. *Id.* at 344–45.

The Court's extraterritoriality analysis did not end there. It then repeated its application of the two-step extraterritoriality test to plaintiffs' invocation of RICO's *civil remedy provision*. The Court noted that Section 1964(c) provides a private civil cause of action allowing "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue in federal court and recover treble damages, costs, and attorney's fees. *Id.* at 346 (quoting 18 U.S.C. §1964(c)). It was this civil remedy provision that the plaintiffs invoked to recover for the defendants' alleged RICO violations. The Court was clear that its determination that RICO's criminal provisions applied to conduct outside the United States did *not* mean that the civil cause of action also necessarily applied extraterritorially. *Id.* As the Court explained, "[t]he creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion." *Id.* (quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 727 (2004)). Thus, irrespective of its conclusion that the presumption had been overcome with respect to RICO's substantive prohibitions, the Court concluded that courts must separately consider whether RICO's private right of action also overcame the presumption. *Id.* Considering the text of the provision, the Court concluded that "[n]othing in §1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." *Id.* at 349. The Court explained that "[i]t is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries. Something more is needed, and here it is absent." *Id.* at 350. Accordingly, the Court concluded that the plaintiffs' claims must be dismissed because they rested entirely on injuries suffered abroad.

### B. Under *RJR Nabisco*, the TVPA's Civil Remedy Does Not Apply Extraterritorially.

Congress enacted the TVPA in 2000 to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children [and] to ensure just

and effective punishment of traffickers, and to protect their victims." Pub. L. No. 106–386, §102, 114 Stat. 1466 (2000). As initially passed into law, the Act criminalized and provided increased penalties for various forms of human trafficking, such as sale into involuntary servitude (Section 1584), forced labor (Section 1589), forced labor trafficking (Section 1590), commercial sex trafficking (Section 1591), and unlawful concealment of the passport of another for the purpose of subjecting the person to involuntary servitude (Section 1592). Initially, the TVPA was exclusively a criminal statute and is thus found in Title 18 of the United States Code.

Three years later, Congress amended and reauthorized the TVPA through the "Trafficking Victims Protection *Reauthorization* Act of 2003." In the renewed legislation, Congress added, among other things, a civil remedy, Section 1595, which allowed victims to sue perpetrators for violations of some, but not all, of the TVPA's substantive criminal provisions. *See* Pub. L. No. 108–193, §4(a)(4)(A), 117 Stat. 2878 (2003). Under the 2003 Amendments, civil actions under Section 1595 were limited to violations of Sections 1589, 1590, and 1591. *Id.*

In 2008, Congress again amended the TVPA and again expanded its application in several significant ways. *See* Pub. L. No. 110–457, §§221–223, 122 Stat. 5067 (2008). Substantively, the 2008 amendments expanded the scope of Section 1589 to prohibit knowingly benefitting from "participation in a venture which has engaged in the providing or obtaining of labor or services" by any of the means described in Section 1589(a). *See* 18 U.S.C. §1589(b). Section 1595 was also amended. As revised, Section 1595 provides victims to sue perpetrators for violations of *any* of the TVPA's substantive criminal provisions (not just for violations of Sections 1589, 1590, or 1591). It also provides for civil liability against anyone who "knowingly benefits" from a violation of the TVPA. *See* 18 U.S.C. §1595(a).

The 2008 amendment also specifically addressed overseas application of the TVPA. Section 1596 is titled "Additional jurisdiction in certain trafficking offenses" and provides, in relevant part:

> In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if—
>
>> (1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or

(2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

18 U.S.C. §1596(a).

**1. Section 1596 Makes No Mention of Section 1595 or Extraterritorial Application of the TVPA's Civil Remedy.**

In support of his attempt to apply the TVPA to the conditions he faced in China, Xu Lun invokes Section 1596's grant of "extra-territorial jurisdiction" over violations of Section 1589 of the TVPA. *See* 18 U.S.C. §1596(a). According to Xu Lun, Section 1596 gives extraterritorial effect over any offense under Section 1589 so long as the offender is present in the United States. (ECF No. 41 at 57.)

The Court agrees that in enacting Section 1596, Congress clearly and affirmatively indicated that Section 1589 applies to conduct occurring outside the United States. Under this provision, if the offender is present in the United States or is either a national of the United States or an alien lawfully admitted for permanent residence, he or she can be prosecuted in the United States under Section 1589.

But, as the Supreme Court made clear in *RJR Nabisco*, the fact that the government can prosecute a *criminal violation* of the statute that takes place outside the country does not necessarily mean that a plaintiff can maintain a *civil claim* based on the same conduct. 579 U.S. at 346. Courts must "separately apply the presumption against extraterritoriality" to the civil cause of action itself, even if the presumption has already been overcome with respect to the underlying substantive provision. *Id.* While Congress has made clear that Section 1589—the underlying criminal offense that Xu Lun's claims are predicated on—applies extraterritorially, that is a different question than whether the TVPA's civil remedy provision in Section 1595(a) provides Xu Lun with a civil cause of action for Milwaukee Tool's alleged violations of Section 1589 in China. A private right of action does not reach abroad simply because the underlying substantive law governs conduct in foreign countries—something more is needed, and here, as it was in *RJR Nabisco*, it is absent.

Although the presumption against extraterritoriality has clearly been overcome with respect to the underlying substantive prohibitions on which Xu Lun bases his claims, Section 1595 itself does not overcome the presumption. Section 1595 provides that victims of violations of the TVPA may bring a civil action against the perpetrator (or those who knowingly benefit from the violation), but it says nothing regarding extraterritorial application. Section 1596(a) provides that

federal courts have "extraterritorial jurisdiction" over any "offense" under Sections 1581, 1583, 1584, 1589, 1590, or 1591 if certain conditions are met. There is no mention of Section 1595. Nor is there anything else in the statute suggesting Congress's intent to extend the TVPA's civil remedies to overseas conduct. Accordingly, as in *RJR Nabisco*, given the lack of "something more" to support extraterritoriality, the Court must conclude that Congress did not intend for the civil remedy in Section 1595 to apply to foreign conduct.

Xu Lun resists this conclusion. He first asserts that the TVPA is unlike RICO and thus *RJR Nabisco* is distinguishable. He notes that every substantive criminal provision of the TVPA applies extraterritorially, whereas the substantive provisions of RICO apply extraterritorially only to the extent that the predicate acts alleged in a particular case themselves apply extraterritorially. According to Xu Lun, because the TVPA clearly and directly incorporates only extraterritorial predicates, there is "something more" in the TVPA that RICO lacks. (ECF No. 41 at 19–23.) This misreads a central holding of *RJR Nabisco*. As the Supreme Court explained, a civil cause of action does not inherently apply extraterritorially simply because the underlying substantive provision on which the claim is based has overcome the presumption. It does not matter if every substantive criminal provision of the TVPA overcomes the presumption against extraterritoriality; the presumption applies to each section *on its own*, and each section must rebut that presumption *on its own*. As the Court explained, "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." *RJR Nabisco*, 579 U.S. at 346–347. Criminal prosecutions necessarily come with various safeguards (a higher burden of proof, prosecutorial discretion, etc.) that are absent in civil cases. If Congress considered the potential international friction from giving extraterritorial application to the various criminal provisions in the TVPA, it would have done so with these safeguards in mind. Under *RJR Nabisco*, this Court must presume that the TVPA's civil cause of action applies only to conduct occurring within the United States, absent clear, affirmative indication from Congress that Section 1595 applies extraterritorially.

**2. The TVPA's Stated Purpose Does Not Overcome the Presumption.**

Xu Lun next invokes the TVPA's stated purpose—to address the problem of human trafficking "throughout the word"—as proof that Section 1595 applies to conduct occurring outside the United States. But this misstates the relevant standard. Xu Lun's argument is also inconsistent with the Supreme Court's teaching in *RJR Nabisco*.

The question is not whether "'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court,' but whether Congress has affirmatively and unmistakably instructed that the statute will do so." *RJR Nabisco*, 579 U.S. at 335 (quoting *Morrison*, 561 U.S. at 261). Xu Lun is correct that courts must not "interpret federal statutes to negate their own stated purposes." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 482 (7th Cir. 2024) (quoting *King v. Burwell*, 576 U.S. 473, 493 (2015)). But Congress's intent to broadly address human trafficking and forced labor does not mean the TVPA must be applied without regard to its express limits or to established doctrines like the presumption against extraterritoriality. Indeed, the same argument Xu Lun makes here could be made about RICO, a statute enacted to combat the major problem of criminal racketeering and organized crime. As *RJR Nabisco* shows, Congress's desire to attack a problem by criminalizing conduct, even conduct in foreign nations, does not mean that a corollary civil remedy must also apply to foreign conduct.

Courts must first apply the traditional tools of statutory construction to arrive at the best reading of a statute; only then may courts consider "express textual evidence of congressional purpose elsewhere in the statute to double-check their work, while keeping in mind that 'no legislation pursues its purposes at all costs.'" *Motorola Sols.,* 208 F.4th at 482 (quoting *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987)). As explained above, Section 1595 fails to overcome the presumption by itself, and Section 1596 is silent as to Section 1595's extraterritorial application. This indicates that Section 1595 does not apply extraterritorially, and the legislative history supports this conclusion. Since *RJR Nabisco*, Congress has twice amended Section 1595—once in 2018 and again in 2023. *See* Pub. L. No. 115-164 §§4, 6, 132 Stat. 1253 (2018); Pub. L. No. 117-347 §102, 136 Stat. 6199 (2023). Despite this, Congress did not add any language regarding extraterritorial application of Section 1595. *See, e.g., Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (courts presume that, when Congress enacts statutes, it is aware of relevant judicial precedent). Nor has Congress amended Section 1596 since its enactment in 2008 to give extraterritorial effect to Section 1595. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally."). Congress's inaction appears to be a deliberate decision that while Section 1589 applies to extraterritorial conduct, thus allowing criminal prosecutions for misconduct abroad so long as the requirements of Section 1596 are met, Section 1595 applies only to domestic conduct.

### 3. The Text of Section 1596 Indicates that the "Extra-territorial Jurisdiction" Applies Only to the TVPA's Substantive Criminal Prohibitions.

The Court further notes that text of Section 1596 itself strongly suggests Congress's intention to limit Section 1596's extraterritorial application to criminal prosecutions. Section 1596(b) provides that "[n]o prosecution may be commenced against a person ***under this section*** if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct constituting such offense." (emphasis added). Congress's use of the phrase "under this section" indicates that the extraterritorial application of the TVPA is limited to criminal prosecutions for violations of the TVPA. Other language supports this construction. Section 1596(a) provides that "the courts of the United States have extra-territorial jurisdiction over any ***offense*** (or any attempt or conspiracy to commit an ***offense***) under section 1581, 1583, 1584, 1589, 1590, or 1591[.]" (emphasis added). The use of the word "offense" generally denotes a criminal violation.

To avoid this latter point, Xu Lun asserts that the Seventh Circuit rejected a similar argument in *Motorola Solutions*. He argues that, under *Motorola Solutions*, the word "offense" in the TVPA must be construed to encompass both criminal and civil offenses and, thus, Section 1596 should be read to encompass violations of Section 1589 both criminally prosecuted and civilly pursued via Section 1595. (ECF No. 41 at 21–22.) But Xu Luns misreads *Motorola Solutions*.

*Motorola Solutions* involved the civil remedy provision of the Defend Trade Secrets Act (DTSA) and its extraterritorial application. Like the TVPA, the DTSA primarily provides for criminal liability while also creating a private right of action for violations. *See* 18 U.S.C. §§1832, 1836(b)). The DTSA provision extending its applicability to conduct occurring outside the United States, 18 U.S.C. §1837, is substantially different than Section 1596 of the TVPA. Section 1837 is titled "Applicability to conduct outside the United States" and provides broadly that "[t]his *chapter* . . . applies to conduct occurring outside the United States" if the offender is a United States citizen, permanent resident, or an organization organized under the laws of the United States or a State, or an act in furtherance of the offense was committed in the United States." (emphasis added.) The Seventh Circuit concluded that Congress's use of the words "[t]his chapter," indicates that all of the DTSA—including the civil remedy provision—applied extraterritorially so long as the requirements of Section 1837 were met. *Motorola Sols.,* 208 F.4th at 482. While the

defendants argued that Section 1837's grant of extraterritorial application applied only to the criminal violations of the DTSA, because the word "offense" is used for criminal violations only, the Seventh Circuit rejected this argument, explaining that, in the context of the DTSA, "offense" encompasses both criminal and civil violations. *Id.* at 485. The defendants' argument relied upon the Supreme Court's decision in *Kellogg Brown & Root Services Inc. v. United States ex rel. Carter*, 575 U.S. 650, 659 (2015), which held that, while "offense" can denote a civil violation, as of 2015, the term "offense" within Title 18 had only been used to denote criminal violations. The Seventh Circuit noted that the defendants' argument "would have been persuasive" if the DTSA had not been passed in 2016, after *Kellogg Brown* was decided. *Motorola Sols.,* 108 F.4th at 485. Thus, Congress in 2016 was aware that "offense" could include civil violations, and other textual evidence indicated that Congress's use of the term "offense" in the DTSA was meant to encompass both civil and criminal violations. *Id.*

If anything, *Motorola Solutions* further demonstrates that Section 1595 does not apply extraterritorially. Unlike Section 1837 of the DTSA, which clearly and affirmatively states that "[t]his chapter" applies to conduct occurring outside the United States where certain conditions are met, Section 1596 applies only to certain, enumerated sections of the TVPA, and makes no mention of the civil remedy available via Section 1595. Moreover, Section 1596 was last amended in 2008. The use of "offense" in 2008—before the Supreme Court decided *Kellogg Brown*—must be interpreted to encompass only criminal violations, not civil ones. 575 U.S. at 659; *see also Motorola Sols.,* 108 F.4th at 485.

**4. The Out-Of-Circuit Decisions Xu Lun Relies Upon Are Inconsistent with the Supreme Court's Instructions in *RJR Nabisco*.**

Xu Lun cites two out-of-circuit decisions, *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019) and *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017), which he asserts hold that Section 1595 applies to foreign conduct. (ECF No. 41 at 20.) Neither case is binding on this Court, and both are difficult to square with the Supreme Court's teaching in *RJR Nabisco*.

In *Howard*, a plaintiff sued under Section 1595, alleging that the defendants (both State Department employees stationed at United States Embassy in Yemen) violated multiple provisions of the TVPA, including its prohibitions on forced labor and commercial sex trafficking, while she worked as their live-in housekeeper. 917 F.3d at 233–35. The defendants argued that the plaintiff impermissibly sought to apply the TVPA's civil remedy extraterritorially because the violations

alleged occurred abroad. The Fourth Circuit disagreed, holding that the plaintiff's suit was not barred by the presumption against extraterritoriality. *Id.* at 241. In reaching this result, the Fourth Circuit concluded that Section 1595 evinces a "clear indication of extraterritorial effect," because it "directly incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates." *Id.* (citing *RJR Nabisco*, 579 U.S. at 339–40). The Fourth Circuit noted that "[l]ike §1962, the TVPA's civil remedy provision directly incorporates a set of predicate offenses 'that plainly apply to at least some foreign conduct.'" *Id*. at 242 (quoting *RJR Nabisco*, 579 U.S. at 338). But, contrary to the teaching in *RJR Nabisco*, the Fourth Circuit concluded that the TVPA's civil remedy provisions apply extraterritorially based on the evidence that Congress intended the TVPA's criminal provisions to apply to conduct outside the United States. The Court's analysis failed to account for the Supreme Court's clear instruction that a civil cause of action does not inherently apply extraterritoriality merely because the predicate violation applies extraterritoriality. *See RJR Nabisco*, 579 U.S. at 350 ("It is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries."). The Fourth Circuit applied the Supreme Court's reasoning in concluding that RICO's *substantive criminal prohibitions* applied extraterritorially—because the statute's predicate criminal offenses apply extraterritorially—to the TVPA's *civil remedy*. This misses a key step in the Supreme Court's analysis.

*Adhikari* is similarly unpersuasive. The plaintiffs in *Adhikari* were the families of twelve Nepali men who were allegedly trafficked by defendant corporations to perform work on a United States military base in Iraq in 2004. 845 F.3d at 190–91. The defendants argued that the plaintiffs could not pursue their TVPA claims because the alleged conduct occurred abroad in 2004, prior to Congress's enactment of Section 1596. *See id.* at 201–02. The Fifth Circuit's analysis focused on whether Section 1596's grant of "extra-territorial jurisdiction" applied retroactively to the defendants' conduct. *See id.* at 202–06 (concluding that the presumption against retroactivity prohibits applying Section 1596 to a civil claim under Section 1595 for pre-enactment conduct). While Xu Lun is correct that the Fifth Circuit assumed, in dicta, that Section 1596 "enables federal courts to entertain a private party's civil suit that alleges extraterritorial violations of the TVPA," neither party disputed that conclusion. *Id.* at 200. Thus, the Fifth Circuit's analysis does not include any substantive discussion of Section 1595's extraterritorial application.

The Court finds the analysis in *Doe I v. Apple Inc.*, No. 1:19-CV-03737 (CJN), 2021 WL 5774224 (D.D.C. Nov. 2, 2021), to be more persuasive. The plaintiffs in *Apple* were sixteen former child laborers who were forced to work mining cobalt in the Democratic Republic of Congo. *Id.* at *1. The plaintiffs claimed that the defendant tech companies were liable under the TVPA for knowingly benefitting from participation in a venture that used forced and trafficked labor. Although the district court dismissed the complaint for lack of standing, it went on to conclude that Section 1595 does not apply to extraterritorial conduct. The *Apple* plaintiffs contended that, because they sought civil relief through Section 1595 for violations of Section 1589, the text of Section 1596 allows for extraterritorial application of their TVPA claims. *Id.* at *14. The district court rejected this argument. It first noted that 1596 does not mention the TVPA's civil remedy, despite explicitly granting extraterritorial application to many of the criminal provisions. *Id.* at *15. The district court further noted that, Section 1596's repeated use of the word "offense" suggests that it was focused on criminal, not civil, applications. *Id.* This Court agrees with the *Apple* court's conclusion that Congress's omission of Section 1595 from Section 1596(a) "was not mistaken, but was an intentional decision not to extend extraterritorially the reach of the statute's civil component." *Id.* at *16; *see also Mia v. Kimberly-Clark Corp.*, No. 1:22-CV-02353 (CJN), 2025 WL 752564 at *6–8 (D.D.C. Mar. 10, 2025) (applying *Apple* and rejecting the Fourth Circuit's analysis in *Howard*); *Pavlovich v. Gaiman*, No. 25-CV-78-JDP, 2025 WL 2819372, at *7–8 (W.D. Wis. Oct. 3, 2025) (rejecting the Fourth Circuit's analysis in *Howard* and noting that the TVPA's civil remedy contains no clear indication of an extraterritorial application).

**C. The Amended Complaint Does Not Allege a Domestic Violation of the TVPA.**

Because there is no clear, affirmative indication from Congress that Section 1595 applies to extraterritorial conduct, the Court must proceed to step two of the *RJR Nabisco* analysis and determine whether Xu Lun's allegations involve a permissible, domestic application of the TVPA. *See RJR Nabisco*, 579 U.S. at 337. Milwaukee Tool argues that the amended complaint must be dismissed because the alleged TVPA violation occurred in China. (ECF No. 30 at 11–12.) It contends that the focus of Section 1595 falls where the underlying forced labor, giving rise to the alleged injury, occurred. (*Id.* at 12.) Xu Lun disagrees, asserting that he permissibly alleges domestic conduct, as Milwaukee Tool benefitted from its participation in a venture that used forced

labor, in violation of Section 1589(b), and that benefit was incurred here in the United States. (ECF No. 41 at 25.)

To "determine whether the case involves a domestic application of the statute" the Court looks to the statute's "focus." *RJR Nabisco*, 579 U.S. at 337. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad[.]" *Id.* But if the conduct relevant to the focus occurred outside the United States, "then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* In determining a statute's focus, the Court first considers the relevant statutory provision. *See WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 414 (2018). Based on the statutory provision, the Court will then determine what conduct is being regulated and what interests are being protected or vindicated. *See Morrison*, 561 U.S. at 267. Statutory provisions must not be analyzed in a vacuum: if the provision works in tandem with others, all provisions must be considered to determine the statute's focus. *WesternGeco*, 585 U.S. at 414. After determining what the "focus" is, the Court considers the conduct alleged to have violated the provision. *Morrison*, 561 U.S. at 266. If the conduct relevant to the "focus" of the provision occurred in the United States, then the statute is being applied domestically. *WesternGeco*, 585 U.S. at 413. "The focus of a statute is 'the object[t] of [its] solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protec[t]' or vindicate." *Id.* at 413–14 (quoting *Morrison*, 561 U.S. at 267).

In *WesternGeco*, the Supreme Court considered the "focus" of the general damages remedy of the Patent Act, which provides that "the court shall award the claimant damages adequate to compensate for the infringement." *Id.* at 414 (quoting 35 U.S.C. §284). The Court reasoned that "the overriding purpose of §284 is to afford patent owners complete compensation for infringements," and "[t]he question posed by the statute is how much has the Patent Holder suffered by the infringement." *Id.* at 414–15 (internal citations omitted). Thus, the Court concluded, the act of the infringement is "plainly the focus of §284." *Id.* at 415. Because the Patent Act identifies several ways that a patent can be infringed, the Court explained that it must look to the type of infringement that occurred. The plaintiff's infringement claim was based on the defendant's alleged violation of Section 271(f)(2), which provides that a company is "liable as an infringer" if it "supplies" certain components of a patented invention "in or from the United

States" with the intent that they "will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States." *Id.* (quoting 35 U.S.C. §271(f)(2)). The Court explained that "the focus of §284, in a case involving infringement under §271(f)(2), is on the act of exporting components from the United States." *Id.* Considering this, the Court concluded that domestic infringement is "the object of the statute's solicitude" in that context. *Id.* (quoting *Morrison*, 561 U.S. at 267). Thus, the plaintiff's claims involved a permissible, domestic application of Section 284 of the Patent Act. *Id.* at 417.

Applying *WesternGeco*, the Court concludes that Xu Lun's claims do not involve a permissible, domestic application of the TVPA. Section 1595 provides a civil remedy allowing victims to sue perpetrators for violations of the TVPA, through which Xu Lun seeks to hold Milwaukee Tool liable for its alleged violations of Section 1589. Accordingly, the Court must look to both Section 1595, the cause of action, and Section 1589, the type of violation that occurred, to determine the "focus" of Section 1595. Section 1589(a) prohibits knowingly providing or obtaining forced labor, while Section 1589(b) prohibits knowingly benefitting from participation in a venture that has provided or obtained forced labor. It is clear from the text of Section 1589 that the underlying "focus" of the provision is to prohibit the use of forced labor. And it is undisputed that Xu Lun's allegations of forced labor occurred in China. Thus, in this context, the focus of Section 1595 is conduct occurring outside the United States.

Xu Lun argues that Section 1589 does not have one focus but two, depending on the violation, and that the violation itself must be construed as the focus. (*See* ECF No. 41 at 26–28.) He maintains that this is a domestic application of the statute, because he is suing for Milwaukee Tool's benefit from the use of forced labor, and that any benefit incurred by Milwaukee Tool was incurred here in Wisconsin. (*Id.* at 28–29.) But the Court cannot individually analyze the subsections of Section 1589 "in a vacuum." *See WesternGeco*, 585 U.S. at 414. Here, the logical conclusion is that the focus of a claim for a violation of Section 1589 is where the forced labor occurred. The amended complaint alleges that Xu Lun was subjected to forced labor in China only. Xu Lun's claims against Milwaukee Tool do not involve a permissible, domestic application of the TVPA, and therefore must be dismissed.

## CONCLUSION

The Court will grant the Defendants' motions and dismiss the amended complaint. Xu Lun's claims against Techtronic Industries fail because the Court does not have personal jurisdiction over it. Techtronic Industries is a foreign corporation not subject to general personal jurisdiction in this Court, and the litigation does not relate to any of Techtronic Industries' contacts with the United States. The claims against Milwaukee Tool must also be dismissed because Xu Lun impermissibly seeks to apply Section 1595 of the TVPA to conduct occurring abroad. Congress has not given clear, affirmative indication that Section 1595 applies extraterritorially, and Xu Lun alleges the that the forced labor occurred in China.

Accordingly,

**IT IS HEREBY ORDERED** that Techtronic Industries Company Limited's Motion to Dismiss, ECF No. 31, is **GRANTED**. Xu Lun's claims against Techtronic Industries are **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction.

**IT IS FURTHER ORDERED** that Xu Lun's Motion to Conduct Jurisdictional Discovery, ECF No. 42, is **DENIED**.

**IT IS FURTHER ORDERED** that Milwaukee Tool's Motion to Dismiss, ECF No. 29, is **GRANTED**. Xu Lun's claims against Milwaukee Tool are **DISMISSED WITH PREJUDICE** for failure to state a claim.

**IT IS FURTHER ORDERED** that the case is **DISMISSED**. The Clerk of Court is instructed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on December 1, 2025.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

XU LUN,

Plaintiff,

**JUDGMENT IN A CIVIL CASE**

v.

Case No. 24-cv-0803-bhl

MILWAUKEE ELECTRIC TOOL CORPORATION
and TECHTRONIC INDUSTRIES COMPANY LIMITED,

Defendants.

☐ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict

☒ **Decision by Court.** This action came before the Court for consideration. The Court has decided the issues and rendered a decision.

**IT IS HEREBY ORDERED AND ADJUDGED** that the Techtronic Industries Company Limited's Motion to Dismiss, ECF No. 31, is granted and Xu Lun's claims against Techtronic Industries are dismissed without prejudice for lack of personal jurisdiction; Milwaukee Tool's Motion to Dismiss, ECF No. 29, is granted and Xu Lun's claims against Milwaukee Tool are dismissed with prejudice for failure to state a claim; Xu Lun's Motion to Conduct Jurisdictional Discovery, ECF No. 42, is denied.

Dated at Milwaukee, Wisconsin on December 1, 2025.

LINDA M. KLEMM
Clerk of Court

s/ *Julie D.*
(By) Deputy Clerk