No. 25-3347

# United States Court of Appeals for the Seventh Circuit

XU LUN,

*Plaintiff–Appellant,*

v.

MILWAUKEE ELECTRIC TOOL CORPORATION,

*Defendant–Appellee.*

Appeal from the United States District Court
Eastern District of Wisconsin (No. 1:24-cv-0803-BHL)

## BRIEF FOR FORMER UNITED STATES AMBASSADORS-AT-LARGE TO MONITOR AND COMBAT TRAFFICKING IN PERSONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF–APPELLANT

Geoffrey P. Eaton
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street NW, Suite 835
Washington, DC 20036
202-629-3530
geoff.eaton@sparacinopllc.com
eli.kay-oliphant @sparacinopllc.com

*Attorneys for Amici Curiae*

i

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3347

Short Caption: Xu Lun v. Milwaukee Electric Tool Corporation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   Former Ambassadors-at-Large to Monitor and Combat Trafficking in Persons Luis C.deBaca, Cynthia Dyer, and

   John Cotton Richmond

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   Sparacino PLLC

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

---

Attorney's Signature: /s/ Eli J. Kay-Oliphant     Date: 05/01/2026

Attorney's Printed Name: Eli J. Kay-Oliphant

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address: 1920 L Street NW, Suite 835

   Washington, DC 20036

Phone Number: 202-629-3530     Fax Number:

E-Mail Address: eli.kay-oliphant@sparacinopllc.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................iv

INTERESTS OF *AMICI* .......................................................................1

CERTIFICATE OF AUTHORSHIP ........................................................6

SUMMARY OF ARGUMENT .................................................................6

ARGUMENT ...........................................................................................8

I.  From Its Inception, Congress Designed the TVPA as an Instrument to Address a Global Crisis, Not Merely a Domestic One. ..............................................................................8

   A. The hearings leading to the TVPA's enactment focused overwhelmingly on transnational trafficking. ...............................9

   B. The TVPA was enacted as the domestic implementation of an international treaty commitment. ...............................................13

II. Congress Intended the Civil Remedy to Reach Extraterritorial Trafficking, and Each Successive Amendment Confirmed that Intent. ..........................................................16

   A. The background of successive amendments reflects Congress's consistent understanding that the TVPA addressed a global problem. ...................................................................17

   B. The text of § 1596 reflects Congress's understanding that the post-2008 statute reaches extraterritorial conduct. ......................18

   C. Congress's omission of § 1595 from § 1596 reflects statutory structure, not domestic intent. ..................................................19

III. Congress Reauthorized § 1595 Knowing Full Well that Courts Were Applying It Extraterritorially. ............................................21

   A. Following the 2008 amendments, courts consistently applied § 1595 extraterritorially, and Congress repeatedly reauthorized the statute without correction. ..............................22

   B. The district court's contrary inference rests on a far more attenuated chain of reasoning. ...................................................26

IV.    At a Minimum, § 1595 Applies to Defendants in the United States Who Knowingly Benefit from Trafficking Occurring Abroad. .................................................................................... 29

   A.    The beneficiary provision was specifically designed to hold domestic economic beneficiaries of foreign trafficking accountable. ....................................................................... 30

   B.    The district court's construction is irreconcilable with congressional intent. ............................................................. 32

   C.    Congress's response to judicial narrowing of § 1595 confirms it regards the civil remedy's scope as settled legislative intent. ....... 34

CONCLUSION ............................................................................. 36

CERTIFICATE OF COMPLIANCE ..................................................... 38

# TABLE OF AUTHORITIES

## Cases

*A.A. v. Omnicom Grp., Inc.*,
2026 WL 504904 (S.D.N.Y. Feb. 24, 2026) ..........................................28

*Abafita v. Aldukhan*,
2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019) ..........................................28

*Adhikari v. KBR Inc.*,
2017 WL 4237923 (S.D. Tex. Sept. 25, 2017) ......................................27

*Adhikari v. Kellogg Brown & Root, Inc.*,
845 F.3d 184 (5th Cir. 2017) ...............................................22, 27

*Aguilera v. Aegis Commc'ns Grp., LLC*,
72 F. Supp. 3d 975 (W.D. Mo. 2014) ...............................................27

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ...............................................25

*Doe 1 v. Apple Inc.*,
96 F.4th 403 (D.C. Cir. 2024) ...............................................23

*F.C. v. Jacobs Eng. Grp., Inc.*,
2026 WL 787993 (D. Colo. Mar. 20, 2026)...............................................28

*F.C. v. Jacobs Sols. Inc.*,
790 F. Supp. 3d 1158 (D. Colo. 2025) ...............................................27

*Flood v. Kuhn*,
407 U.S. 258 (1972) ...............................................25

*Lun v. Milwaukee Electric Tool Corp.*,
2025 WL 3443536 (E.D. Wis. Dec. 1, 2025)..............................19, 26, 32

*Ratha v. Phatthana Seafood Co.*,
2016 WL 11020222 (C.D. Cal. Nov. 9, 2016) ...............................23, 27

*Ratha v. Phatthana Seafood Co.*,
35 F.4th 1159 (9th Cir. 2022)...............................................22, 27

*Roe v. Howard*,
2018 WL 284977, (E.D. Va. Jan. 3, 2018)...............................................27

*Roe v. Howard*,
917 F.3d 229 (4th Cir. 2019) ...............................................22, 27

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*,
752 F. Supp. 3d 118 (D.D.C. 2024) ......................................................28

**Statutes**

Trafficking Victims Protection Act of 2000,
Pub. L. No. 106-386, 114 Stat. 1466 ............................................. 11, 14
Trafficking Victims Protection Reauthorization Act of 2005,
Pub. L. No. 109-164, 119 Stat. 3558 .....................................................17
William Wilberforce Trafficking Victims Protection
Reauthorization Act of 2008, Pub. L. No. 110-457,
122 Stat. 5044 ...........................................................................................30

**Other Authorities**

154 Cong. Rec. S10886
(daily ed. Dec. 10, 2008) .......................................................................13
Br. for Sen. Robert Menendez, *et al.* as *Amici Curiae* in Support of
Plaintiffs-Appellees and Affirmance, *Rodriguez v. Pan-American
Health Org.*, 29 F.4th 706 (D.C. Cir. 2022) (No. 20-7114) ...................26
Br. of Members Of Cong. Rep. Nadler, *et al.* as *Amici Curiae* in
Support of Plaintiffs-Appellants, *Ratha v. Rubicon Res., LLC*, 111
F.4th 946 (9th Cir. 2024) (No. 23-55299) ............................................26
Br. of Members of Cong. Sen. Blumenthal, Rep. Smith, *et al.* as
*Amici Curiae* Supporting Respondents, *Nestlé USA, Inc. v. Doe*,
593 U.S. 628 (2021) (No. 19-416) ........................................................26
*Examining U.S. and Glob. Commitments to Combatting Human
Trafficking*: Hearing Before the S. Comm. on Foreign Rels.,
S. Hrg. 118-82, 118th Cong. 1 (2023)...................................................24
H.R. Rep. No. 106-939 (2000) (Conf. Rep.) ............................................31
*Int'l Trafficking in Women and Children: Hearings Before the
Subcomm. on Near E. & S. Asian Aff. of the S. Comm. on Foreign
Rel.*, S. Hrg. 106-705, 106th Cong. (2000) ..................................... 10, 31
*Remarks by the President & The First Lady on Int'l Women's Day*
(Mar. 11, 1998),

https://clintonwhitehouse4.archives.gov/WH/New/html/19980311-14543.html .......................................................................10

S. Foreign Rels. Comm., Press Release, *Senators Menendez, Risch, Kaine, Rubio Re-Introduce Int'l Trafficking Victims Protection Reauthorization Act* (Mar. 27, 2023).................................................................................24

S. Foreign Rels. Comm., Press Release, *Risch Applauds Committee Passage of Legislation on Eswatini, Human Trafficking* (June 8, 2023) .....................................24

*The Ongoing Tragedy of Int'l Slavery and Human Trafficking: An Overview, Hearing Before the Subcomm. on Human Rights & Wellness of the H. Comm. on Gov't Reform,* 108th Cong. (2003) ............................................12, 17

*Trafficking in Persons: The Fed. Gov't's Approach to Eradicate this Worldwide Problem, Hearing Before the Subcomm. on Human Rights & Wellness of the H. Comm. on Gov't Reform,* 108th Cong. (2004) .............................................12

*Winning the Fight Against Human Trafficking: The Frederick Douglass Reauthorization Act, Hearing Before the Subcomm. on Afr., Glob. Health, Glob. Hum. Rts. & Int'l Orgs. of the H. Comm. on Foreign Affs.,* 115th Cong. (2017) ............................................23

*Amici* are bipartisan former United States Ambassadors-at-Large to Monitor and Combat Trafficking in Persons who served in Republican and Democratic administrations and were responsible for implementing the Trafficking Victims Protection Act and its successive reauthorizations, administering United States anti-trafficking diplomacy under the Palermo Protocol, and overseeing U.S. anti-trafficking policy in coordination with foreign governments and international organizations. *Amici* are:

**Luis C.deBaca**, Professor from Practice at the University of Michigan Law School, is a lawyer and diplomat. He served in the Obama administration as Ambassador-at-Large to Monitor and Combat Trafficking in Persons and subsequently as Director of the Department of Justice's Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking. Ambassador C.deBaca is former counsel to the House Committee on the Judiciary, and served as lead staffer in that role during the negotiation and promulgation of the 2008 amendments to the TVPA. Previously, as Involuntary Servitude

---

[1] All parties have consented to the filing of this brief.

and Slavery Coordinator of the U.S. Department of Justice Civil Rights Division's Criminal Section, he led investigations and prosecutions of forced labor and sex trafficking and coordinated policy and interagency efforts, including the National Worker Exploitation Task Force. In that role, he served as the lead DOJ drafter of the TVPA of 2000 and was a member of the interagency team that negotiated the 2000 United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women in Children, supplementing the United Nations Convention against Transnational Organized Crime. From his activities as the lead anti-slavery prosecutor, a DOJ policy official, the lead House Judiciary Committee, Ambassador-at-Large, and professor, C.deBaca obtained unique personal knowledge and perspective of the TVPA.

**Cynthia Dyer** is a human rights expert, lawyer, and diplomat who served in the Biden administration as Ambassador-at-Large to Monitor and Combat Trafficking in Persons. In December 2022, the Senate unanimously confirmed her to lead the United States's global engagement to combat human trafficking and support the coordination of anti-trafficking efforts across the U.S. government. While Ambassador, she travelled to and directly engaged with government officials in 20

countries throughout every region in the world. She currently serves as the Chief Program Officer at the Arizona State University McCain Institute, leading the design and delivery of its Human Rights & Freedom, Democracy, and Leadership Programs.

**John Cotton Richmond** is an attorney and diplomat dedicated to combating human trafficking, fortifying national security, and supporting economic prosperity. The U.S. Senate unanimously confirmed him to serve during the Trump administration as the US Ambassador-at-Large to Monitor and Combat Trafficking in Persons, the nation's highest-ranking position in the fight for human freedom. As the head of the Office to Monitor and Combat Trafficking in Persons, he led U.S. foreign policy of issues of labor and sex trafficking and coordinated the federal interagency response to human trafficking in the United States. He currently serves as Chief Impact Officer of Atlas Free, the founder of the Libertas Council, Non-resident Senior Advisor at the Center for Strategic and International Studies, Senior Advisor to Love Does, Fellow at the C.S. Lewis Institute, and regularly speaks on public justice systems, foreign policy, leadership, vocation, and meaningful work.

*Amici* write to address a question on which they have unique and direct authority after having served in the highest-ranking position in the U.S. government dedicated to human trafficking: how the TVPA and its civil remedy were understood, administered, and implemented by the executive branch officials charged with formulating and putting the statute into practice across more than two decades of U.S. anti-trafficking policy.

The district court held that Congress did not intend § 1595's civil remedy to apply extraterritorially. That holding is inconsistent with how the executive branch has administered this statute from its inception. Throughout *amici*'s tenures—and throughout the tenures of their predecessors and successors—the TVPA was implemented as an instrument meant to reach not only domestic sex and labor trafficking cases, but also to have a global reach.

Executive branch officials engaged with foreign governments, coordinated internationally under the United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children (the Palermo Protocol) as the United States' domestic implementing legislation for an international treaty commitment, and

administered the statute's diplomatic and foreign assistance provisions as an instrument of global reach. No senior official responsible for implementing this statute has ever understood it to be limited to domestic conduct.

The perspective *amici* offer is not merely corroborative. Officials responsible for implementing a statute internationally operate on a working understanding of what the statute means in practice. When those officials—operating with the knowledge of Congress and in ongoing dialogue with congressional overseers—consistently administered the TVPA as an instrument of global reach without objection from Congress, that pattern of executive implementation is itself evidence of what the statute means. The district court's territorial reading would not merely contradict Congress's intent; it would render unworkable the executive branch's decades-long administration of the TVPA as a tool of international anti-trafficking policy.

This appeal presents the first opportunity for a federal court of appeals to squarely address the extraterritoriality of § 1595's civil remedy following two intra-district decisions rejecting it. *Amici* submit this brief to ensure that the Seventh Circuit has before it a full account

of how this statute has been understood and administered by those responsible for implementing it.

## CERTIFICATE OF AUTHORSHIP

Under Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No one other than *amici* or their counsel contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

In their careers, *amici* understood and implemented the TVPA to provide a comprehensive legal response to trafficking wherever it occurred. They ranked foreign governments on how well they addressed it, conditioned American foreign assistance on their performance, and engaged diplomatically with counterparts around the world about trafficking in their countries and ours—all on the understanding that the statute behind those efforts reached trafficking globally. The legislative record confirms that understanding. The district court's territorially-limited reading of § 1595's civil remedy does not.

Congress enacted the TVPA in 2000 as an explicitly international statute responding to a crisis it repeatedly described as global in reach and character, and each successive amendment reflected that consistent intent. The text of § 1596, which provides extraterritorial jurisdiction "in addition to any domestic or extra-territorial jurisdiction otherwise provided by law," reflects Congress's understanding that the statute already carried extraterritorial reach when the 2008 amendments were enacted. Congress's omission of § 1595 from § 1596's list of offenses reflected the structural reality that § 1595 is a civil remedy, not a standalone offense. And a Congress that directed the executive branch to hold foreign governments accountable for trafficking occurring within their own borders cannot have intended the same statute's civil remedy to stop at ours.

Throughout the period during which Congress repeatedly reauthorized § 1595, the executive branch administered the TVPA as a statute of global reach—with the full knowledge of Congress and without objection from any Member—providing further support for the conclusion that courts applying § 1595 extraterritorially have correctly understood what Congress intended.

Even if this Court were to conclude that § 1595 does not generally apply to all extraterritorial trafficking, the 2008 amendments' knowing-benefit provision independently requires reversal. That provision was specifically designed to reach defendants in the United States who profit from trafficking occurring abroad. The Department of Justice told Congress that without it, the law would "provide a liability shield between the direct oppressor and the economic beneficiary of the slave labor." A construction of § 1595 that preserves that shield contradicts the specific purpose Congress enacted the provision to serve—and would undermine the international accountability framework that *amici* spent their careers building.

## ARGUMENT

### I.  From Its Inception, Congress Designed the TVPA as an Instrument to Address a Global Crisis, Not Merely a Domestic One.

The TVPA was not enacted to address a solely domestic problem. From its inception, Congress understood itself to be legislating about a global crisis—one that required global reach—not just domestic issues. Two features of the statute's origin establish this: (1) the comprehensive record of congressional hearings that framed trafficking as a

transnational emergency; and (2) the international treaty architecture within which the TVPA was designed to operate. *Amici* administered this statute on the basis of that understanding, and that understanding was never questioned.

### A. The hearings leading to the TVPA's enactment focused overwhelmingly on transnational trafficking.

The TVPA did not emerge from concern about a crime problem solely domestic in nature. It emerged from congressional and executive recognition that millions of people—predominantly women and children—were being trafficked across international borders each year, and that existing law was wholly inadequate to address a crime that was transnational in its organization, its economics, and its human toll. On March 11, 1998, International Women's Day, President William J. Clinton tasked the President's Interagency Council on Women, chaired by Secretary of State Madeline Albright and housed at the State Department, with coordinating U.S. Government activities against this scourge, including by having the Justice Department step up legal reform and enforcement efforts in both the U.S. and abroad. *Remarks by the President & The First Lady on Int'l Women's Day* (Mar. 11, 1998),

https://clintonwhitehouse4.archives.gov/WH/New/html/19980311-14543.html.

The record of the hearings leading to the 2000 enactment demonstrates unambiguously that Congress shared this coordinated national/global approach. At the International Trafficking in Women and Children hearing before the Senate Foreign Relations Committee's Subcommittee on Near Eastern and South Asian Affairs, Senator Wellstone described trafficking as "one of the darkest aspects of the globalization of the world economy" and stated his intention to address the problem of "as many as 2 million women that are trafficked throughout the world economy." *Int'l Trafficking in Women and Children: Hearings Before the Subcomm. on Near E. & S. Asian Aff. of the S. Comm. on Foreign Rel.*, S. Hrg. 106-705, 106th Cong. 73 (2000), 2000 WL 357912 (hereinafter "*Hearing: Int'l Trafficking*"). At that time, Frank E. Loy, the Undersecretary of State for Global Affairs, provided the State Department's position that "trafficking is a global problem," "any legislation should enhance our global efforts" to prevent trafficking, and specifically that "trafficked victims should be able to bring private civil lawsuits against traffickers"—a statement of intent directed at the global

10

problem the statute was enacted to address. *Id*. at 14-15, 2000 WL 210064.

This framing was not rhetorical. The original TVPA's statutory findings stated that "[a]t least 700,000 persons annually, primarily women and children, are trafficked within or across international borders," that "[a]pproximately 50,000 women and children are trafficked into the United States each year," and that traffickers "often transport victims from their home communities to unfamiliar destinations, including foreign countries." Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, § 102(b), 114 Stat. 1466. The statute expressly stated that its purpose was "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Id*. § 102(a). Nothing in these purposes was bounded by geography.

The congressional hearings accompanying the reauthorization that added the civil remedy confirmed this understanding. At the 2003 hearing on *The Ongoing Tragedy of International Slavery and Human Trafficking*—the hearing at which Congress added § 1595's civil

11

remedy—Representative Burton convened proceedings and described trafficking as a "worldwide crisis" which needed to be dealt with "on a global level." *The Ongoing Tragedy of Int'l Slavery and Human Trafficking: An Overview, Hearing Before the Subcomm. on Human Rights & Wellness of the H. Comm. on Gov't Reform*, 108th Cong. 1, 3 (2003) (hereinafter "*Hearing: The Ongoing Tragedy*"). Witnesses at that hearing described trafficking as "global in character," "a global problem," and a practice "embedded in ... the global economy." The civil remedy Congress enacted at that hearing was designed to reach the global problem that hearing examined.

The 2004 hearing continued in the same register, with Representative Burton describing the subcommittee's focus on "atrocious practices of human trafficking and slavery around the world" and Representative Watson describing trafficking as a "worldwide problem" requiring action "internationally but most of all our own domestic side." *Trafficking in Persons: The Fed. Gov't's Approach to Eradicate this Worldwide Problem, Hearing Before the Subcomm. on Human Rights & Wellness of the H. Comm. on Gov't Reform,* 108th Cong. 1, 11-12 (2004).

Similarly, the legislative history related to the addition of the express extraterritoriality provision in 2008 confirms Congress's focus on the global nature of both the trafficking problem and the legislative solution, emphasizing that "[n]owhere on earth should it be acceptable to deceive, abuse, and force a person into a life of enslavement." 154 Cong. Rec. S10886 (daily ed. Dec. 10, 2008) (statement of Sen. Leahy). Indeed, Senator Leahy applauded the legislature's decision to "strengthen our efforts to stop the abhorrent practice of human trafficking in the United States and around the world." *Id. Amici* administered a statute understood by Congress and the executive branch alike as reaching trafficking wherever it occurred; the district court's territorial reading is irreconcilable with that shared understanding.

### B. The TVPA was enacted as the domestic implementation of an international treaty commitment.

The TVPA's international orientation was structural. The statute was signed into law just before the promulgation of the Palermo Protocol, which was opened for signature and immediately signed by the United States in December 2000. *Amici* administered the TVPA as the United States' principal domestic implementing legislation related to that treaty

commitment. The Palermo Protocol framed trafficking as an international crime requiring coordinated cross-border responses; the TVPA was the domestic legal instrument through which the United States in part fulfilled its treaty obligations—and *amici* engaged with foreign governments on that basis throughout their tenures.

The legislative findings accompanying the original TVPA specifically referenced the problem of slavery "throughout the world," trafficking "within or across international borders," Pub. L. No. 106-386, § 102(b)(1), a "transnational crime," *id.* §§ 102(b)(3), (24), for which "legislation and law enforcement in … other countries are inadequate," *id.* § 102(b)(14). The State Department was directed to publish an annual Trafficking in Persons Report ranking foreign governments' compliance with minimum anti-trafficking standards. The statute's sanctions provisions conditioned foreign assistance on foreign governments' anti-trafficking efforts.

A statute negotiated simultaneously with and enacted as the domestic legal complement to an international anti-trafficking treaty—one that simultaneously directed the United States to hold foreign governments accountable for their anti-trafficking records—cannot

14

plausibly be read to exclude extraterritorial trafficking from its civil remedy. *Amici* administered the TVPA as a tool of international anti-trafficking policy. That was not a creative executive branch reinterpretation of a domestic statute; it was the straightforward application of what the statute was designed to do as the legislation and treaty negotiations progressed in tandem.

*Amici* administered those international provisions—the annual Trafficking in Persons Report assessing foreign governments' anti-trafficking records, the foreign assistance programs supporting victims abroad, the diplomatic engagement with foreign counterparts about trafficking occurring in their countries and ours—on the consistent understanding that the TVPA as a whole was directed at trafficking wherever it occurred. That understanding was not an abstract legal conclusion; it was a working premise embedded in every aspect of how *amici* did their jobs. A Congress that simultaneously required the United States to rank foreign governments on how well they addressed trafficking of their own citizens, conditioned foreign assistance on those governments' anti-trafficking performance, and engaged diplomatically with foreign counterparts about trafficking anywhere in the world cannot

15

have intended the same statute's civil remedy to reach only trafficking that happened on United States soil. The civil remedy is part of the same statute, enacted by the same Congress that created every other provision *amici* were charged with administering internationally. A civil remedy limited to only domestic claims would have been incoherent alongside the global framework.

## II. Congress Intended the Civil Remedy to Reach Extraterritorial Trafficking, and Each Successive Amendment Confirmed that Intent.

The post-2008 statute reflects Congress's intent that § 1595's civil remedy reach extraterritorial trafficking. Three features of the statutory text and history establish this. First, the successive amendments leading to the 2008 Act reflect a consistent congressional understanding that the statute addressed a global problem and should reach it. Second, § 1596's "in addition to" language reflects Congress's understanding that extraterritorial jurisdiction already existed when the 2008 amendments were enacted. Third, Congress's decision not to enumerate § 1595 in § 1596's list of offenses reflects an elementary structural distinction— § 1595 is a civil remedy, not an offense—not a decision to limit the civil remedy's geographic reach.

**A.    The background of successive amendments reflects Congress's consistent understanding that the TVPA addressed a global problem.**

Before turning to the post-2008 statute that is directly at issue, it is worth noting briefly what the history of successive amendments establishes: that Congress consistently understood itself to be legislating about a transnational crisis and consistently acted to ensure its statute reached it. The 2003 reauthorization that added § 1595's civil remedy was accompanied by hearing testimony focused comprehensively on trafficking "on a global level." *Hearing: The Ongoing Tragedy* (statement of Rep. Burton). The 2005 reauthorization extended Chapter 77 liability to U.S. government employees and contractors acting abroad, placing that extension in a chapter Congress expressly titled "Extraterritorial Jurisdiction Over Certain Trafficking in Persons Offenses." Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, § 103, 119 Stat. 3558, 3562. Each successive amendment reflected the same understanding: that the TVPA was designed to address trafficking wherever it occurred, and that Congress would act to ensure its statute's reach matched that design.

That background matters for reading the 2008 amendments. A Congress that had consistently acted to extend its anti-trafficking statute's reach to foreign conduct did not turn around in 2008 and silently limit the civil remedy to domestic conduct. The 2008 amendments are best understood as the most comprehensive expression of a legislative intent that had been present and consistently acted upon since 2000. *Amici* administered the statute's international provisions of each successive iteration of the statute on exactly that understanding.

**B. The text of § 1596 reflects Congress's understanding that the post-2008 statute reaches extraterritorial conduct.**

Section 1596(a) provides: "In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense … under section 1581, 1583, 1584, 1589, 1590, or 1591 if" the offender is a U.S. national or is present in the United States. 18 U.S.C. § 1596(a).

The phrase "in addition to any … extra-territorial jurisdiction otherwise provided by law" is Congress's acknowledgment that some extraterritorial jurisdiction over Chapter 77 offenses already existed when § 1596 was enacted. Congress routinely employs such savings

18

clauses to avoid inadvertently displacing pre-existing jurisdictional grants. Read against the background of a statute whose findings, purposes, and comprehensive legislative history all emphasize the transnational character of trafficking, this language reflects Congress's understanding that the TVPA already reached extraterritorial conduct and that § 1596 was supplementing rather than creating that reach. A Congress that understood its statute to be territorial-only would have had no reason to frame § 1596 as additive to existing extraterritorial jurisdiction.

### C. Congress's omission of § 1595 from § 1596 reflects statutory structure, not domestic intent.

The district court concluded that Congress's omission of § 1595 from § 1596's enumerated list was "an intentional decision not to extend extraterritorially the reach of the statute's civil component." *Lun v. Milwaukee Electric Tool Corp.*, 2025 WL 3443536, at \*14 (E.D. Wis. Dec. 1, 2025). Those who administered this statute internationally—and, for one *amicus*, Amb. C.deBaca, the House Judiciary Committee staffer in 2008 who marshalled the reauthorization negotiations and worked with House of Representatives' non-partisan staff legislative counsel to draft the language of Chapter 77 amendments—consistently understood *why*

§ 1595 does not appear in § 1596: Section 1596 grants extraterritorial jurisdiction over "offenses." Section 1595 is not an offense. It is a civil remedy for offenses. The omission reflects an elementary structural distinction about how the statute works, not a substantive policy choice to limit the civil remedy to domestic conduct.

The TVPA was understood throughout the executive branch as a remedial framework in which the civil remedy travels with the criminal prohibitions it enforces—a reading consistent with and reflected in the executive branch's administration of the statute's international provisions as a coherent whole. When Congress extended extraterritorial jurisdiction over the offenses that form § 1595's predicate, it was extending the jurisdictional reach of the entire enforcement framework. No separate enumeration of § 1595 was necessary or appropriate, because § 1595 is not a standalone offense. To read Congress's structural choice as a silent decision to exclude civil claims from extraterritorial application attributes to Congress a precision of drafting intent that the legislative record does not support, is contrary to one *amicus*'s personal knowledge from leading the negotiation and drafting process, and is

20

contradicted by the executive branch's consistent administration of the statute.

## III. Congress Reauthorized § 1595 Knowing Full Well that Courts Were Applying It Extraterritorially.

Congress has reauthorized § 1595 repeatedly since courts began applying it extraterritorially. Throughout that period, the executive branch administered the TVPA as a statute reaching trafficking wherever it occurred—with Congress's full knowledge and without objection from any Member of Congress. That pattern of consistent executive implementation, sustained across multiple administrations in ongoing dialogue with congressional overseers, confirms that courts applying § 1595 extraterritorially have correctly read the statute. The district court below drew the opposite inference from Congress's post-*RJR Nabisco* amendments—concluding that Congress's failure to add explicit extraterritorial language in 2018 and 2023 reflects a deliberate acceptance of territorial limitation. That inference rests on a deeply attenuated and flawed chain of reasoning.

**A. Following the 2008 amendments, courts consistently applied § 1595 extraterritorially, and Congress repeatedly reauthorized the statute without correction.**

The 2008 Wilberforce Act established the extraterritorial framework that is directly at issue in this appeal. In the years that followed, courts applied § 1595 extraterritorially with increasing consistency. The Fourth Circuit in *Roe* held that § 1595 provides a civil remedy for violations of extraterritorial predicate offenses under § 3271, the 2005 TVPRA provision covering federal government employees and contractors abroad, and broadly held that Congress was concerned with international as well as domestic matters. *Roe v. Howard*, 917 F.3d 229, 241-42 (4th Cir. 2019). The Fifth Circuit evaluated whether extraterritorial application of the civil remedy applied to claims arising *before* the 2008 amendment, and held it does not. *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 201 (5th Cir. 2017) (noting the parties' agreement that extraterritorial application applied *after* the amendment). The Ninth Circuit, when given the opportunity to reject the premise, declined to do so. *See Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1168 (9th Cir. 2022) ("[W]e assume without deciding that Plaintiffs are correct and that § 1595 permits a private cause of action for

extraterritorial violations of the substantive provisions listed in § 1596.”). The D.C. Circuit, when it had the opportunity to affirm one outlier district court decision, neither adopted nor endorsed the minority view that extraterritoriality does not apply to § 1595. *See Doe 1 v. Apple Inc.*, 96 F.4th 403, 414 n.4 (D.C. Cir. 2024) (declining to affirm on the alternative grounds that the civil action does not apply extraterritorially). At the district court level, in the years since the amendment, courts consistently held that the TVPA applies extraterritorially, with one stating that the “argument that TVPRA’s extraterritorial jurisdiction does not extend to civil actions has been overwhelmingly rejected by the courts.” *Ratha v. Phatthana Seafood Co.*, 2016 WL 11020222, at *6 (C.D. Cal. Nov. 9, 2016) (collecting cases).

Against this background of consistent judicial extraterritorial application, Congress reauthorized or amended the TVPRA—including § 1595—in 2018, 2019, and 2023, and made no attempt to override extraterritorial application. *See, e.g.*, *Winning the Fight Against Human Trafficking: The Frederick Douglass Reauthorization Act, Hearing Before the Subcomm. on Afr., Glob. Health, Glob. Hum. Rts. & Int’l Orgs. of the H. Comm. on Foreign Affs.*, 115th Cong. 68 (2017) (“thank you … for

advancing what I believe is our global mission both international and domestic to eradicate modern slavery") (statement of Rep. Wagner); S. Foreign Rels. Comm., Press Release, *Risch Applauds Committee Passage of Legislation on Eswatini, Human Trafficking* (June 8, 2023) (stating that the 2023 reauthorization is meant to "ensure human traffickers are properly investigated, prosecuted, and held accountable globally") (Sen. Risch); S. Foreign Rels. Comm., Press Release, *Senators Menendez, Risch, Kaine, Rubio Re-Introduce Int'l Trafficking Victims Protection Reauthorization Act* (Mar. 27, 2023) (stating the law is meant to "combat[] human trafficking worldwide"); *Examining U.S. and Glob. Commitments to Combatting Human Trafficking*: *Hearing Before the S. Comm. on Foreign Rels.*, S. Hrg. 118-82, 118th Cong. 1 (2023) (noting that trafficking happens on a "global scale" and commending the law "putting in place legal frameworks to hold traffickers to account") (statement of Sen. Menendez).

Throughout those reauthorization periods, the executive branch administered the TVPA as reaching trafficking wherever it occurred— engaging with foreign governments under its authority, coordinating internationally under the Palermo Protocol, and administering the

statute's diplomatic and foreign assistance provisions as instruments of global reach. *Amici* administered the statute on that basis throughout their tenures, in ongoing dialogue with the congressional overseers responsible for reauthorizing it.

Congressional acquiescence ordinarily carries somewhat less interpretive weight than direct evidence of statutory intent because it requires courts to infer meaning from institutional silence. But the acquiescence argument here has a particular character. *Amici* are former executive branch officials who administered this statute's international provisions throughout the periods of congressional reauthorization, and not only were called upon to testify before Congress but regularly interacted with Members and staff. The executive branch's consistent administration of the TVPA as an instrument of global reach—sustained across multiple administrations, with the knowledge of Congress, and without objection from any Member of Congress—is not mere inaction. It is a visible, ongoing pattern that Congress observed and declined to override, and the inference of endorsement that follows is meaningful. *See Flood v. Kuhn*, 407 U.S. 258, 283-84 (1972); *Bob Jones Univ. v. United States*, 461 U.S. 574, 599-602 (1983). That inference is reinforced by the

active participation of Members of Congress as *amici* in support of extraterritorial application in multiple proceedings. *See* Br. of Members of Cong. Sen. Blumenthal, Rep. Smith, *et al.* as *Amici Curiae* Supporting Respondents, *Nestlé USA, Inc. v. Doe*, 593 U.S. 628 (2021) (No. 19-416); Br. for Sen. Robert Menendez, *et al.* as *Amici Curiae* in Support of Plaintiffs-Appellees and Affirmance, *Rodriguez v. Pan-American Health Org.*, 29 F.4th 706 (D.C. Cir. 2022) (No. 20-7114); Br. of Members Of Cong. Rep. Nadler, *et al.* as *Amici Curiae* in Support of Plaintiffs-Appellants, *Ratha v. Rubicon Res., LLC*, 111 F.4th 946 (9th Cir. 2024) (No. 23-55299). To *amici*'s knowledge, no Member of Congress—current or past—has ever expressed a different view, and no senior executive branch official responsible for administering this statute's international provisions has ever done so on the premise that the civil remedy was territorially limited.

B. **The district court's contrary inference rests on a far more attenuated chain of reasoning.**

The district court reasoned that Congress's amendments to § 1595 in 2018 and 2023 without adding explicit extraterritorial language— enacted after *RJR Nabisco*—reflect a deliberate congressional choice to accept a territorial reading of § 1595. *Lun*, 2025 WL 3443536, at *10.

That argument rests on a far more attenuated chain of inference than *amici*'s, and it is refuted by the pattern of executive implementation that *amici* directly observed.

*Amici*'s argument is grounded in congressional awareness of multiple judicial constructions of § 1595 itself. As stated, for more than a decade courts applying § 1595 explicitly and consistently held that it reaches extraterritorial conduct. *E.g., Aguilera v. Aegis Commc'ns Grp., LLC*, 72 F. Supp. 3d 975 (W.D. Mo. 2014); *Ratha*, 2016 WL 11020222 (collecting cases); *Roe v. Howard*, 2018 WL 284977, at *3-4 (E.D. Va. Jan. 3, 2018), *aff'd*, 917 F.3d 229 (4th Cir. 2019); *Adhikari v. KBR Inc.*, 2017 WL 4237923, at *5 (S.D. Tex. Sept. 25, 2017). Congress reauthorized the statute multiple times in that period without correction: at the time of the 2018 reauthorization, every court to consider the question had concluded that § 1595 applies extraterritorially, and at the time of the 2023 reauthorization, every Court of Appeals to consider the question had either held or assumed extraterritorial application. *See Roe*, 917 F.3d at 239-43; *Ratha*, 35 F.4th at 1168; *Adhikari*, 845 F.3d at 201. Although a handful of district courts had concluded otherwise, the overwhelming majority sided with extraterritoriality. *E.g., F.C. v. Jacobs Sols. Inc.*, 790

F. Supp. 3d 1158, 1179-85 (D. Colo. 2025); *U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118, 132 (D.D.C. 2024); *A.A. v. Omnicom Grp., Inc.*, 2026 WL 504904, at *16-20 (S.D.N.Y. Feb. 24, 2026); *Abafita v. Aldukhan*, 2019 WL 6735148, at *5 (S.D.N.Y. Apr. 4, 2019).

The district court's argument, by contrast, requires a far more speculative chain of inference. Although purportedly grounded in the principle that courts presume Congress is aware of relevant judicial precedent, it wholly ignores the overwhelming body of cases applying § 1595 extraterritorially—the most relevant judicial precedent available—in favor of an unsupported assumption that the Supreme Court's 2016 decision in *RJR Nabisco* necessarily placed Congress on notice that § 1595 could not apply extraterritorially. But *RJR Nabisco* considered a completely different statutory regime, not the TVPA. And in the decade since *RJR Nabisco*, it has been repeatedly considered in relation to the TVPA with almost all courts finding that § 1595 has extraterritorial reach. *E.g.*, *F.C. v. Jacobs Eng. Grp., Inc.*, 2026 WL 787993, at *3 (D. Colo. Mar. 20, 2026) ("[T]he majority of the courts that have addressed this issue have found that the TVPA's civil claims apply extraterritorially").

*Amici* can speak to this from their implementation experience. The executive branch's administration of the TVPA throughout the period following *RJR Nabisco* proceeded on the consistent understanding that the statute—including its civil remedy—applied extraterritorially—an understanding that was never questioned by Congress in its oversight of executive branch implementation. Congress's post-2008 silence on the extraterritoriality question meant what congressional silence on a settled question, confirmed by consistent executive implementation, ordinarily means: that Congress was satisfied with the judicial construction and administrative practice it was observing—not that it had silently accepted an inference drawn from a decision about a different statute that no appellate court had yet applied to § 1595.

## IV. At a Minimum, § 1595 Applies to Defendants in the United States Who Knowingly Benefit from Trafficking Occurring Abroad.

Even if this Court were to conclude that § 1595 does not generally apply to all extraterritorial trafficking, the 2008 amendments make clear that Congress intended the beneficiary provision specifically to reach defendants in the United States who receive economic benefit from trafficking ventures operating abroad. This independent ground for

reversal is firmly rooted in the text, structure, and history of the 2008 amendments, and it applies directly to the facts of this case.

### A. The beneficiary provision was specifically designed to hold domestic economic beneficiaries of foreign trafficking accountable.

The same 2008 Wilberforce Act that added § 1596's extraterritorial jurisdiction amended § 1595(a) to create civil liability for "whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067. These two provisions—§ 1596's extraterritorial jurisdiction and § 1595's beneficiary liability—were enacted together as a unified legislative response to a single enforcement problem: that those who profited most from trafficking were often the most geographically distant from it, and thus the most difficult to reach under existing law.

Congress had previously considered and declined to include broad beneficiary liability in the original 2000 TVPA, explaining in the Conference Report that it was concerned such a provision "might include

30

within its scope persons, such as stockholders in large companies, who have an attenuated financial interest in a legitimate business where a few employees might act in violation of the new statute." H.R. Rep. No. 106-939, at 101-02 (2000) (Conf. Rep.). By 2008, Congress had concluded that those concerns did not justify leaving the economic beneficiaries of trafficking beyond the civil remedy's reach.

The problem the beneficiary provision was designed to solve had been identified in the congressional record since the TVPA's original enactment. Department of Justice testimony at the time of the 2000 Act warned that trafficking law risked creating "a liability shield between the direct oppressor and the economic beneficiary of the slave labor." *Hearing: Int'l Trafficking*, at 78 (statement of William Yeomans, Chief of Staff, Civil Rights Division, Dep't of Justice). When Congress returned to the statute in 2008, closing that gap was among its central objectives. The beneficiary provision was the instrument Congress designed for that purpose. By distinguishing the "direct oppressor"—the actor who compels the labor—from the "economic beneficiary"—the actor who profits from it—the DOJ witness identified the beneficiary provision as an independent provision targeting a structurally distinct category of

defendant. Congress understood the provision in exactly those terms: as creating a freestanding basis for civil liability focused on the defendant's domestic act of knowingly receiving value, not as a mere appendage to the prohibition on direct forced labor.

That understanding was operative in the executive branch's administration of the statute. Officials charged with addressing the global economics of trafficking—engaging with supply chains, foreign governments, and international organizations—understood the beneficiary provision as targeting the domestic actors who profit from foreign trafficking ventures. A construction of the statute that exempts those actors would undermine the statute's international accountability framework.

**B.     The district court's construction is irreconcilable with congressional intent.**

The district court concluded that the "focus" of a § 1595 claim predicated on § 1589 violations is where the forced labor occurred, not where the benefit was received, because § 1589's subsections cannot be analyzed "in a vacuum." *Lun*, 2025 WL 3443536, at *15. Those who administered the statute internationally understood Congress to have

designed it to reach precisely this scenario—and the district court's contrary construction is irreconcilable with that design.

Congress designed § 1589(b) to create liability for a defendant whose culpable act is the knowing receipt of value from a venture the defendant knew or should have known engaged in trafficking. That act— the knowing receipt of benefit—is what Congress made unlawful, and it occurs where the defendant is, not where the trafficking is. Congress did not design the beneficiary provision to immunize the domestic beneficiary simply because the underlying trafficking occurred abroad. It designed the provision for precisely that scenario, because that is where the accountability gap the DOJ had identified most commonly arises. Congress understood that the profits of global trafficking networks are realized at the point of distribution and sale in the United States, not solely at the point of production abroad. A construction of § 1595 that cannot reach those profits defeats the provision's purpose and recreates the very accountability gap Congress enacted the provision to eliminate.

**C. Congress's response to judicial narrowing of § 1595 confirms it regards the civil remedy's scope as settled legislative intent.**

The history of congressional responses to judicial narrowing of § 1595 further confirms how Congress understands the scope of the beneficiary provision. When the Ninth Circuit in *Ratha* held that § 1595 did not reach those who attempted but had not yet succeeded in benefiting from a trafficking venture, Congress responded within nine months, unanimously, with legislation specifically designated "Technical and Clarifying." The designation is significant: Congress did not describe the amendment as a prospective change to the law. It described it as a clarification—a correction of a judicial misreading of what the statute had meant since 2008. Congress understood the Ninth Circuit to have gotten the statute wrong, not to have identified a gap that Congress was choosing to fill. Notably, Congress has not reacted similarly in response to the repeated holdings by the majority of courts that § 1595 is meant to apply extraterritorially—because those holdings got it right.

The district court's construction in this case is a more consequential narrowing than the one Congress corrected in response to *Ratha*. *Ratha* addressed the question of who qualifies as a beneficiary at the margins;

the district court's holding eliminates liability for the entire category of domestic beneficiaries of foreign trafficking—the primary practical application of the beneficiary provision to global supply chains. If Congress acted swiftly and unanimously to correct a narrow judicial misreading of § 1595's beneficiary definition, designating its correction "Technical and Clarifying" to make clear the court had simply misread the statute, it is not plausible that Congress would accept a construction that eliminates the provision's central application. *Amici*, who spent their careers building the international framework the TVPA was designed to support, regard that construction as equally a misreading— one that would gut the provision's central application just as surely as the misreading Congress corrected in response to *Ratha*.

The officials who join this brief implemented this statute across multiple administrations and nearly two decades of United States anti-trafficking policy. They engaged with foreign governments under its authority, administered the Palermo Protocol as the United States's domestic implementing legislation for an international treaty commitment, and coordinated the United States' international anti-trafficking efforts on the premise that the statute reached trafficking

35

wherever it occurred. Throughout that period, § 1595's civil remedy was understood—by implementing officials, by the congressional overseers who reauthorized the statute, and by the overwhelming weight of judicial authority—to reach extraterritorial trafficking.

The district court's contrary reading is inconsistent with that history. It would render unworkable the executive branch's consistent administration of this statute as an instrument of global reach, contradict the congressional record that produced it, and recreate the liability shield that Congress specifically enacted the beneficiary provision to eliminate. Courts that have narrowed § 1595's scope have been corrected—swiftly, unanimously, and with explicit designations of clarification rather than change. The district court's decision is the most consequential narrowing yet, and those who implemented this statute say it is wrong.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

Geoffrey P. Eaton
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street NW, Suite 835
Washington, DC 20036
202-629-3530
geoff.eaton@sparacinopllc.com
eli.kay-oliphant @sparacinopllc.com

*Attorneys for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 6,476 words. I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: May 1, 2026

/s/_____

Eli J. Kay-Oliphant

SPARACINO PLLC 1920
L Street, NW Suite 835
Washington, DC 20036
202-629-3530
geoff.eaton@sparacinopllc.com
eli.kay-oliphant @sparacinopllc.com

*Attorneys for Amici Curiae*