**No. 25-3347**

**IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

XU LUN, a pseudonym,

*Plaintiff-Appellant*,

*v.*

MILWAUKEE ELECTRIC TOOL CORPORATION,

*Defendant-Appellee*.

On Appeal from the United States District Court for the Eastern District of Wisconsin, Case No. 2:24–cv–00803–BHL (The Hon. Brett H. Ludwig)

# BRIEF OF DEFENDANT-APPELLEE MILWAUKEE ELECTRIC TOOL CORPORATION

Dated: July 27, 2026


Ellen E. Dew
William W. Reichart III
DLA PIPER LLP (US)
650 S. Exeter St., Suite 1100
Baltimore, MD 21202
(410) 580-3000
ellen.dew@us.dlapiper.com
wes.reichart@us.dlapiper.com

David Horniak
DLA PIPER LLP (US)
500 Eighth Street NW
Washington, DC 20004
(202) 799-4361
david.horniak@us.dlapiper.com

*Counsel for Defendant-Appellee Milwaukee Electric Tool Corporation.*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3347

Short Caption: Xu Lun v. Milwaukee Electric Tool Corporation et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Milwaukee Electric Tool Corporation

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
DLA Piper LLP (US); Reinhart Boerner Van Deuren, S.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
Milwaukee Electric Tool Corp. is wholly owned by Esstar Industries, Inc. Esstar Industries, Inc. is wholly owned by Techtronic Industries North America Inc. The parent of Techtronic Industries North America Inc. is Techtronic Industries Company Ltd.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
Techtonic Industries Company Ltd. is publicly traded on the Hong Kong Stock Exchange.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney's Signature: /s/ Ellen E. Dew Date: 1/21/26

Attorney's Printed Name: Ellen E. Dew

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 650 S. Exeter St., Suite 1100
Baltimore, Maryland 21202

Phone Number: (410) 580-3000 Fax Number: (410) 580-3001

E-Mail Address: ellen.dew@us.dlapiper.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3347

Short Caption: Xu Lun v. Milwaukee Electric Tool Corporation et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Milwaukee Electric Tool Corporation

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
DLA Piper LLP (US), Reinhart Boerner Van Deuren, S.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
Milwaukee Electric Tool Corp. is wholly owned by Esstar Industries, Inc. Esstar Industries, Inc. is wholly owned by Techtronic Industries North America Inc. The parent of Techtronic Industries North America Inc. is Techtronic Industries Company Ltd.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
Techtonic Industries Company Ltd. is oublicly traded on the Hong Kong Stock Exchange

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney's Signature: /s/ William W. Reichart III Date: 07/27/2026

Attorney's Printed Name: William W. Reichart III

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 650 S. Exeter St., Suite 1100
Baltimore, MD 21202

Phone Number: (410) 580 3000 Fax Number: (410) 580-3001

E-Mail Address: wes.reichart@us.dlapiper.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-3347

Short Caption: Xu Lun v. Milwaukee Electric Tool Corporation et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Milwaukee Electric Tool Corporation

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
DLA Piper LLP (US), Reinhart Boerner Van Deuren, S.C.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
Milwaukee Electric Tool Corp. is wholly owned by Esstar Industries, Inc. Esstar Industries, Inc. is wholly owned by Techtronic Industries North America Inc. The parent of Techtronic Industries North America Inc. is Techtronic Industries Company Ltd.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
Techtonic Industries Company Ltd. is oublicly traded on the Hong Kong Stock Exchange

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney's Signature: /s/ David Horniak Date: 07/27/2026

Attorney's Printed Name: David Horniak

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 500 Eight Street NW
Washington, DC 20004

Phone Number: (202) 799 4361 Fax Number: (410) 580-3001

E-Mail Address: david.horniak@us.dlapiper.com

## TABLE OF CONTENTS


INTRODUCTION ........ 1
JURISDICTIONAL STATEMENT ........ 3
STATEMENT OF THE ISSUES ........ 3
STATEMENT OF THE CASE ........ 4

A. Statutory History of the TVPRA. ........ 4
   1. Congress Criminalizes Human Trafficking. ........ 4
   2. Congress Adds a Civil Remedy for Certain Crimes, But Without Extraterritorial Reach. ........ 4
   3. Congress Adds Extraterritorial Jurisdiction for the Prosecution of Certain Offenders. ........ 5
   4. Congress Expands Extraterritorial Criminal Jurisdiction but Does Not Apply that Expansion to the Civil Remedy. ........ 6
   5. Subsequent Amendments to Section 1595 Have Not Expanded the Civil Remedy to Conduct Outside the United States. ........ 8

B. Factual Background. ........ 9
   1. Plaintiff Was Allegedly Trafficked by Guards at the Chishan Prison. ........ 10
   2. The Amended Complaint's Scant Allegations Concerning Milwaukee Tool. ........ 12

C. The District Court Dismisses Plaintiff's Amended Complaint Against Milwaukee Tool as Impermissibly Extraterritorial. ........ 14

STANDARD OF REVIEW ........ 16
SUMMARY OF THE ARGUMENT ........ 17
ARGUMENT ........ 19

I. The TVPRA's Civil Remedy Provision Does Not Apply Extraterritorially. ........ 19
   A. There Is No "Clear, Affirmative Indication" that Section 1595(a) Applies Extraterritorially. ........ 22
   B. Section 1596 Does Not Clearly and Unmistakably Instruct Courts to Apply Section 1595 Extraterritorially. ........ 26
   C. The Statutory Context, Purpose, and History Further Establish that Section 1595 Does Not Apply Extraterritorially. ........ 33
   D. Inapposite, Out-of-Circuit Decisions Do Not Support Reversal. ........ 37
   E. Amici Raise Unpersuasive Arguments. ........ 40

II. Plaintiff's Case Does Not Involve a Domestic Application of Section 1595(a) of the TVPRA. ........ 41
   A. The Statutory Focus Here is Forced Labor. ........ 43
   B. The Conduct Relevant to the Statutory Focus Occurred in China. ........ 47

CONCLUSION ........ 48
STATUTORY ADDENDUM ........ A-i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. v. Omnicom Grp., Inc.*,
2026 WL 504904 (S.D.N.Y. Feb. 24, 2026) .......... 39, 46, 47

*Abafita v. Aldukham*,
2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019) .......... 39

*Abitron Austria GmbH v. Hetronic Int'l Inc.*,
600 U.S. 412 (2023) .......... *passim*

*Adhikari v. Kellogg Brown & Root, Inc.*,
845 F.3d 184 (5th Cir. 2017) .......... 37, 39

*Aguilera v. Aegis Communications Group, LLC*,
72 F. Supp. 3d 975 (W.D. Mo. 2014) .......... 39

*Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
268 F.3d 103 (2d Cir. 2001) .......... 30

*C.T. v. Red Roof Inns, Inc.*,
2021 WL 602578 (S.D. Ohio July 1, 2021) .......... 39

*Daramola v. Oracle Am., Inc.*,
92 F.4th 833 (9th Cir. 2024) .......... 34

*Emerson v. Dart*,
109 F.4th 936 (7th Cir. 2024) .......... 16, 17

*F.C. v. Jacobs Sols. Inc.*,
790 F. Supp. 3d 1158 (D. Colo. 2025) .......... 39

*Firestone Fin. Corp. v. Meyer*,
796 F.3d 822 (7th Cir. 2015) .......... 17

*Food Mktg. Inst. v. Argus Leaders Media*,
588 U.S. 427 (2019) .......... 34

*G.G. v. Salesforce.com*,
76 F.4th 544 (7th Cir. 2023) .......... 48

*Garvey v. Admin. Rev. Bd., U.S. Dep't of Lab.*,
56 F.4th 110 (D.C. Cir. 2022) .......... 33, 36

*Hackett v. City of S. Bend*,
956 F.3d 504 (7th Cir. 2020) .................... 9

*U.S. ex rel. Hawkins v. ManTech Int'l*,
2024 WL 4332117 (D.D.C. Sept. 27, 2024) .................... 37

*Jogi v. Voges*,
480 F.3d 822 (7th Cir. 2007) .................... 34

*Kellogg Brown & Root Service Inc. v. United States ex rel. Carter*,
575 U.S. 650 (2015)) .................... 27, 28

*Lott v. Pfizer, Inc.*,
492 F.3d 789 (7th Cir. 2007) .................... 40

*Mia v. Kimberly-Clark Corp.*,
2025 WL 752564 (D.D.C. Mar. 10, 2025) .................... 38, 47

*Miao v. United Airlines, Inc.*,
164 F.4th 622 (7th Cir. 2026) .................... 17

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007) .................... 19

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) .................... *passim*

*Motorola Solutions, Inc. v. Hytera Commc'ns Corp. Ltd.*,
108 F.4th 458 (7th Cir. 2024) .................... *passim*

*Pavlovich v. Gaiman*,
2025 WL 2819372 (W.D. Wis. Oct. 3, 2025) .................... 38

*Pavlovich v. Gaiman*,
179 F.4th 603 (2026) .................... 38

*Pfizer, Inc. v. Government of India*,
434 U.S. 308 (1978) .................... 23, 24

*RJR Nabisco v. European Community*,
579 U.S. 325 (2016) .................... *passim*

*Roberts v. City of Chi.*,
817 F.3d 561 (7th Cir. 2016) .................... 10

*Rodriguez v. Pan American Health Org.*,
29 F.4th 706 (D.C. Cir. 2022) .................... 46, 47

*Rodriguez v. United States*,
480 U.S. 522 (1987) .......... 35

*Roe v. Howard*,
917 F.3d 229 (4th Cir. 2019) .......... *passim*

*Ruderman v. Kenosha County, Wisc.*,
178 F.4th 333 (7th Cir. 2026) .......... 48

*Russello v. United States*,
464 U.S. 16 (1983) .......... 33

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) .......... 21

*Taylor v. Salvation Army Nat'l Corp.*,
110 F.4th 1017 (7th Cir. 2024) .......... 31

*United States v. Garcia Sota*,
948 F.3d 356 (D.C. Cir. 2020) .......... 33, 34

*United States v. Melvin*,
948 F.3d 848 (7th Cir. 2020) .......... 27

*U.S. ex rel. Hawkins v. ManTech Int'l*,
2024 WL 4332117, at *7 (D.D.C. Sept. 27, 2024) .......... 37

*WesternGeco LLC v. ION Geophysical Corp.*,
585 U.S. 407 (2018) .......... *passim*

*Yegiazaryan v. Smagin*,
599 U.S. 533 (2023) .......... 32

**Statutes**

18 U.S.C. § 1589 .......... *passim*

18 U.S.C. § 1595 .......... *passim*

18 U.S.C. § 1596 .......... *passim*

18 U.S.C. § 1962 .......... 21, 38

18 U.S.C. § 1964 .......... 21

18 U.S.C. § 3271 .......... 5

18 U.S.C. § 4101(e) .......... 30

Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117–347, 136 Stat. 6199 (2023) .......... 9

Allow States and Victims to Fight Online Sex Trafficking Act, Pub. L. No. 115–164, 132 Stat. 1253 (2018) .......... 9

Defend Trade Secrets Act of 2016, Pub L. No. 114-150, 130 Stat. 376 (2016).......... *passim*

Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114–22, 129 Stat. 227 (2015) .......... 9

Trafficking Victims Protection Act, Pub L. No. 106–386, 114 Stat. 1464 (2000) .......... 4, 40

Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. 108–193, 117 Stat. 2875 (2003) .......... 4, 5

Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. 109–164, 119 Stat. 3558 (2006) .......... 5

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110–457, 122 Stat. 5067 (2008) .......... 6, 8

**Other Authorities**

154 Cong. Rec. 23714 (2008) .......... 7

154 Cong. Rec. 24762–63 (2008) .......... 8, 37

H.R. Rep. No. 101–430, pt. I (2008) .......... 37

H.R. Rep. No. 109–317, pt. I (2005) .......... 5, 6

H.R. Rep. No. 110–430, pt. 1 (Nov. 6, 2007) .......... 7

*Offender*, Black's Law Dictionary (12th ed. 2024) .......... 30

## GLOSSARY

| | |
|---|---|
| AAL Br. | Amicus Brief of the Former United States Ambassadors-at-Large to Monitor and Combat Trafficking in Persons as Amici Curiae in Support of Plaintiff-Appellant (Document No. 41) |
| Ambassadors | The Former Ambassadors-at-Large that filed the AAL Br. |
| App. | Plaintiff-Appellant's Appendix (Document No. 27) |
| Br. | Plaintiff-Appellant's Opening Brief (Document No. 21) |
| Milwaukee Tool | Defendant-Appellee, Milwaukee Electric Tool Corporation |
| Plaintiff | Plaintiff-Appellant Xu Lun, who is proceeding pseudonymously |
| RICO | Racketeer Influenced Corrupt Organizations Act |
| SA | Plaintiff-Appellant's Short Appendix (Appendix to Document No. 21) |
| SAG Br. | Amicus Brief of the States of Iowa and 11 Additional States as Amicus Curiae in Support of Plaintiff-Appellant and Reversal (Document No. 33) |
| Shanghai Select | Non-party Shanghai Select Safety Products, Ltd., based in China |
| State AGs | The State Attorneys General that submitted the SAG Br. |
| TJ Br. | Amicus Curiae Brief of Towards Justice in Support of Reversal (Document No. 44) |
| TVPRA | Trafficking Victims Protection Reauthorization Act |

## STATUTES

All pertinent statutes are included in the addendum to this brief.

## INTRODUCTION

Plaintiff, a foreign national and resident of China, seeks money damages from Milwaukee Tool. He brings a civil claim under the TVPRA for forced labor that he allegedly suffered as a political prisoner in China. Plaintiff alleges that he was forced to produce work gloves by prison guards, who were agents of the Chinese government and had purportedly conspired with a Chinese company.

Given Milwaukee Tool's robust commitment to ethical labor practices, Plaintiff's attempt to link Milwaukee Tool to the alleged trafficking is, unsurprisingly, attenuated.[1] Plaintiff alleges that: (a) Milwaukee Tool contracted to purchase several models of its work gloves from a supplier based in Hong Kong, (b) that supplier, in turn, contracted with a manufacturer in China, (c) that Chinese manufacturer, in turn, allegedly outsourced its production of certain gloves to Chinese prison officials, and (d) while Plaintiff was imprisoned in China, those prison officials allegedly forced him to make gloves bearing the Milwaukee Tool logo. Plaintiff does not allege any facts (nor could he) that would support finding Milwaukee Tool knew about the alleged conduct of Chinese prison officials three levels down the alleged supply chain, much less participated in it.

The district court rightly found that Plaintiff failed to state a claim against Milwaukee Tool. The district court correctly held that the TVPRA's civil remedy provision—18 U.S.C. § 1595(a)—does not authorize claims, such as Plaintiff's, for forced labor that allegedly occurred abroad. And the district court also correctly concluded that Plaintiff's claim seeks an impermissible extraterritorial, not domestic, application of

[1] Milwaukee Tool denies that it has ever purchased gloves manufactured at a Chinese prison. Milwaukee Tool believes, if Plaintiff did indeed make gloves in prison, that the gloves at issue were counterfeit products.

Section 1595(a). The district court reached this holding by correctly applying the longstanding presumption against extraterritoriality, doing so precisely in the manner directed by the Supreme Court.

Plaintiff, and the *amici* supporting reversal, now ask this Court to ignore the clear commands of Supreme Court precedent and to read Section 1595(a) to say something it does not. Their arguments principally rely on the TVPRA's separate and distinct grant of jurisdiction over *criminal* prosecutions of certain extraterritorial conduct. But, that extraterritorial grant, set forth in Section 1596, *says nothing* about extraterritorial application of the *civil* remedy in Section 1595. And, as the district court correctly recognized, Plaintiff's argument that Section 1595 incorporates the extraterritoriality of its predicates is foreclosed by the Supreme Court's central holding in *RJR Nabisco v. European Community*, 579 U.S. 325 (2016). It is settled law that a statute creating a private civil cause of action does not apply to conduct abroad merely because the underlying predicate offense does. Something more is needed. But, here, nothing in the text of Section 1595, or elsewhere in the TVPRA, clearly and affirmatively indicates that Congress intended the civil remedy to apply extraterritorially. Thus, it does not.

Alternatively, Plaintiff, and certain *amici*, argue that Plaintiff's claim for the forced labor he allegedly suffered at the hands of Chinese prison officials in a Chinese prison camp on behalf of a Chinese manufacturer is a domestic, not extraterritorial, application of the TVPRA. The sole basis for their argument is that Milwaukee Tool allegedly experienced some tangential "benefit" in the United States through the purchase of cheaper gloves from its supplier. This theory falls short for several reasons, not least of which is that it rests on the conclusory assertion that Milwaukee Tool actually received and sold the gloves Plaintiff allegedly produced, a wholly unsupported proposition.

Further, even if Plaintiff had plausibly alleged that Milwaukee Tool "benefitted" in the United States (he has not), that would still not render his claim domestic. The focus of the forced labor statute is on engaging in prohibited labor practices, whether directly or through participation in a trafficking venture. Here, Plaintiff cannot claim Milwaukee Tool engaged in forced labor directly or through a joint venture in the United States. The alleged forced labor, and any associated venture, was indisputably located in China and three steps removed from Milwaukee Tool and the territorial borders of the United States.

At bottom, Plaintiff, and *amici*, urge this Court to stretch the TVPRA well beyond its meaning. As they would have it, Americans and American companies would be subject to civil TVPRA claims any time they purchase a product allegedly produced with forced labor abroad, because they ostensibly "benefit" from a lower price. That is not the statute Congress passed.

This Court should affirm.

## JURISDICTIONAL STATEMENT

The Jurisdictional Statement of Appellant is complete and correct.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly held that the TVPRA's civil cause of action (18 U.S.C. § 1595(a)), which is silent on extraterritorial application, does not grant courts jurisdiction to decide private civil claims premised on alleged forced labor in China.

2. Whether the district court correctly held that Plaintiff's claim premised on alleged forced labor in China is an extraterritorial, as opposed to domestic, application of the TVPRA.

## STATEMENT OF THE CASE

### A. Statutory History of the TVPRA.

Throughout the TVPRA's long history of intentional and incremental expansion, Congress has acted separately and distinctly with respect to the statute's criminal and civil provisions. This history illustrates that Congress has not, in any way, indicated that the TVPRA's civil cause of action in Section 1595 is co-extensive with its criminal provisions, much less that it confers extraterritorial jurisdiction.

#### 1. Congress Criminalizes Human Trafficking.

Congress enacted the Trafficking Victims Protection Act ("TVPA") in 2000 "to 'combat trafficking in persons, a contemporary manifestation of slavery,'" "'to ensure just and effective punishment of traffickers, and to protect their victims.'" SA–14–15 (quoting Pub. L. No. 106–386, § 102, 114 Stat. 1466 (2000)). "As initially passed into law, the Act criminalized and provided increased penalties for various forms of human trafficking," including sale into involuntary servitude (Section 1584), forced labor (Section 1589), trafficking with respect to peonage (Section 1590), and commercial sex trafficking (Section 1591), among others. SA–15. "Initially, the TVPA was exclusively a criminal statute and is thus found in Title 18 of the United States Code," which is titled "Crimes and Criminal Procedure." *Id.*

#### 2. Congress Adds a Civil Remedy for Certain Crimes, But Without Extraterritorial Reach.

In 2003, Congress passed the TVPRA, which amended and reauthorized the TVPA. Pub. L. 108–193, 117 Stat. 2875, Sec. 4 (2003). The amended legislation added, among other things, a civil cause of action, codified at Section 1595 with the title, "Civil remedy." *Id.* This provision allowed victims of some, but not all, of the TVPRA's substantive

criminal provisions to bring claims against perpetrators for money damages in federal court. *Id.* Nothing in the text of the 2003 amendments or associated legislative history suggests that Congress intended the newly enacted civil remedy to apply extraterritorially.

### 3. Congress Adds Extraterritorial Jurisdiction for the Prosecution of Certain Offenders.

The next round of amendments and reauthorization came in 2005. *See* TVPRA of 2005, Pub. L. No. 109–164, § 103, 119 Stat. 3558, 3562 (2006). At that time, Congress added extraterritorial jurisdiction for certain *criminal* offenses, giving courts jurisdiction "over Federal Government employees or contractors, and those accompanying them, for the *prosecution* of Federal trafficking *offenses* that are committed outside the United States." H.R. Rep. No. 109–317, pt. I, at 19 (2005) (emphases added). The new provision was codified at 18 U.S.C. § 3271. It placed important limits on the expanded jurisdictional scope for such prosecutions, including requiring approval by the Attorney General or Deputy Attorney General in certain circumstances. *See* 18 U.S.C. § 3271(b) (prohibiting prosecution, for offenses committed outside of the United States, of persons previously subject to prosecution by a foreign government unless approved). These limitations reflect measured Congressional judgment: a check held by the highest levels of the executive branch for extraterritorial prosecutions, which raise serious international relations concerns.

The genesis for this expansion of criminal jurisdiction was specific and targeted. Congress recognized that federal law extended jurisdiction to offenses by "Department of Defense contractors and other Federal contractors operating abroad in support of a Department of Defense mission," but did not cover other contractors. H.R. Rep. No. 109–317, pt. I, at 19 (2005). Given a "concern[] about the involvement of Federal contractors

in human trafficking" and the inability to prosecute non-Defense contractors involved in sex trafficking in Bosnia-Herzegovina, Congress enacted this expansion. *Id.*

### 4. Congress Expands Extraterritorial Criminal Jurisdiction but Does Not Apply that Expansion to the Civil Remedy.

In 2008, Congress amended the jurisdictional scope of the TVPRA's criminal provision and broadened the scope of the civil provisions. *See* William Wilberforce TVPRA of 2008, Pub. L. No. 110–457, §§ 221–23, 122 Stat. 5067 (2008).

#### a. Congress Adds Extraterritorial Criminal Jurisdiction Over Certain Offenders for Certain Offenses.

With respect to the scope of criminal jurisdiction, Congress expanded the TVPRA's extraterritorial reach, adding Section 1596, titled "Additional jurisdiction in certain trafficking offenses." *Id.* § 223. Section 1596 provides that "the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591" so long as the "alleged offender is a national of the United States or an alien lawfully admitted for permanent residence" or "present in the United States." *Id.* (codified at 18 U.S.C. § 1596(a)). This list encompasses a subset of the TVPRA's substantive criminal provisions but does not contain any reference to the civil remedy provision in Section 1595.

Congress also notably imported the same explicit limitation on prosecutions "under this section," 18 U.S.C. § 1596(b), that it previously enacted with respect to extraterritorial jurisdiction over criminal offenses by government contractors. Specifically, Section 1596(b), titled "Limitation on prosecution of offenses prosecuted in other countries," provides that:

> No prosecution may be commenced against a person under this section if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct

> constituting such offense, except upon the approval of the Attorney General or the Deputy Attorney General (or a person acting in either such capacity, which function of approval may not be delegated).

18 U.S.C. § 1596(b). This again reflects Congressional judgment concerning the necessity of safeguards against the potential friction with other sovereigns that may arise in extraterritorial applications of the TVPRA.

The clear textual references to "offenses," "offenders," and "prosecution[s]" confirm the exclusively criminal focus of Section 1596.

So too does the legislative history. For example, a House Foreign Affairs Committee Report explains that the 2008 amendments were aimed at "expanding and revising U.S. *criminal* violations, including creating *crimes* against sex tour operators and facilitating extraterritorial *prosecutions* against international trafficking *criminals*." H.R. Rep. No. 110–430, pt. 1, at 35 (Nov. 6, 2007) (emphasis added). The Report explains that Section 222, titled "Jurisdiction in Certain Trafficking Offenses," "provides jurisdiction to U.S. courts for the *prosecution* of certain trafficking *offenses* committed abroad." *Id.* at 51 (emphases added).

What is more, the co-sponsor of the Senate version of Section 1596, Senator Durbin, explained the motivation for the expansion as follows: "to close" "a legal loophole in current law" whereby "[t]he U.S. government is allowed to prosecute human traffickers who commit crimes in the United States, but it is not permitted to prosecute traffickers who commit crimes abroad and then come to our shores." 154 Cong. Rec. 23714 (2008) (statement of Sen. Durbin). Section 1596 was enacted specifically to fix that problem.[2]

---

[2] When Senator Durbin's proposed language for Section 1596 was incorporated into the Senate's version of the 2008 TVPRA, he again confirmed the criminal focus: "[T]he TVPRA contains a law enforcement initiative that I introduced with Senator Coburn called the Trafficking in Persons Accountability Act, which will allow Federal

Conversely, there is *nothing* in the Congressional record to suggest that Congress intended Section 1596 to also expand the TVPRA's *civil* remedy to overseas conduct.

### b. Congress Expands the Civil Remedy Without Any Reference to Extraterritorial Application.

At the same time Congress added Section 1596, Congress expanded Section 1595 to permit victims to sue perpetrators of any of the TVPRA's substantive criminal prohibitions as well as anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." Pub. L. No. 110–457, § 221. Congress did not, however, reference any extraterritorial application of Section 1595. Nor did Congress cross-reference Section 1596, which applies to only a subset of the substantive criminal provisions covered by Section 1595.

### 5. Subsequent Amendments to Section 1595 Have Not Expanded the Civil Remedy to Conduct Outside the United States.

Section 1595 has been amended three times since 2008. None of those amendments added any language indicating that Congress intended for TVPRA's civil remedy to apply extraterritorially.

First, in 2015, Congress made a minor amendment to the statute of limitations provision in 18 U.S.C. § 1595(c) to toll the limitations period until a minor victim turns 18

---

prosecutors to investigate and prosecute traffickers found in the United States even if their trafficking crimes were committed abroad. This initiative, which I discussed in more detail in a Congressional Record statement on October 1, 2008, makes an important statement about this nation's intolerance for human rights abuses wherever they occur." 154 Cong. Rec. 24762–63 (2008) (statement of Sen. Durbin). He said nothing of extraterritorial civil claims.

years of age. Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114–22, § 120, 129 Stat. 227, 247 (2015).

Next, in 2018, Congress amended Section 1595 to add subsection (d), which permits State Attorneys General to bring civil actions against "any person who violates section 1591" for sex trafficking if the State Attorney General "has a reason to believe that an interest of the residents of that State has been or is threatened or adversely affected[.]" Allow States and Victims to Fight Online Sex Trafficking Act, Pub. L. No. 115–164, § 6, 132 Stat. 1253, 1255 (2018). Notably, the addition of this section came without any indication that State Attorneys General have *carte blanche* authority to pursue extraterritorial conduct via civil claims, as Plaintiff and *amici* would have it. Nor would that make sense, given that Congress placed clear limitations on the *federal* government in criminally pursuing extraterritorial conduct.

And, most recently, Section 1595(a) was amended in 2023 to allow for civil claims against persons whom "attempt[] or conspire[] to benefit" from a violation. Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117–347, § 102, 136 Stat. 6199, 6200 (2023). Again, Congress did not address extraterritoriality.

**B. Factual Background.**

Plaintiff asserts a single cause of action against Milwaukee Tool, claiming a violation of Section 1589(b).[3] That criminal statute prohibits "knowingly benefit[ting] . . . from participation in a venture which has engaged in the providing or obtaining of

[3] The Amended Complaint also asserts a violation of Section 1589(a), but Plaintiff has not pursued that claim on appeal, thus forfeiting it. *See Hackett v. City of S. Bend*, 956 F.3d 504, 510 (7th Cir. 2020) ("An appellant who does not address the rulings and reasoning of the district court forfeits any arguments he might have that those rulings were wrong").

labor or services by [certain enumerated] means . . . , knowing or in reckless disregard" of the venture's forced labor violations. 18 U.S.C. § 1589(b).

Far from being involved in any venture that allegedly trafficked Plaintiff in China, Milwaukee Tool unequivocally condemns forced labor. Milwaukee Tool is an industry leader on ethical labor practices, having enacted a Policy Against Modern Slavery and Human Trafficking over a decade ago. App.–40 (¶ 104). Thus, it is not surprising that Plaintiff's attempt to tie Milwaukee Tool to the harm he purportedly suffered at the hands of the Chinese government relies on speculative and conclusory assertions that are not supported by well-pleaded facts.[4]

#### 1. Plaintiff Was Allegedly Trafficked by Guards at the Chishan Prison.

Plaintiff,[5] a resident of China, was imprisoned by the Chinese government after being convicted for subversion of state power in July 2021. *Id.* at 13, 22 (¶¶ 12, 37). Although he was originally sentenced to five years' imprisonment, Plaintiff was released in July 2022, one year after his conviction. *Id.*

For a portion of his imprisonment, Plaintiff was housed at Hunan Chishan Prison in Hunan Province, China (the "Prison"), which has a factory within its walls and, according to Plaintiff, is known for forced labor and torture of prisoners. *Id.* at 13, 21–22 (¶¶ 12, 34, 37). The Amended Complaint alleges that, during Plaintiff's time at the Prison,

---

4 As required, the district court "'accept[ed] all well-pleaded facts as true and dr[e]w reasonable inferences in [Plaintiff]'s favor.'" SA–12 (quoting *Roberts v. City of Chi.*, 817 F.3d 561, 564 (7th Cir. 2016)). Accordingly, Milwaukee Tool's recitation of the Amended Complaint's allegations is not an admission of their veracity. Milwaukee Tool contests many of the allegations, which are demonstrably false.

5 Plaintiff moved, and was granted leave to proceed pseudonymously, on the ground that he fears retaliation by his alleged traffickers—the Chinese government. *See* Order Granting Motion to Proceed Pseudonymously, ECF No. 26 (Oct. 2, 2024).

"[a]ll prisoners, criminal and political, at Chishan Prison were subjected to forced labor" by Prison officials—employees and agents of the Chinese government—under grueling conditions. *Id.* at 24 (¶ 47). Although prison labor is permitted in China and inmates were compensated for their work, Plaintiff alleges the amount paid was minimal and "prison officials always came up with excuses to deduct [inmates'] pay." *Id.* at 25 (¶ 53). Plaintiff also alleges that inmates that refused to work or did not work hard enough were threatened and punished by prison officials. *Id.* (¶ 54). The punishment ranged from restrictions on visitation time to solitary confinement and physical abuse. *Id.*

During his time at Chishan Prison, Plaintiff was allegedly "subjected to five months of forced labor" by the Prison's guards, starting "[o]n or around February 23, 2022" and continuing until his release on July 21, 2022. *Id.* at 22 (¶ 37). Plaintiff claims he was forced by prison guards "to make a variety of textile goods." *Id.* One of the items he was allegedly forced to make was a certain line of "work gloves bearing the distinct 'Milwaukee' logo." *Id.*

Significantly, Plaintiff does not allege that anyone affiliated with Milwaukee Tool ordered him to produce the gloves. Rather, he alleges that a "client" of the prison—Shanghai Select, a Chinese company—ordered the gloves. *Id.* at 23 (¶ 44). Plaintiff asserts that "Shanghai Select was frequently mentioned by the prison guards as an important customer" of the Prison, and that "Shanghai Select also sent representatives to the prison to monitor the production and conduct quality control." *Id.*

By Plaintiff's allegations, the prison officials conspired with Shanghai Select to provide a labor source, presumably in exchange for payment or other consideration from Shanghai Select. Together, the prison officials and Shanghai Select allegedly formed a forced labor trafficking venture in China.

### 2. The Amended Complaint's Scant Allegations Concerning Milwaukee Tool.

Aside from Plaintiff's allegation that the gloves he produced bore the Milwaukee logo, the Amended Complaint includes precious few *factual* allegations linking the production of those gloves to Milwaukee Tool.

Located in Brookfield, Wisconsin, Milwaukee Tool is a long-standing and leading brand in the power tool industry. *Id.* at 14, 20 (¶¶ 20, 32). Milwaukee Tool markets and sells hundreds of products, including several lines of heavy-duty work gloves. *Id.* at 26–27 (¶ 59). Milwaukee Tool purchases gloves from a third-party supplier, Techtronic Trading Ltd., a Hong Kong corporation[6] that itself works with suppliers to obtain gloves according to Milwaukee Tool's specifications. *Id.* at 24 (¶ 46).

It is through that standard procurement process, one undoubtedly employed by thousands of American businesses, that Plaintiff seeks to hold Milwaukee Tool liable for the injuries allegedly inflicted on him by Prison officials and Shanghai Select. The sum of Plaintiff's allegations regarding Milwaukee Tool's involvement with the production of its work gloves is that Milwaukee Tool:

a) designed several models of gloves (*Id.* at 26–28 (¶¶ 57, 59, 61)), and

b) contracted with its supplier, non-party Techtronic Trading Ltd., who in turn allegedly contracted with Shanghai Select for the manufacture of certain lines of work gloves (*Id.* at 24, 43 (¶¶ 46, 112)).

That is it.

---

[6] Techtronic Trading Ltd.'s parent company, Techtronic Industries Company, Limited, was a named defendant in the Amended Complaint but was dismissed by the district court for lack of personal jurisdiction. *See* SA–3–4. Plaintiff voluntarily dismissed Techtronic Industries Company, Ltd. from this appeal.

Plaintiff does not allege, nor could he, that Milwaukee Tool had a direct relationship with Shanghai Select, much less that Milwaukee Tool directed Shanghai Select to outsource its production to officials at the Prison. He also does not allege that Milwaukee Tool had any knowledge that Shanghai Select conspired with those officials to produce gloves through forced labor to sell them to Techtronic Trading Ltd. Nor does he allege that the gloves bearing the Milwaukee logo that he allegedly produced were authentic or even actually sold to Milwaukee Tool, a serious and striking omission given the ubiquity of counterfeit products manufactured in China.

Instead, Plaintiff offers nothing more than speculative and conclusory allegations. He claims that Milwaukee Tool should have known that Shanghai Select, one of the largest glove suppliers in the world, allegedly used forced labor merely because of his subjective belief (without factual support) that Shanghai Select was able to deliver gloves to Milwaukee Tool's supplier at a lower price. *Id.* at 41 (¶ 108). And he urges that the mere existence of generic and generalized statistics concerning the purported prevalence of forced labor in China also means that Milwaukee Tool should have known that its gloves were the product of forced labor. *Id.* at 30–32 (¶¶ 66–75).

Finally, Plaintiff relies on allegations concerning actions taken by U.S. Customs and Border Protection and Walmart in 2024 (Br. 12 (citing App.–11, 46–47)), years after his alleged trafficking in 2022. Those allegations are irrelevant to this lawsuit. They cannot possibly support any knowledge of Milwaukee Tool during the relevant period here, and Plaintiff's reliance on them only serves to highlight the dearth of facts supporting his claim.[7]

---

[7] If this lawsuit proceeds to discovery, Milwaukee Tool will demonstrate that Walmart is not and has never been an authorized distributor of Milwaukee Tool products.

### C. The District Court Dismisses Plaintiff's Amended Complaint Against Milwaukee Tool as Impermissibly Extraterritorial.

After Plaintiff filed suit, Milwaukee Tool moved to dismiss on multiple grounds, including that Plaintiff's claim is impermissibly extraterritorial. In response, Plaintiff filed the Amended Complaint. Milwaukee Tool again moved to dismiss, asserting substantially the same arguments.

The district court granted Milwaukee Tool's motion, finding that the TVPRA's civil remedy does not apply extraterritorially to Plaintiff's claim for forced labor in China. SA–2. The district court analyzed the issues at length and applied the "two-step framework for determining whether a statute overcomes the presumption" against extraterritoriality, as confirmed by the Supreme Court in *RJR Nabisco*. *Id.* at 13.

First, the district court considered whether "Congress clearly and affirmatively intended for the [TVPRA's civil remedy] statute to have extraterritorial effect." *Id.* For this analysis, the court started with the text of Section 1595, which the court found "says nothing regarding extraterritorial application." *Id.* at 16. The court then turned to Plaintiff's invocation of "Section 1596's grant of 'extra-territorial jurisdiction' over violations of Section 1589." *Id.* (quoting 18 U.S.C. § 1596). Although the court "agree[d] that in enacting Section 1596, Congress clearly and affirmatively indicated that Section 1589 applies to conduct occurring outside the United States," the court rejected Plaintiff's argument that such extraterritorial grant was sufficient to support Plaintiff's civil claim. *Id.*

---

The products that Walmart allegedly stopped carrying were not sold by Milwaukee Tool. Rather, they were sold by independent third-party vendors through Walmart.

The district court explained: "as the Supreme Court made clear in *RJR Nabisco*, the fact that the government can prosecute a *criminal violation* of the statute that takes place outside the country does not necessarily mean that a plaintiff can maintain a *civil claim* based on the same conduct." *Id.* (emphasis in original). Rather, *RJR Nabisco* teaches that "[c]ourts must 'separately apply the presumption against extraterritoriality' to the civil cause of action itself, even if the presumption has already been overcome with respect to the underlying substantive provision." *Id.* (quoting *RJR Nabisco*, 579 U.S. at 346).

In doing so, the district court noted that "[t]here is no mention of Section 1595" in Section 1596, which "indicates that Section 1595 does not apply" to conduct abroad. *Id.* at 17–18. "Nor is there anything else in the statute suggesting Congress's intent to extend the TVPA's civil remedies to overseas conduct." *Id.* Thus, the district court found that it "must conclude that Congress did not intend for the civil remedy in Section 1595 to apply to foreign conduct" because there was no affirmative, clear, and unmistakable grant of extraterritorial application. *Id.* at 17.

The district court further concluded that the "text of Section 1596 itself strongly suggests Congress's intention to limit Section 1596's application to criminal prosecutions." *Id.* at 19. Section 1596 refers to "offenses" and addresses jurisdiction over "prosecution" "under this section," all uniquely criminal terms. *Id.* (quoting 18 U.S.C. § 1596). And the district court rejected Plaintiff's arguments to the contrary, finding them inconsistent with the Supreme Court's instructions in *RJR Nabisco* and this Court's holding in *Motorola Solutions, Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458 (7th Cir. 2024). SA–17–21.

Ultimately, the district court found that "there is no clear, affirmative indication from Congress that Section 1595 applies to extraterritorial conduct." *Id.* at 22. Thus, the district court next considered "whether [Plaintiff]'s allegations involve a permissible, domestic application." *Id.* at 22. That question involves determining whether the conduct relevant to the statute's focus—*i.e.*, what the statute seeks to regulate—occurred in the United States. *Id.* at 23.

Applying the Supreme Court's instruction in *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407 (2018), the district court looked at both Section 1595 (the civil cause of action) and the alleged substantive violation, Section 1589. *Id.* at 23–24. The district court found that "[i]t is clear from the text of Section 1589," including subpart (b), "that the underlying 'focus' of the provision is to prohibit the use of forced labor." *Id.* at 24. Because "it is undisputed that [Plaintiff]'s allegations of forced labor occurred in China," the district court held that his "claims do not involve a permissible, domestic application" and "therefore must be dismissed." *Id.*

Having dismissed the Amended Complaint against Milwaukee Tool with prejudice on extraterritoriality grounds, the district court declined to reach Milwaukee Tool's other arguments for dismissal.[8]

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *Emerson v. Dart*, 109 F.4th 936, 940 (7th Cir. 2024). "To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must 'state a claim to relief that

[8] Milwaukee Tool maintains that the unaddressed arguments raised in its motion also warrant dismissal with prejudice even if this Court disagrees with the district court's analysis of the extraterritoriality issues.

is plausible on its face.'" *Id.* at 941 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to be plausible, rather than merely conceivable, the complaint's "factual content must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (cleaned up). Although "well-pleaded factual allegations" are accepted as true, *Emerson*, 109 F.4th at 941, conclusory and "[s]peculative allegations . . . are not enough," *Miao v. United Airlines, Inc.*, 164 F.4th 622, 624 (7th Cir. 2026).

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's well-reasoned decision. It is correct on both steps of the extraterritoriality analysis and correctly applies the Supreme Court's commands and this Court's precedent.

*First*, the TVPRA does not authorize civil suits for forced labor that allegedly occurred outside the United States. *RJR Nabisco* requires a clear, affirmative, and unmistakable instruction of extraterritorial application. 579 U.S. at 335. Where, as here, the statute at issue provides a private right of action, the presumption against extraterritoriality cannot be overcome merely because the private right of action's substantive predicates govern conduct abroad. *Id.* at 350. "Something more is needed" to establish that Congress clearly, affirmatively, and unmistakably gave the civil cause of action extraterritorial reach. *Id.*

Here, "something more" is absent. Section 1595(a), the TVPRA's civil remedy provision, is silent, and no other section of the TVPRA says anything about extraterritorial civil claims. To the contrary, the statutory text, context, and history all confirm that the civil cause of action does not apply abroad.

Plaintiff's arguments to the contrary are not well-taken.[9] Plaintiff relies on the text of the TVPRA's extraterritorial expansion for *criminal* prosecutions, but that statute—Section 1596—says nothing about *civil* claims. Moreover, its context, purpose, and history confirm that Congress intended Section 1596 to apply only to criminal prosecutions, and that Congress did not intend for its extraterritorial expansion to include the private civil cause of action in Section 1595(a).

*Second*, because the district court correctly found Section 1595(a) does not authorize causes of action premised on extraterritorial conduct, Plaintiff's claim may only proceed if it qualifies as a domestic application of Section 1595. Here, Plaintiff is a foreign national and resident of China who alleges he was subject to forced labor in China, by Chinese prison officials, who contracted with a Chinese supplier. These allegations do not support the conclusion that Plaintiff's claim is a "domestic" application of Section 1595(a).

For a civil claim to qualify as "domestic," the conduct relevant to its "focus" must have occurred in the United States. *WesternGeco*, 585 U.S. at 412–16. The "focus" of a statute is the core conduct that it seeks to regulate, not the effects of that conduct. *Abitron Austria GmbH v. Hetronic Int'l Inc.*, 600 U.S. 412, 435 (2023).

Here, Section 1595(a) provides a civil cause of action for victims of violations of the TVPRA, meaning that the conduct violating the statute is its focus. The violation at issue—forced labor under Section 1589(b)—prohibits participation in a trafficking venture and works in tandem with Section 1589(a) to criminalize all participants in the

---

9 When describing and responding to "Plaintiff's argument," this brief also addresses the same arguments as raised by the *amici*. To the extent that this brief addresses an argument raised solely by the *amici*, and not Plaintiff, the brief attributes the argument to the *amici* that have raised it. To be sure, Milwaukee Tool rejects all arguments that have been raised in favor of reversal.

trafficking operation. Thus, forced labor is the statutory focus, and conduct constituting participation in trafficking is what the relevant provisions seek to regulate.

Plaintiff's alleged forced labor and trafficking indisputably occurred in China allegedly at the hands of the Chinese government and a Chinese company (together, the operators of the alleged trafficking venture). Thus, the conduct relevant to the focus of his claim is clearly extraterritorial.

## ARGUMENT

### I. The TVPRA's Civil Remedy Provision Does Not Apply Extraterritorially.

It is well settled that "United States law governs domestically but does not rule the world." *RJR Nabisco*, 579 U.S. at 335; *see also Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007). The Supreme Court has repeatedly affirmed that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco*, 579 U.S. at 335; *see also Abitron*, 600 U.S. at 417–20. This principle, known as the "presumption against extraterritoriality," requires courts to presume that federal statutes do not apply "to conduct in the territory of another sovereign." *Abitron*, 600 U.S. at 417 (citations and quotations omitted).

To overcome the presumption, a federal statute must contain "a clear, affirmative indication" that it applies to conduct abroad. *RJR Nabisco*, 579 U.S. at 337. "The question is not whether [a court] think[s] 'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court,' but whether Congress has *affirmatively* and *unmistakably* instructed that the statute will do so." *Id.* at 335 (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 261 (2010)) (emphasis added).

There are several reasons for the presumption. "Most notably, it serves to avoid international discord that can result when U.S. law is applied to conduct in foreign countries," *RJR Nabisco*, 579 U.S. at 335–36, by preventing "'unintended clashes between our laws and those of other nations,'" *WesternGeco*, 585 U.S. at 412–13 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). It also "rests on 'the commonsense notion that Congress generally legislates with domestic concerns in mind.'" *Id.* at 412 (quoting *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993)). Thus, courts must "apply the presumption across the board," even in cases where there may be no conflict with foreign law. *RJR Nabisco*, 579 U.S. at 336. And the presumption must be applied to all statutes, not just substantive provisions. *Id.* at 337 ("We must ask" whether the presumption has been rebutted "regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction").

In cases that concern whether a civil right of action applies extraterritorially, such as this one, the Supreme Court's decision in *RJR Nabisco* controls the analysis. As announced there, "the presumption against extraterritoriality must be applied separately to both [the statute]'s substantive provisions and its private right of action." *Id.* at 350. What is more, "[i]t is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries. *Something more is needed*" to show that Congress gave the civil cause of action extraterritorial reach. *Id.* (emphasis added).

There is good reason for this additional requirement. "The creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion." *Id.* at 346 (quoting

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004)). Moreover, "providing a civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." *Id.* at 346–47.

In *RJR Nabisco*, the Supreme Court applied these principles to RICO, and considered whether it has extraterritorial effect, including its criminal liability provision (18 U.S.C. § 1962) and its civil cause of action (18 U.S.C. § 1964(c)). *Id.* RICO's criminal provision prohibits racketeering activity, which the Supreme Court observed is defined "to include a number of predicates that plainly apply to at least some foreign conduct." *Id.* at 338. The Court concluded that "Congress's incorporation of . . . extraterritorial predicates" provides the required "clear, affirmative indication that § 1962 applies to foreign racketeering activity—but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *Id.* at 339. In other words, the Court held that if the predicate statute overcomes the presumption against extraterritoriality, then a prosecution under RICO's criminal provision based on that predicate applies to overseas conduct. *Id.* ("We emphasize the important limitation that foreign conduct must violate a predicate statute that manifests unmistakable congressional intent to apply extraterritorially." (internal quotation marks omitted)).

That analysis did not apply to RICO's civil right of action, however. And the Court reached the opposite conclusion with respect to that civil cause of action: RICO Section 1964(c) does not apply extraterritorially. *Id.* at 349–54. The "something more" required to establish extraterritorial reach was missing. The Court started with the statutory text, noting that "[n]othing in § 1964(c) provides a clear indication that Congress intended to create a private right of action" for extraterritorial conduct. *Id.* at 349. Nor is there

anything else in the RICO statute that clearly and unmistakably indicates Congressional intent for civil right of action to apply abroad.

The same result follows with respect to the TVPRA. It is undisputed that Section 1589's criminal prohibition on forced labor applies extraterritorially. But, as the district court correctly found, the TVPRA's private right of action—granted by Section 1595(a)—does not overcome the presumption. Thus, Plaintiff's claim is impermissibly extraterritorial.

### A. There Is No "Clear, Affirmative Indication" that Section 1595(a) Applies Extraterritorially.

To determine whether a federal statute applies extraterritorially, Courts employ "traditional tools of statutory interpretation." *Motorola*, 108 F.4th at 481. That analysis, of course, starts with "the statutory text." *Id.* Here, the TVPRA's civil cause of action in Section 1595(a) provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).

The plain text of Section 1595(a) says nothing about the right to bring civil actions based on conduct abroad. Nor does any other provision of the TVPRA. That silence dooms Plaintiff's claim. As the Supreme Court has made clear, "[i]t is a 'rare statute that clearly evidences extraterritorial effect despite lacking an *express* statement of extraterritoriality.'" *Abitron*, 600 U.S. at 420 (quoting *RJR Nabisco*, 579 U.S. at 340) (emphasis added); *see also WesternGeco*, 585 U.S. at 413 (stating that presumption "can

be rebutted *only if the text* provides a 'clear indication of extraterritorial application'" (emphasis added) (quoting *Morrison*, 561 U.S. at 255)).

Had Congress wanted the TVPRA's private right of action to apply extraterritorially, it could have easily expressed that intention. But it did not. Thus, as the district court rightly held, without a clear, affirmative, and unmistakable instruction from Congress, the statute does not apply beyond U.S. shores. SA–17; *see also Morrison*, 561 U.S. at 255 ("When a statute gives no clear indication of an extraterritorial application, it has none.").

The only text in Section 1595(a) that Plaintiff passingly argues evinces extraterritorial application is that the section uses the phrase "victims" to describe who may bring a suit. Br. 32. He argues that must mean "foreign victims" of "foreign trafficking" because the preamble of the 2000 TVPA—not the statute that enacted Section 1595—generally referred to "victims" being trafficked into other countries. And he attempts the same point with the term "perpetrators," whom Section 1595(a) says can be sued for trafficking violations. Br. 33. This argument fails for several reasons.

First, the statutory purpose of the 2000 TVPA has no bearing on what Congress meant years later with the enactment of Section 1595. Second, Plaintiff mischaracterizes the 2000 TVPA preamble. Far from suggesting that Congress imbued either "victim" or "perpetrator" with extraterritorial meaning, the preamble made generic findings about how "victims" could be trafficked internationally by "perpetrators," which says nothing about application to solely foreign conduct. *See* Br. 30–32. Indeed, domestic trafficking could result in a victim from the U.S. taken abroad, or a U.S. person bringing a victim to the U.S., neither of which is what occurred here—Plaintiff was allegedly trafficked by the Chinese government in China. Third, Plaintiff's argument relies on *Pfizer, Inc. v.*

*Government of India*, 434 U.S. 308 (1978), but the Supreme Court made clear in *RJR Nabisco* that *Pfizer* came "before we honed our extraterritoriality jurisprudence." 579 U.S. at 353.

Plaintiff also argues that the district court's conclusion is inconsistent with this Court's decision in *Motorola*. Not so. In *Motorola*, this Court applied the *RJR Nabisco* framework to the Defend Trade Secrets Act ("DTSA"). 108 F.4th at 480. The DTSA was enacted in 2016, "amending sections of the Economic Espionage Act of 1996 (EEA)" which "had added chapter 90 to title 18 of the United States Code." *Id.* The EEA made "the theft of trade secrets a federal crime in many situations." *Id.* The EEA also enacted Section 1837, titled "Applicability to conduct outside of the United States," which provides that "[t]his chapter also applies to conduct outside of the United States if . . . an act in furtherance of the offense was committed in the United States." *Id.* (quotations omitted). Thus, the EEA's criminal provisions applied extraterritorially. *Id.*

For its part, the DTSA amended chapter 90 in several ways, including creating a private right of action, which was codified in chapter 90 as Section 1836(b). *Id.* Importantly, "[t]he DTSA made *no changes* to Section 1837." *Id.* (emphasis added). Thus, this Court held that although the text of Section 1836(b) did not expressly refer to extraterritorial application, the rest of the DTSA provides the "something more" required to clearly and affirmatively indicate that the private right of action applies abroad. This Court focused on the reference to "*this chapter*" in Section 1837's extraterritorial grant over "conduct" abroad and the fact that Congress did not amend that section when adding the private right of action. *Id.* at 482, 485. This Court explained that "Congress's decision to leave the introductory language in Section 1837 unchanged . . . is more persuasive

textual evidence" of clear Congressional intent for it to apply to the civil cause of action. *Id.* at 485.

Ultimately, this Court rejected the defendant's argument to the contrary as amounting to a "suggestion that we treat section 1837 as meaning something other than what it says." *Id.* at 484. By its plain terms, Section 1837 applies to all of chapter 90, including the private right of action added by the DTSA, and thus civil claims can be brought based on extraterritorial conduct. *Id.*

This Court found that its conclusion was buttressed by the history of the DTSA, "including detailed line-editing of chapter 90," which this Court held "indicates that Congress carefully relied on existing provisions of the EEA and wrote the DTSA so that provisions of both acts would mesh smoothly." *Id.* at 485. "Congress made detailed changes to other sections of chapter 90 but not to section 1837." *Id.* That was a "choice" this Court "treat[ed] . . . as intentional," meaning that it was evidence that Congress intended to leave Section 1837 as applicable to the whole of chapter 90 as revised. *Id.*

Here, the district court correctly applied *Motorola* in its analysis. As the district court concluded, *Motorola* "further demonstrates that Section 1595 [of the TVPRA] does not apply extraterritorially." SA–20. "Unlike Section 1837 of the DTSA, which clearly and affirmatively states that 'this chapter' applies to conduct outside the United States where certain conditions are met," the TVPRA contains no such indication that the entire statutory chapter, including Section 1595, applies abroad. *Id.* Quite the opposite: the grant of extraterritorial jurisdiction in "Section 1596 applies only to certain, enumerated sections . . . and makes no mention of the civil remedy available via Section 1595." *Id.*

It is also notable that here, unlike the DTSA, the extraterritorial expansion (Section 1596) came *after* the civil remedy (Section 1595) was enacted. There is a significant

difference between a civil remedy being added to a statute with an extraterritorial provision already applicable to the whole statute (as in *Motorola*), versus a follow-on extraterritorial section that makes no express reference to the entire statute or to the pre-existing civil remedy provision that never previously applied extraterritorially (as in this case). At bottom, the TVPRA lacks the clear, affirmative, and unmistakable "something more" needed for the civil remedy provision to apply abroad.

### B. Section 1596 Does Not Clearly and Unmistakably Instruct Courts to Apply Section 1595 Extraterritorially.

In his attempt to identify the "something more" required by *RJR Nabisco*, Plaintiff misconstrues the import of Section 1596 to a proper extraterritoriality analysis.

#### 1. Section 1596 Does Not Expressly Refer to Civil Claims.

First, Plaintiff argues that Section 1596 provides an "express statement of extraterritorial application" for Section 1595. Br. 28–29. But the plain text of Section 1596 does not provide anything clear or unmistakable, let alone affirmative, having that effect. Section 1596 is titled "Additional jurisdiction in certain trafficking offenses" and states, in pertinent part:

> In general.—In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if—
>
> (1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in Section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or
>
> (2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

18 U.S.C § 1596(a). Notably, it does not reference Section 1595 or otherwise expressly state that its provision of extraterritorial jurisdiction applies to civil claims. And unlike

the extraterritorial provision in the DTSA, it does not apply to all of Chapter 77 (the TVPRA).

Instead, Plaintiff hinges his argument on a murkier theory. He claims that the term "offense"—as used in Section 1596(a)'s grant of "extra-territorial jurisdiction over any offense" under Section 1589—broadly "refer[s] to any violation of the statute, whether civilly or criminally enforced." Br. 16, 29. But there is nothing in the text of the TVPRA to support that reading.

As an initial matter, it is well established "that the use of different words in the same statute is evidence that Congress intended different meanings." *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020). Here, Section 1595(a) permits victims "of a *violation* of this chapter" to bring civil actions, whereas Section 1596(a) refers to the commission of an "*offense* (or attempt or conspiracy to commit an *offense*) under" several criminal provisions. Had Congress wished to tie Sections 1595(a) and 1596(a) together in the manner Plaintiff suggests, it easily could have used the term "offense" in both. The fact that it did not is clear evidence of differential scope, especially given that Section 1595(a) was amended at the same time that Section 1596(a) was enacted.

What is more, as the district court correctly recognized, the term "offense" as used in Section 1596,[10] which was enacted in 2008, confirms the section's exclusively criminal focus. SA–19–20. Indeed, in 2015—seven years after Section 1596's enactment—the Supreme Court observed in *Kellogg Brown & Root Service Inc. v. United States ex rel.*

[10] To the extent Plaintiff argues that district court found that "offense" can never be used to refer to a civil violation, *see* Br. 40, that misunderstands the district court's decision and confuses the argument. The district court made no such finding. Rather, the relevant issue is solely what "offense" means in Section 1596(a).

*Carter* that "[a]lthough the term offense appears hundreds of times in Title 18," as of the time that case was decided, there was not "a single provision of that title [(which included Section 1596)] in which 'offense' [wa]s employed to denote a civil violation." 575 U.S. 650, 659 (2015).

Plaintiff's attempt "to avoid this [] point" falls short. SA–19. It rests on his incorrect assertion that the district court "relied on a reading of the Supreme Court's decision in *Kellogg Brown* . . . that this court already rejected" in *Motorola*. Br. 40. To the contrary, it is Plaintiff who "misreads *Motorola*." SA–19.

In *Motorola*, this Court rejected the application of *Kellogg Brown* to the DTSA's use of the term "offense" because *Kellogg Brown* "was decided a year *before* the DTSA was enacted," 108 F.4th at 486 (emphasis added). Thus, as this Court recognized, "section 1837's use of the term 'offense' to encompass section 1836's civil violations would have provided the 'single provision of that title' the Supreme Court looked for and did not find in *Kellogg Brown*," had *Kellogg Brown* been decided *after* the DTSA. *Id.*[11]

The opposite is true here, and district court correctly applied *Motorola* and *Kellogg Brown*. As the district court noted, Section 1596(a)'s "use of 'offense' in 2008—before the Supreme Court decided *Kellog Brown*—must be interpreted to encompass only criminal violations, not civil ones." SA–20. And that result is confirmed by the fact that nothing in the TVPRA suggests that Section 1596's reference applies to Section 1595 or all of Chapter 77.

[11] The clarity in *Motorola* that Section 1837's use of the term "offense" covered civil claims comes from Section 1837's broad reference to "this chapter" as a whole, which had been amended to include civil claims. *Id.*

Trying to side-step this clear conclusion, Plaintiff points to a red herring: that Section 1595(c)(2), the provision tolling the limitations period for victims under the age of 18, which was added in 2015, uses the term "offense." Br. 19. In full that subsection states:

> No action may be maintained under subsection (a) unless it is commenced not later than the later of—
>
> (1) 10 years after the cause of action arose; or
>
> (2) 10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.

18 U.S.C. § 1595(c).

Contrary to Plaintiff's argument, the use of the term "offense" in this limited context does not mean that the term "offense" as used in Section 1596(a), as enacted in 2008, refers to civil claims. Recall, Section 1595(a) does not use the term "offense." To accept Plaintiff's argument would require this Court to conclude that Congress, through the 2015 adjustment of a limitations period for minor victims in Section 1595(c)(2), actually intended to silently revise the meaning of "offense" in Section 1596(a) to now refer to civil claims and have that revised definition silently apply to Section 1595(a). That logic is flawed. And that sort of silent, unclear, and technical editing cannot meet *RJR Nabisco*'s requirement of a clear, affirmative, and unmistakable instruction for extraterritoriality. The more logical conclusion is simply that Congress was using "offense" in 1595(c) to refer to the underlying, predicate acts, and not to the civil claims themselves.

Setting aside the term "offense," other terms in Section 1596 further confirm its exclusively criminal focus. For example, Section 1596 uses the term "alleged offenders" to describe who may be pursued for prosecution, 18 U.S.C. § 1596(a)(1), which is a

uniquely criminal term. Indeed, elsewhere in Title 18, the term "offender" is used to refer to "a person who has been *convicted* of an offense." *See* 18 U.S.C. § 4101(e) (emphasis added); *see also Offender*, Black's Law Dictionary (12th ed. 2024) (defining an "offender" as "[s]omeone who has committed a crime"). Conversely, Section 1595(a) refers to "perpetrator[s]." 18 U.S.C. § 1595(a).

Additionally, Section 1596(b) states that "no *prosecution* may be commenced against a person *under this section* if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such a person for the conduct constituting such offense" without certain approvals. 18 U.S.C. § 1596(b) (emphases added). "Congress's use of the phrase 'under this section' indicates that the extraterritorial application . . . is limited to criminal prosecutions." SA–19.

And, what is more, Section 1596(b)'s check on prosecutions shows that Congress had significant concerns about potential international friction. It would make no sense for Congress to omit a similar check on civil claims, especially because it is well recognized that such claims invite greater risk. *See Abitron*, 600 U.S. at 417; *see also Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 123 (2d Cir. 2001) (describing risks in civil RICO claims). But Section 1595 includes no such limitation.

That risk exists here. In this case, Plaintiff's civil claim attacks the conduct of Chinese government officials and the terms of confinement in China. Essentially, he seeks to apply U.S. standards of conduct to the Chinese government's operation of its prisons. It is easy to imagine that international discord may arise from adjudication and determination of this claim. As this Court has recognized, even in the United States, "individuals subject to a criminal sentence, and therefore to the government's legitimate authority to effectuate the objectives of criminal justice . . . cannot expect to have the same

freedom of choice with respect to their work and living conditions as individuals not subject to the penal objectives of the state." *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1032 (7th Cir. 2024) (dismissing forced labor claim concerning prison labor). This weighs heavily in favor of the presumption against extraterritoriality. *See RJR Nabisco*, 579 U.S. at 348 ("Although a risk of conflict between the American statute and foreign law is not a prerequisite for applying the presumption against extraterritoriality, where such a risk is evident, the need to enforce the presumption is at its apex").

### 2. RJR Nabisco Forecloses Plaintiff's Incorporation Argument.

Plaintiff next argues that Section 1595(a) applies extraterritorially because it "directly and clearly incorporates" criminal prohibitions "that are themselves extraterritorial." Br. 29. He argues that the criminal prohibitions apply extraterritorially by their own terms or through Section 1596, and that extraterritorial application is incorporated into Section 1595. *Id.* But, as the district court correctly held, this argument contradicts the Supreme Court's instruction in *RJR Nabisco* and is thus foreclosed. SA–16–17 (explaining that Plaintiff "misreads a central holding in *RJR Nabisco*" and his "analysis fail[s] to account for the Supreme Court's clear instruction[s]"). Indeed, "[t]his reasoning . . . fails to appreciate that the presumption against extraterritoriality must be applied separately to both [the TVPRA's] substantive provisions and its private right of action," which are "two separate issues that . . . raise distinct extraterritoriality problems." *RJR Nabisco*, 579 U.S. at 350, 353.

Plaintiff attempts to distinguish *RJR Nabisco* by arguing that "unlike the civil cause of action in RICO," which requires injury to business or property, Section 1595(a) "does not limit the kinds of violations for which it provides a remedy." Br. 31. But that is

not a distinction *RJR Nabisco* turned on. Rather, the court simply noted that RICO's civil cause of action was "narrower in its application" than its criminal provision, and that "*in any event* [that fact] does not support extraterritoriality." 579 U.S. at 350 (emphasis added). Nowhere did the court say, as Plaintiff argues here, that the requirement for a separate clear, affirmative, and unmistakable instruction for a civil cause of action to apply extraterritorially would be excused had the scope of RICO's civil and criminal provisions been roughly equal.

Straying from the result compelled by *RJR Nabisco* would also invite a host of legislative issues. The Supreme Court has emphasized that "consistent application of the presumption 'preserves a stable background against which Congress can legislate with predictable effects.'" *Yegiazaryan v. Smagin*, 599 U.S. 533, 541 (2023) (quoting *Morrison*, 561 U.S. at 261). *RJR Nabisco* dictates a clear rule which preserves that stable background: a private right of action does not apply extraterritorially based on the extraterritoriality of its predicates; there must be a clear, affirmative, and unmistakable statement that the private right of action itself is extraterritorial.

There is none here. If the rule of *RJR Nabisco* is not upheld, it leaves Congress with little guidance about how to limit a private right of action to domestic application when the substantive provisions of the statute apply abroad. Taking Plaintiff's argument to its logical conclusion would require Congress to affirmatively and unmistakably say that the private right of action does *not* apply extraterritorially. But that is not the law and turns the presumption on its head.

### C. The Statutory Context, Purpose, and History Further Establish that Section 1595 Does Not Apply Extraterritorially.

Plaintiff next invokes the "context," "purpose," and "history" of the TVPRA. Br. 33–37. But far from supporting Plaintiff's contentions, each of those items "buttresse[s]" the district court's holding that Section 1595 does not apply extraterritorially. *Motorola*, 108 F.4th at 482.

#### 1. The Context of Section 1595 Does Not Support Extraterritorial Application.

Plaintiff argues that the "context" of Section 1595 favors extraterritorial application, and that the district court erred by concluding that Section 1596's failure to reference Section 1595 is evidence of Congress's intent to the contrary. Br. 40–41. Both are wrong.

It is a longstanding principle that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion and exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up). As applied to the issue of extraterritoriality, other circuit courts have explained that "Congress's explicit provision for extraterritorial jurisdiction in one provision [of a statute] . . . militates *against* inferring any such application for a closely related and nearby provision with no such signal." *United States v. Garcia Sota*, 948 F.3d 356, 358 (D.C. Cir. 2020) (emphasis added).

Stated another way, "legislation explicitly providing one provision with extraterritorial reach likely weighs against a finding that another provision without such language applies overseas." *Garvey v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 56 F.4th 110, 123 (D.C. Cir. 2022). That is because, when Congress enacts certain provisions with

express extraterritorial in scope, those "provisions demonstrate that when it desires to do so, Congress knows how to speak with sufficient clarity to regulate beyond our borders." *Daramola v. Oracle Am., Inc.*, 92 F.4th 833, 839 (9th Cir. 2024).

Applying those principles here supports the district court's conclusion that Section 1595's silence concerning extraterritoriality combined with "Congress's omission of Section 1595 from Section 1596(a)" evinces "an intentional decision not to extend extraterritorially the reach of the statute's civil component." SA–22 (citations and quotations omitted). And that reasoning is further strengthened where, as here, "Congress gave both provisions their current form in a single statute." *Garcia Sota*, 948 F.3d at 358.

**2. The TVPA's Purpose Does Not Support Extraterritorial Application.**

Plaintiff next argues that because part of the purpose of the TVPA, as originally enacted in 2000, was to address trafficking "throughout the world," that is sufficient to express Congress's intention for Section 1595 to apply extraterritorially. Br. 34. But that argument fails for several reasons.

As an initial matter, because the TVPRA's text is clear that its extension of extraterritorial jurisdiction is limited to criminal prosecutions, this Court need not consider any additional sources. *See Food Mktg. Inst. v. Argus Leaders Media*, 588 U.S. 427, 436 (2019) (stating when a "careful examination of the ordinary meaning and structure of the law itself . . . yields a clear answer, judges must stop"). This Court has specifically cautioned that "[i]t is a mistake to allow general language of a preamble to create an ambiguity in specific statutory or treaty text where none exists." *Jogi v. Voges*, 480 F.3d 822, 834 (7th Cir. 2007). Thus, with respect to the extraterritoriality analysis,

only "[a]fter courts have applied the traditional tools of statutory construction" may they "consider express textual evidence of congressional purpose elsewhere in the statute to *double-check* their work, while keeping in mind that 'no legislation pursues its purposes at all costs.'" *Motorola*, 108 F.4th at 482 (quoting *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987)) (emphasis added).

Here, Plaintiff asks this Court not to double-check what is confirmed by express statements in the TVPRA, but rather to use the generic Congressional "findings" to inject the "something more" that is missing. *See* Br. 30–36. He argues that those generic findings can, and should, fill the void where the statute is silent. But that is not the law.

Even if this Court were to consider Plaintiff's argument, his contentions fall short because they rely on generic statements of purpose in the 2000 TVPA, not on any statements contemporaneous with the original enactment of Section 1595 in 2003, or the amendments of Section 1595 and enactment of Section 1596 in 2008.[12] This is the antithesis of what this Court endorsed in *Motorola*. There, this Court considered language in the DTSA itself, which added the civil right of action, concerning its purpose, *not* language concerning the purpose of the earlier statute that it amended. 108 F.4th at 480, 483.

Finally, even if Plaintiff were right to rely on general statements of purpose in the TVPA of 2000 (he is not), those general pronouncements do not compel a different result. The district court was right: "Congress's intent to broadly address human trafficking and forced labor does not mean that the TVPA must be applied without regard to its express

[12] *Howard* erred on this score too. *See Roe v. Howard*, 917 F.3d 229, 242 (4th Cir. 2019) (citing legislative purpose for the 2000 enactment).

limits or to established doctrines like the presumption against extraterritoriality." SA–18. "As *RJR Nabisco* shows, Congress's desire to attack a problem by criminalizing conduct, even conduct in foreign nations, does not mean that a corollary civil remedy must also apply to foreign conduct." *Id.* And here, nothing in the general statements about a desire by Congress to "address the global problem of human trafficking" (Br. 35), provides any clear, affirmative, or unmistakable indication that Congress also intended to pursue those aims by authorizing extraterritorial civil suits.

### 3. The Statutory History Confirms that Congress Intended Only Criminal, Not Civil, Provisions to Apply Abroad.

Finally, Plaintiff argues that the relevant statutory history "strongly supports" his argument for extraterritorial application of the TVPRA's civil cause of action. Br. 36. Not so. Indeed, the exact opposite is true.

To start, there is nothing in the history of the incremental, separate, and distinct expansion of the civil and criminal provisions in the TVPRA that suggests that Congress ever intended Section 1595(a) to apply extraterritorially in lock step with the criminal provisions. And neither Plaintiff, nor *amici*, have identified anything in the legislative history suggesting that Congress ever considered extraterritorial application of the civil remedy provision. That weighs heavily against finding the affirmative, clear, and unmistakable Congressional intent necessary to overcome the presumption. *See Garvey*, 56 F.4th at 123 (rejecting extraterritorial application where "the statute's legislative history indicates that Congress gave no consideration to either the possibility or the problem of overseas application").

Rather, the legislative history is clear that the opposite is true. When Congress enacted Section 1596, the contemporaneous Congressional reports and statements make

clear that the purpose of that section was to "allow Federal prosecutors to investigate and prosecute traffickers found in the United States even if their trafficking claims were committed abroad." 154 Cong. Rec. 24762–63. Indeed, Section 1596 was designed to facilitate "extraterritorial prosecutions against international trafficking criminals." H.R. Rep. No. 101–430, pt. I, at 35.

### D. Inapposite, Out-of-Circuit Decisions Do Not Support Reversal.

Without support for his argument in the statutory text, context, legislative history, or Supreme Court precedent, Plaintiff relies on several inapposite, out-of-circuit decisions. *See* Br. 29–31, 35–36. None are persuasive. None support reversal.

Starting at the appellate court level, Plaintiff invokes *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019), and *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184(5th Cir. 2017). Contrary to Plaintiff's suggestion, however, neither the Fourth Circuit nor the Fifth Circuit "directly addressed th[e] question" before this Court concerning whether Section 1595(a) applies abroad based on Section 1596(a). Br. 36. Even the Ambassadors admit as much. *See* AAL Br. 5 ("This appeal presents the *first* opportunity for a federal court of appeals to squarely address the extraterritoriality of § 1595's civil remedy" (emphasis added)). And "both [decisions] are difficult to square with the Supreme Court's teaching in *RJR Nabisco*." SA–20.

*Howard* involved a suit against State Department employee stationed at a U.S. Embassy in Yemen where the plaintiff, their live-in housekeeper, alleged forced labor and commercial sex trafficking.[13] 917 F.3d at 233–35. Notably, that case did not address

[13] Even courts interpreting *Howard* similarly to Plaintiff have found the involvement of U.S. embassy personnel to be "of key importance to the ruling." *See U.S. ex rel. Hawkins v. ManTech Int'l*, 2024 WL 4332117, at *7 (D.D.C. Sept. 27, 2024).

Section 1596, which was not enacted at the time of the conduct at issue. Instead, *Howard* incorrectly concluded that Section 1595(a) could apply extraterritorially solely because "it incorporates a predicate statutory provision that applies extraterritorially." *Id.* at 242. Specifically, the Fourth Circuit found that "like § 1962 [of RICO], the TVPA's civil remedy provision directly incorporates a set of predicate offenses that plainly apply to at least some foreign conduct." *Id.*

This analysis was wrong. Section 1962 of RICO is the *criminal* liability provision, not the civil provision, which *RJR Nabisco* took pains to make clear must be analyzed separately. In wrongly applying *RJR Nabisco*, the Fourth Circuit missed the requirement to find a separate, clear, affirmative, and unmistakable indication of extraterritoriality for Section 1595(a) other than its predicates. As the district court rightly recognized, "[t]his misses a key step." SA–21.

Unsurprisingly, several federal district courts, including the district court here, have rejected *Howard*'s mistaken reasoning. *See, e.g.*, *Pavlovich v. Gaiman*, 2025 WL 2819372, at *8 (W.D. Wis. Oct. 3, 2025); ("The distinction *Roe* [*v. Howard*] tried to make about the purpose of the TVPA is not persuasive.")[14]; *Mia v. Kimberly-Clark Corp.*, 2025 WL 752564, at *7 (D.D.C. Mar. 10, 2025) (finding *Howard* was "erroneously reasoned" on the same grounds as the district court in the instant case). These cases are better reasoned—they follow the Supreme Court's clear instructions—than the district court cases Plaintiff relies on, which reflexively adopt *Howard* without undertaking a full

[14] This Court recently affirmed the district court's decision dismissing the claims in *Pavlovich* on *forum non conveniens* grounds without deciding the extraterritoriality issue. *See Pavlovich v. Gaiman*, 179 F.4th 603, 609 (2026). It did, however, note that "the risk is apparent" that applying the civil-remedy provision to extraterritorial conduct "would do violence to international comity." *Id.* at 610.

analysis. *See, e.g.*, *A.A. v. Omnicom Grp., Inc.*, 2026 WL 504904 (S.D.N.Y. Feb. 24, 2026) (relying on *Howard*); *F.C. v. Jacobs Sols. Inc.*, 790 F. Supp. 3d 1158 (D. Colo. 2025) (same).

*Adhikari* is further afield. In that case, the Fifth Circuit addressed whether "Section 1596's grant of 'extra-territorial jurisdiction' applied retroactively to defendants' conduct." SA–21 (citing *Adhikari*, 845 F.3d at 202–06). But the Fifth Circuit *did not reach* the issue of extraterritoriality because the parties did "not dispute" it, which renders the decision of no value here. 845 F.3d at 200.

Beyond *Howard* and *Adhikari*, Plaintiff's non-binding district court cases from outside this Circuit are also unpersuasive. In *C.T. v. Red Roof Inns, Inc.*, 2021 WL 602578, at *4 (S.D. Ohio July 1, 2021), the district court considered "[w]hether Section 1596 . . . authorized nationwide service of process," not whether it expressed congressional intent for Section 1595 to apply extraterritorially. Indeed, that case involved a claim for sex trafficking that allegedly occurred at "properties in the Fort Myers, Florida area." *Id.* at *1.

In *Aguilera v. Aegis Communications Group, LLC*, 72 F. Supp. 3d 975, 979 (W.D. Mo. 2014), the court was responding to a claim that the TVPRA did not include the territorial offense of trafficking victims out of the United States. *Id.* Both trafficking into the United States from abroad, and from the United States to abroad are domestic applications of the TVPRA as part of the trafficking occurs in the United States.

And, in *Abafita v. Aldukham*, 2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019), the court found the defendants liable under Section 1595 when "Defendants forced [the victim] to work as a domestic servant and subjected her to abominable living and working conditions in Dubai, United Arab Emirates ("UAE"), New York and New Jersey." *Id.* at

*1. The trafficking into the United States of a victim from a foreign country is exactly the territorial violations of the TVPRA Congress had sought to prevent in the original 2000 TVPA. *See* Pub. L. No. 106-386, 114 Stat. 1464, 1466–67.

### E. Amici Raise Unpersuasive Arguments.

Finally, some of the *amici* advocating for reversal offer arguments not advanced by Plaintiff. Those arguments are unavailing and fail for several reasons.

Towards Justice argues that because forced labor trafficking is an "inherently global problem," Section 1595(a) must be read to reach overseas conduct. TJ Br. 3–11. But Towards Justice points to no authority from any Court suggesting that the mandatory *RJR Nabisco* analysis can be ignored for policy reasons. Nor does Towards Justice even identify anything in the TVPRA itself to support its argument. Instead, it relies on cherry-picked, out-of-context, one-off statements by individual legislators and persons testifying before Congress about the international scope of human trafficking. *See id.* These, "are of minimal value when it comes to interpreting statutes," *Lott v. Pfizer, Inc.*, 492 F.3d 789, 794 (7th Cir. 2007), and of course, do not provide the "something more" required for Section 1595(a) to apply abroad.

The Ambassadors take much the same tack, focusing on "hearings leading to the TVPA's enactment" in 2000 and the purported need for a coordinated international approach to trafficking. AAL Br. 9–16. But, even if true, that does not replace the fact that the statute as enacted in 2000 did *not* include a civil right of action, and the amendments adding the civil remedy made no reference to extraterritorial application in their text, elsewhere in the TVPRA, or anywhere in the legislative history.

And the Ambassadors' argument that their view of what the law should be is persuasive because they "are former executive branch officials who administered [the

TVPRA]'s international provisions" carries very little weight. *Id.* at 25. No official administered Section 1595(a), which provides a *private* right of action. Milwaukee Tool does not deny that the TVPRA contains certain provisions requiring international reporting; but that is a far cry from clear, affirmative, and unmistakable Congressional intention for a private right of action to apply extraterritorially.

Similarly unpersuasive is the argument by the State AGs, who generically claim that they must have the ability to enforce the TVPRA beyond American shores. State AG enforcement under Section 1595(d) is limited to claims for sex trafficking, not the types of forced labor claims at issue here. *See* 18 U.S.C. § 1595(d). And, more telling, the examples of actions the State AGs claim would be impacted by the district court's correct reading of the statute reveal not extraterritorial applications of the TVPRA, but clearly domestic ones. *See* SAG Br. 3 (citing examples of actions involving trafficking in Oklahoma and Texas). At bottom, the State AGs point to nothing in the statutory or legislative history suggesting that Congress ever intended Section 1595(d) to apply extraterritorially, let alone for Section 1595(a) to do so as well.

## II. Plaintiff's Case Does Not Involve a Domestic Application of Section 1595(a) of the TVPRA.

"Because there is no clear, affirmative indication from Congress that Section 1595 applies to extraterritorial conduct," the district court correctly proceeded to the second step in the extraterritoriality analysis. SA–22 (citing *RJR Nabisco*, 579 U.S. at 337). Step Two "asks whether the present case involves only a permissible domestic application of the statute." *Motorola*, 108 F.4th at 473. For that to be true, Plaintiff "must establish that 'the conduct relevant to [Section 1595's] focus occurred in the United States,'" *Nestlé*, 593 U.S. 628, 633 (2021) (quoting *RJR Nabisco*, 579 U.S. at 337). Otherwise, "if the conduct

relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application *regardless* of any other conduct that occurred in U.S. territory." *RJR Nabisco*, 579 U.S. at 337 (emphasis added).

This step "is designed to apply the presumption against extraterritoriality to claims that involve both domestic and foreign activity, separating the activity that matters from the activity that does not." *Abitron*, 600 U.S. at 419. Conduct that is "merely incidental" to the focus of the statute, even if necessary to state a claim, does "not have 'primacy' for purposes of the extraterritoriality analysis." *WesternGeco*, 585 U.S. at 416. And the domestic status of non-focus conduct does not preclude the application of the presumption.

As the Supreme Court has "long recognized . . . the presumption would be meaningless if any domestic conduct could defeat it." *Abitron,* 600 U.S. at 419 Thus, "[i]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States." *Morrison*, 561 U.S. at 266 (holding allegedly deceptive conduct occurring in United States did not make claim domestic) (emphasis in original). To be sure, "the presumption against extraterritorial application would be a craven watchdog if it retreated to is kennel whenever *some* domestic activity is involved in the case." *Id.* (emphasis in original).

Ultimately, this portion of the extraterritoriality analysis proceeds in two parts. *First*, the court must "determin[e] the provision's focus." *Abitron*, 600 U.S. at 421. *Second*, the court must "then ascertain[] whether [the plaintiff] can establish that the conduct relevant to that focus occurred in the United States." *Id.* (cleaned up). Both are integral to determining whether a claim is domestic or impermissibly extraterritorial because determining statutory "focus" "in the abstract does not exhaust the relevant

inquiry." *Id.* at 422. Rather, a court must consider how the facts relevant to that focus will be established in the case at bar. *Id.* (rejecting "focus-only" approach).

Here, as the district court rightly determined, Plaintiff's claim for forced labor in China—allegedly perpetrated by agents of the Chinese government (prison guards) on behalf of a Chinese company—constitutes an impermissible extraterritorial application of Section 1595(a). The focus of Section 1595(a) in this case turns, in part, on the focus of substantive forced labor statute in Section 1589(b). That section prohibits knowing participation in a forced labor trafficking venture that unlawfully obtained labor, and bars benefiting from that participation. *See* 18 U.S.C. § 1589(b). Thus, as the district court correctly found, the statutory focus of Plaintiff's claim is on "prohibit[ing] the use of forced labor." SA–24. Here, the conduct relevant to that focus—the forced labor—indisputably occurred in China. *Id.* Thus, Plaintiff's claim is an impermissible extraterritorial application.

**A. The Statutory Focus Here is Forced Labor.**

"The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *WesternGeco*, 585 U.S. at 413–14 (cleaned up).

Starting with Section 1595(a), the parties that the statute seeks to protect are those it grants a civil cause of action—"[a]n individual who is a victim of a violation of this chapter." 18 U.S.C. § 1595(a). Here, Plaintiff is located China, allegedly suffered injuries in China, from an alleged trafficking venture entirely in China between a Chinese prison and a company alleged to supply gloves to Milwaukee Tool, and proceeds pseudonymously in this lawsuit because he fears further action by his purported

traffickers—the Chinese government. On that score, there can be no dispute that Plaintiff's claim is extraterritorial.

And, Section 1595(a) provides a private right of action in connection with a violation of Chapter 77. Thus, the violation is the focus of the statute. *See WesternGeco*, 585 U.S. at 414 (holding "infringement" is the focus of the general damages remedy statute in the Patent Act because overriding purpose of that statute is to compensate patent owners for infringement). "But that observation does not fully resolve the case, as the [TVPRA] identifies several" substantive violations. *Id.*

Turning to substantive prohibition on forced labor in Section 1589(b),[15] the analysis turns on the core, primary conduct the statute seeks to regulate. That statute provides:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

18 U.S.C. 1589(b). By prohibiting participation in a trafficking venture, even if not the direct trafficker, Section 1595(b) works in "tandem" with Section 1589(a) to place criminal liability on everyone that knowingly (or in reckless disregard) participates in the trafficking operation. *See WesternGeco*, 585 U.S. at 414. Ultimately, the focus of Section 1595(b) is on prohibiting participation in a forced labor venture, not the "benefits."

---

[15] Plaintiff wrongly contends that the district court "declined to examine the focus" of Section 1589(b). Br. 50–52. Not so. The district court considered both Sections 1589(a) and (b) because Plaintiff explicitly invoked both sections in his Amended Complaint, pleading the same allegations with respect to both claims. While Plaintiff now apparently jettisons his Section 1589(a) claim, that does not change the result. The focus under both subsections is forced labor.

The Supreme Court's recent analysis in *Abitron* confirms this. That case involved the Lanham Act, which requires a plaintiff to show "use in commerce" of a trademark that is "likely to cause confusion." 600 U.S. at 420. "In other words, Congress proscribed the use of a mark in commerce under certain conditions." *Id.* at 423. The Court explained that the "use in commerce"—not the confusion allegedly caused by the use—is the statute's "focus" for purposes of the analysis. *Id.* As the court reasoned, the offending conduct, "to be sure, must create a sufficient risk of confusion, but confusion is not a separate requirement; rather, it is simply a necessary characteristic of an offending use." *Id.* In other words, while likelihood of confusion is a necessary element of the claim, it is just an "effect" of the relevant conduct and therefore not the "focus."

The Supreme Court further explained that concentrating on an "effect" in the United States is wrong because it "threatens to negate the presumption against extraterritoriality." *Id.* at 425. "If a claim . . . involves a domestic application whenever particular effects are likely to occur in the United States, the [presumption against extraterritoriality] watchdog is nothing more than a muzzled Chihuahua." *Id.* (citations and quotations omitted). This squares with the Supreme Court's prior instruction in *WesternGeco* that things "merely incidental" to the prohibited conduct do not broaden the statutory focus. 585 U.S. at 416 (holding it was the "infringement," and not damages resulting from that conduct, that was the focus).

Applying *Abitron* here, "benefitting" from alleged forced labor cannot be the statutory focus, as it is merely an "effect" of the forced labor. The "benefit" must be derived from knowing participation in the forced labor venture. As with the "likelihood of confusion" under the Lanham Act, the "benefit" under Section 1589(b) is simply a characteristic of the participation.

What is more, this case illustrates how the presumption against extraterritoriality would be severely muzzled (if not rendered completely meaningless) if a tangential domestic benefit were sufficient to trigger domestic application. Here, the only "benefit" that Milwaukee Tool could have possibly received is the profits on the gloves it allegedly purchased and then sold—the exact same benefit Milwaukee Tool receives when selling gloves produced by other suppliers, and the exact same benefit Milwaukee Tool would have received absent Shanghai Select's alleged decision (completely unknown to Milwaukee Tool) to outsource production. Permitting domestic application of the statute based on a mere "benefit" thus completely obscures the focus of the statute and the core conduct Congress seeks to prohibit.

Plaintiff's argument to the contrary comes up short. Plaintiff fails to identify a *single* case that supports his argument that the territoriality of a claim turns on where the defendant received a benefit. And, to be sure, the very cases Plaintiff mistakenly relies on at Step One conclude that "[i]n the context of the TVPRA, courts have almost uniformly held that the focus of the TVPRA's private right of action is ultimately on the underlying criminal violations and *not* on any benefits that accrue from them." *Omnicom*, 2026 WL 504904, at *19 (quotations and citations omitted) (collecting cases).

Plaintiff's reliance on *Rodriguez v. Pan American Health Org.*, 29 F.4th 706 (D.C. Cir. 2022), is also misplaced for several reasons. Br. 49. That case did not analyze the presumption against extraterritoriality. It concerned the commercial activity exception in the Foreign Sovereign Immunities Act. *Id.* at 712. Accordingly, the court's "gravamen" analysis, which is only applicable to that Act, has nothing to do with the "focus" analysis for evaluating extraterritoriality here. Nevertheless, in *Rodriguez* the court found that the gravamen of the Section 1589(b) claim was domestic not because of a benefit received,

but also because the defendant allegedly "committed a financial crime in the U.S." which was "itself 'wrongful conduct'" *Id.* at 716–17.[16] By contrast, in this case, the alleged forced labor venture operated in China.

### B. The Conduct Relevant to the Statutory Focus Occurred in China.

The Step Two analysis "does not end with identifying statutory focus." *Abitron*, 600 U.S. 418, 424 (rejecting a "focus-only standard"). Rather, after identifying the statutory focus—here the forced labor venture—the court must determine whether a plaintiff seeking domestic application has sufficiently established that conduct occurred in the United States. Here, the district court correctly carried out this portion of the analysis by "consider[ing] the conduct alleged to have violated" the focus and concluding that it occurred in China. SA–23–24.

Plaintiff alleges that all the venture's purported trafficking of him occurred in China, and he has proceeded pseudonymously in this suit because he is concerned that his traffickers—the Chinese government and Shanghai Select—may seek to retaliate against him. Plaintiff has not alleged that Milwaukee Tool did anything in China. And Plaintiff's attempt to avoid that fact admits the flaws in his reasoning. Plaintiff argues that the relevant conduct occurred in the United States only because Milwaukee Tool "sold gloves—and profited from those sales—in the United States." Br. 45.

---

[16] Even the district court cases Plaintiff cites that are wrong at Step One due to their adoption of the flawed analysis in *Howard*, reject Plaintiff's argument and distinguish *Rodriguez*. *See, e.g.*, *Omnicom*, 2026 WL 504904, at *19 (holding where theory of wrongdoing is "by virtue of the TVPRA violations committed" by others, the focus is on where "the wrongdoing is committed"); *See also Mia*, 2025 WL 752564, at *8 (distinguishing *Rodriguez* on this basis; finding claim to be extraterritorial where plaintiffs alleged no "affirmative financial wrongdoing" by the defendant but "only that any benefits received from their dealings with [the trafficker] were wrongful based on [the trafficker's] alleged labor abuses," which "occurred entirely abroad").

But the sale of gloves alone is insufficient to state a claim. This Court has made clear that "participation" in a venture requires "culpable assistance to a wrongdoer," which requires proving that Milwaukee Tool gave "assistance, support or facilitation to the trafficker," here the Chinese prison guards and Shanghai Select, to further their unlawful aims. *G.G. v. Salesforce.com*, 76 F.4th 544, 559 (7th Cir. 2023); *see also Ruderman v. Kenosha County, Wisc.*, 178 F.4th 333, 337 (7th Cir. 2026) ("[W]e recognize that this statute must be applied with care lest it condemn may common practices"). Plaintiff alleges no assistance or facilitation of the trafficking on the part of Milwaukee Tool, but any such assistance would necessarily occur where the trafficking occurred—in China.

In sum, Plaintiff seeks an impermissible extraterritorial application of Section 1595(a), and thus his claim was properly dismissed.

## CONCLUSION

The district court's judgment should be affirmed.

Dated: July 27, 2026

Respectfully submitted,

*/s/ Ellen E. Dew*
Ellen E. Dew
William W. Reichart III
DLA PIPER LLP (US)
650 S. Exter St., Suite 1100
Baltimore, Maryland 21202
Tel.: (410) 580-3000
ellen.dew@us.dlapiper.com
wes.reichart@us.dlapiper.com

David Horniak
DLA PIPER LLP (US)
500 Eighth Street NW
Washington, D.C. 20004
Tel.: (202) 799-4361
david.horniak@us.dlapiper.com

*Counsel for Appellee*
*Milwaukee Electric Tool Corp.*

## CERTIFICATE OF COMPLIANCE

This opposition complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 13,989 words, excluding the parts exempted under Rule 32(f). This opposition complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 12-point Georgia font.

Dated: July 27, 2026

*/s/ Ellen E. Dew*
Ellen E. Dew

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2026, I electronically filed the foregoing opposition with the Clerk of the Court for the U.S. Court of Appeals for the Seventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

Dated: July 27, 2026

*/s/ Ellen E. Dew*
Ellen E. Dew

# STATUTORY ADDENDUM

**18 U.S.C. § 1589 – Forced labor**

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any of the combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

(b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

(c) In this section:

(1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

(2) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

(d) Whoever violates this section shall be fined under this title, imprisoned not more than 20 years, or both. If death results from a violation of this section, or if the violation includes kidnaping, an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title, imprisoned for any term of years or life, or both.

## 18 U.S.C. § 1595 – Civil Remedy

(a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

(b) (1) Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

(2) In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

(c) No action may be maintained under subsection (a) unless it is commenced not later than the later of—

(1) 10 years after the cause of action arose; or

(2) 10 years victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.

(d) In any case in which the attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591, the attorney general of the State, as parens patriae, may bring a civil action against such person on behalf of the residents of the State in an appropriate district court of the United States to obtain appropriate relief.

**18 U.S.C. 1596– Additional jurisdiction in certain trafficking offenses**

(a) IN GENERAL. -- In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if—

(1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or

(2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

(b) LIMITATION ON PROSECUTIONS OF OFFENSES PROSECUTED IN OTHER COUNTRIES. --No prosecution may be commenced against a person under this section if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct constituting such offense, except upon the approval of the Attorney General or the Deputy Attorney General (or a person acting in either such capacity), which function of approval may not be delegated.

**18 U.S.C. § 3271– Trafficking in persons offenses committed by persons employed by or accompanying the Federal Government outside the United States**

(a) Whoever, while employed by or accompanying the Federal Government outside the United States, engages in conduct outside the United States that would constitute an offense under chapter 77 or 117 of this title if the conduct had been engaged in within the United States or within the special maritime and territorial jurisdiction of the United States shall be punished as provided for that offense.

(b) No prosecution may be commenced against a person under this section if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct constituting such offense, except upon the approval of the Attorney General or the Deputy Attorney General (or a person acting in either such capacity), which function of approval may not be delegated.