No. 25-3347

# In the United States Court of Appeals for the Seventh Circuit

XU LUN, a pseudonym,
*Plaintiff-Appellant,*

v.

MILWAUKEE ELECTRIC TOOL CORPORATION,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Wisconsin
Case No. 2:24-cv-00803-BHL (The Hon. Brett H. Ludwig)

## REPLY BRIEF OF PLAINTIFF-APPELLANT


THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
1400 16th Street NW
Suite 225
Washington, DC 20036
(202) 888-1741

ADAM FARRA
TIMES WANG
FARRA & WANG PLLC
1543 Champa Street
Suite 400
Denver, CO 80202
(202) 505-5989

JENNIFER D. BENNETT
GUPTA WESSLER LLP
235 Montgomery Street
Suite 629
San Francisco, CA 94104
(415) 573-0336
*jennifer@guptawessler.com*

WILLIAM E. PARSONS
HAWKS QUINDEL, S.C.
409 E. Main Street
P.O. Box 2155
Madison, WI 53703
(608) 523-8478


October 5, 2026

*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

Table of authorities ........ ii

Introduction ........ 1

Argument ........ 4

I. This lawsuit targets Milwaukee Tool's domestic conduct ........ 4

A. The conduct relevant to subsection 1589(b)'s focus is "benefiting" from participation in a venture that uses forced labor. ........ 6

B. Milwaukee Tool's conduct related to subsection 1589(b)'s focus occurred domestically. ........ 11

II. Even if this were not a domestic application, the TVPRA applies extraterritorially to U.S. companies like Milwaukee Tool. ........ 13

A. The TVPRA expressly grants courts extraterritorial jurisdiction over trafficking offenses enforced civilly. ........ 14

B. Extraterritorial jurisdiction is confirmed by section 1595's direct incorporation of extraterritorial predicates. ........ 19

C. Statutory context and history support this conclusion. ........ 22

D. Milwaukee Tool's policy arguments cannot overcome statutory text and context. ........ 27

Conclusion ........ 29

## TABLE OF AUTHORITIES

### Cases

*A.A. v. Omnicom Group, Inc.*,
2026 WL 504904 (S.D.N.Y. 2026) .......... 10, 17, 20

*Abitron Austria GmbH v. Hetronic International, Inc.*,
600 U.S. 412 (2023) .......... 5, 6, 7, 9

*BedRoc Ltd. v. United States*,
541 U.S. 176 (2004) .......... 15

*Bradley v. Village of University Park, Illinois*,
59 F.4th 887 (7th Cir. 2023) .......... 5

*Carr v. United States*,
560 U.S. 438 (2010) .......... 15

*Exxon Mobil Corp. v. Allapattah Services, Inc.*,
545 U.S. 546 (2005) .......... 26

*F.C. v. Jacobs Solutions Inc.*,
790 F. Supp. 3d 1158 (D. Col. 2025) .......... 17, 20, 21

*G.G. v. Salesforce.com, Inc.*,
76 F.4th 544 (7th Cir. 2023) .......... 12

*Holbein v. TAW Enterprises, Inc.*,
983 F.3d 1049 (8th Cir. 2020) .......... 26

*Hueso v. Barnhart*,
948 F.3d 324 (6th Cir. 2020) .......... 26

*Hyatt Hotels Corp. & Subsidiaries v. Commissioner of Internal Revenue*,
174 F.4th 535 (7th Cir. 2026) .......... 12

*Kellogg Brown & Root Services, Inc. v. U.S., ex rel. Carter*,
575 U.S. 650 (2015) .......... 16

*Mia v. Kimberly-Clark Corp.*,
2025 WL 752564 (D.D.C. 2025) .......... 10

*Motorola Solutions, Inc. v. Hytera Communications Corp.*,
108 F.4th 485 (7th Cir. 2024)........................................14, 17, 18, 21, 23, 25, 29

*National Organization for Women, Inc. v. Scheidler*,
396 F.3d 807 (7th Cir. 2005) ........................................................................21

*Pfizer Inc. v. Government of India*,
434 U.S. 308 (1978).....................................................................................19

*Ratha v. Phatthana Seafood Co.*,
2016 WL 11020222 (C.D. Cal. 2016) ..........................................................17

*Ratha v. Rubicon Resources, LLC*,
168 F.4th 541 (9th Cir. 2026) ...................................................................22, 25

*Reid Hospital & Health Care Services, Inc. v. Conifer Revenue Cycle Solutions, LLC*,
8 F.4th 642 (7th Cir. 2021)............................................................................18

*RJR Nabisco v. European Community*,
579 U.S. 325 (2016)..............................................................3, 19, 20, 22, 23, 25, 27

*Rodriguez v. Pan American Health Organization*,
29 F.4th 706 (D.C. Cir. 2022) ...............................................................7, 8, 10

*Roe v. Howard*,
917 F.3d 229 (4th Cir. 2019) ................................................20, 21, 23, 25, 28

*Sebelius v. Auburn Regional Medical Center*,
568 U.S. 145 (2013).......................................................................................16

*United States ex rel. Hawkins v. ManTech International Corp.*,
752 F. Supp. 3d 118 (D.D.C. 2024) .........................................................17, 20

*United States v. Elbaz*,
52 F.4th 593 (4th Cir. 2022) ..........................................................................7

*United States v. Hansen*,
599 U.S. 762 (2023).......................................................................................26

*United States v. Vargas*,
74 F.4th 673 (5th Cir. 2023) ........................................................................26

*WesternGeco LLC v. ION Geophysical Corp.*,
585 U.S. 407 (2018) ........................................ 7

**Statutes**

18 U.S.C. § 1586 ........................................ 21

18 U.S.C. § 1589 ........................................ 1, 5, 7, 11, 16

18 U.S.C. § 1594 ........................................ 16

18 U.S.C. § 1595 ........................................ 2, 14, 16, 28

18 U.S.C. § 1596 ........................................ 2, 13, 14, 15, 17, 18, 28

18 U.S.C. § 1837 ........................................ 18

Justice for Victims of Trafficking Act of 2015,
Pub. L. No. 114-22, 129 Stat 227 ........................................ 17

Trafficking Victims Protection Act of 2005,
Pub. L. No. 109-164, 119 Stat. 3558 ........................................ 24

Trafficking Victims Protection Reauthorization Act of 2003,
Pub. L. No. 108-193, 117 Stat. 2875 ........................................ 24

Victims of Trafficking and Violence Protection Act of 2000,
Pub. L. No. 106-386, 114 Stat. 1464 ........................................ 8

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008,
Pub. L. No. 110-457, 122 Stat. 5044 ........................................ 5, 8, 24, 25

**Other authorities**

154 Congressional Record S10886-01 (Dec. 10, 2008) ........................................ 26

154 Congressional Record S4799-800 (daily ed. May 22, 2008) ........................................ 26

## INTRODUCTION

Milwaukee Tool's response brief demonstrates why reversal is warranted here. The company recognizes that if this suit is a domestic application of the TVPRA, it may proceed. But it abandons the argument that the district court adopted. Milwaukee Tool now agrees with Mr. Xu: To determine whether a claim seeks domestic application, a court must look to the specific statutory provision that the defendant allegedly violated. If the defendant's conduct relevant to the focus of that provision occurred in the United States, the resulting lawsuit is a domestic application.

That's all that's needed to resolve this appeal. Mr. Xu alleges that Milwaukee Tool violated subsection 1589(b), which prohibits "benefit[ing], financially or by receiving anything of value, from participation in a venture which has engaged in" forced labor. The focus of that provision—the specific action that it prohibits—is benefiting. And there's no dispute that the complaint alleges that Milwaukee Tool benefited in the United States.

For the first time on appeal, Milwaukee Tool proposes an alternative focus: participation in a venture. But the specific act that Congress proscribed is benefiting. As the statute's text and history demonstrate, the whole point of the provision is to impose liability on those who, by profiting from forced labor, ensure its continuation—even if they do not participate in the trafficking itself. And regardless,

Milwaukee Tool's participation in the venture was also domestic. The venture was to manufacture Milwaukee Tool work gloves with cheap forced labor, and then reap large profits by selling those gloves to American customers at American prices. All of Milwaukee Tool's participation in this venture occurred in the United States: It is an American company that used its well-established American brand to sell its gloves in the United States, thereby profiting in the United States. Because this lawsuit seeks only a domestic application of the TVPRA, the Court need not decide whether the statute also applies extraterritorially.

But if this Court reaches that question, the statute's text answers it: The TVPRA explicitly provides "extra-territorial jurisdiction" over "*any* offense" under section 1589, including benefiting from forced labor. 18 U.S.C. § 1596(a) (emphasis added). Milwaukee Tool contends that by using the word "offense," Congress intended to extend extraterritorial jurisdiction only to lawsuits seeking criminal enforcement. But the company has no choice but to concede that the statute uses the word "offense" in both the civil and criminal context. The provision setting forth the civil cause of action itself establishes that victims of an "alleged offense" may bring a civil action. 18 U.S.C. § 1595(a), (c)(2). Milwaukee Tool argues that this means only that the word "offense" refers to a violation of the statute, regardless of whether it is criminally or civilly enforced. But that just proves the point: By providing "extra-territorial jurisdiction" over "any offense," Congress chose to provide extraterritorial

jurisdiction over any violation of the statute, regardless of how that violation might be enforced.

If more were needed, the statutory provision setting forth the civil cause of action also directly incorporates extraterritorial predicate offenses. This direct incorporation, the Supreme Court has explained, is a "clear, affirmative indication" that a provision "applies to foreign" conduct. *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 338–39 (2016). Milwaukee Tool suggests that the Supreme Court, in *RJR Nabisco*, held that while direct incorporation of extraterritorial predicates is an "obvious textual" indication of extraterritoriality with respect to criminal enforcement, *id.*, it is somehow meaningless in the civil context. But the Supreme Court held no such thing. The Court merely held that without "something more," "a private right of action" does not "reach abroad" *solely* "because the underlying law governs conduct in foreign countries." *Id.* at 349–350.

As courts across the country have recognized, the evidence that Congress intended to grant extraterritorial jurisdiction goes far beyond the mere fact that the statute can be construed to reach foreign conduct. In *RJR Nabisco*, the extraterritoriality argument relied on daisy-chaining together a series of statutory provisions scattered throughout the U.S. Code to try to demonstrate that a statute with no obvious indications that Congress was concerned with activities abroad nevertheless allowed extraterritorial civil enforcement. The TVPRA, on the other

hand, is a statute designed to address a quintessentially international problem; it expressly grants extraterritorial jurisdiction; and the civil cause of action directly authorizes civil enforcement of extraterritorial predicates, including predicates that can *only* apply to foreign conduct. If extraterritorial jurisdiction were needed here, the TVPRA provides it.

This Court should reverse.

## ARGUMENT

### I. This lawsuit targets Milwaukee Tool's domestic conduct.

Milwaukee Tool recognizes that if this lawsuit is a domestic application of the TVPRA, it may proceed. And the company's own arguments demonstrate that it is a domestic application. Milwaukee Tool does not seriously defend the district court's approach. Instead, the company now concedes (at 42–43) that a lawsuit constitutes a domestic application of a statute if the defendant's "conduct relevant to the statute's focus" occurred in the United States. And, Milwaukee Tool agrees (at 44–45), the relevant statute is not the TVPRA as a whole, but the specific provision that the company is alleged to have violated: subsection 1589(b)'s prohibition on profiting from a venture that uses forced labor.[1]

[1] Unless otherwise specified, all internal citations, quotation marks, and alterations are omitted from quotations throughout this brief.

These concessions are dispositive. By its terms, the focus of 1589(b) is "*benefit[ing]*, financially or by receiving anything of value, from participation in a venture which has engaged in" forced labor. 18 U.S.C. § 1589(b) (emphasis added). And Milwaukee Tool does not dispute that the complaint alleges that the company financially benefited in the United States. That's all that's needed to conclude this lawsuit is a domestic application.

Unable to argue otherwise, Milwaukee Tool contends—for the first time on appeal—that the focus of the statute is not "benefiting" from participation in a venture that relies on forced labor, but participation itself. This argument is forfeited. *See, e.g.*, *Bradley v. Vill. of Univ. Park, Illinois*, 59 F.4th 887, 897 (7th Cir. 2023) ("An appellee may … waive arguments by not raising them in a timely way in the district court."). And, in any event, as the text and history of subsection 1589(b) demonstrate, the "focus of congressional concern" *is* financially benefiting. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 418 (2023). The whole point of the provision is to undermine the market for forced labor by prohibiting companies from profiting from it—or, in the words of the statute, to "[p]unish[] financial gain from trafficked labor." William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 1583(b)(3), 122 Stat. 5044, 5068 (caps omitted).

And even if this Court were to read "benefit[ing]" out of the statute, as Milwaukee Tool suggests, this lawsuit would still be a domestic application. The

company's participation in the venture—importing gloves made with forced labor into the United States, selling them here, and reaping the benefits here—all occurred domestically.

### A. The conduct relevant to subsection 1589(b)'s focus is "benefiting" from participation in a venture that uses forced labor.

Below, Milwaukee Tool argued that a court must try to identify a single focus of the TVPRA as a whole. *See* Dkt. No. 46 at 8.[2] And the district court agreed. SA-24. But Supreme Court precedent forecloses that argument. *See* Opening Br. 45–49. So on appeal, the company has wisely abandoned it. Milwaukee Tool now agrees that the court must identify the focus of subsection 1589(b) specifically—and that if the company's conduct relevant to that focus is domestic, then this lawsuit is a domestic application of the statute.

Milwaukee Tool's only point of disagreement now is what that focus is. Contrary to the company's assertion, the focus of subsection 1589(b) is not participating in a venture that engaged in forced labor; it's financially benefiting from that participation.

Not every element "necessary" to make out a violation of the statute is its focus. *Abitron*, 600 U.S. at 423. Rather, as the Supreme Court has explained, a statute's focus is "the object of the statute's solicitude," *WesternGeco LLC v. ION*

[2] Citations to "Dkt. No." refer to documents on the district court's docket.

*Geophysical Corp.*, 585 U.S. 407, 416 (2018), "the focus of congressional concern," *Abitron*, 600 U.S. at 418.

Milwaukee Tool's novel contention that the focus of subsection 1589(b) is participation cannot be squared with the provision's text or history. Subsection 1589(b) punishes "knowingly benefit[ing], financially or by receiving anything of value, from participation in a venture" that has used forced labor. The "actus reus"—the specific conduct that violates the law—is not participating in the venture. *United States v. Elbaz*, 52 F.4th 593, 603 (4th Cir. 2022). It is "*benefit[ing]* … from participation." 18 U.S.C. § 1589(b) (emphasis added).

As the D.C. Circuit put it, this "financially benefiting" is the "wrongful conduct." *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 715–16 (D.C. Cir. 2022). Benefiting, therefore, is the "gravamen" of a 1589(b) violation, "the core of the claim," the statute's focus. *Id.*; *see also* Former Officials Br. 1–3, 33 (bipartisan former senior Executive Branch officials explaining that the "culpable act is the knowing receipt of value from a venture … engaged in trafficking").[3]

Statutory context and history confirm that benefiting—not participation—was the "the focus of congressional concern." *Abitron*, 600 U.S. at 418; Opening Br.

[3] Milwaukee Tool (at 46) notes that *Rodriguez* analyzed the "gravamen" of subsection 1589(b) under the Foreign Sovereign Immunities Act. But the company offers no reason why the focus of the statute would be any different under the TVPRA.

49, 52. The title of the amendment that added subsection 1589(b) is "Punishing Financial Gain from Trafficked Labor." Pub. L. No. 110-457, § 1583(b)(3), 122 Stat. 5044, 5068. And Congress added the provision because it concluded that it was not enough to punish those who directly engage in forced labor. Opening Br. 7, 52. Companies that profit off goods made with forced labor create a market for those goods, harm domestic competitors "that decline to benefit from forced labor," *Rodriguez*, 29 F.4th at 717 n.5, and hurt workers in the United States. Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 102(b)(12), 114 Stat. 1464, 1467; Opening Br. 7, 52; Towards Justice Br. 16. Congress enacted subsection 1589(b), therefore, to provide a "freestanding" prohibition on "knowingly receiving value" from forced labor. Former Officials Br. at 32; *see* Opening Br. 7, 52. That prohibition on receiving value, reflected in the statute's text, is the statute's focus.

Milwaukee Tool cannot argue with the text or history of the statute. So instead, citing the Supreme Court's decision in *Abitron*, Milwaukee Tool argues that a lawsuit does not necessarily involve a domestic application of a statute simply because "effects [of a violation] are likely to occur in the United States." Resp. Br. 45 (quoting *Abitron*, 600 U.S. at 426). But the claim here is not that the effects of the statutory violation occurred in the United States. It's that the conduct that constitutes the violation occurred in the United States. The statute in *Abitron* "prohibit[ed] the

unauthorized use 'in commerce' of a protected trademark" that "'is likely to cause confusion.'" 600 U.S. at 422–23 (quoting 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)). The Court explained that the actus reus, the "specific action" that "Congress proscribed," is "the use of a mark in commerce." *Id.* at 423. The "risk of confusion," it explained, "is not a separate requirement; rather, it is simply a necessary characteristic of an offending use." *Id.* And therefore, the Court held, it is the "use in commerce," not the confusion, that is "the conduct relevant to" domestic application. *Id.*

Here, the "specific action" prohibited by 1589(b) is benefiting. Under *Abitron*, therefore, it is benefiting that constitutes "the conduct relevant to" domestic application. *Id.*[4]

Beyond that, Milwaukee Tool relies on out-of-context quotes from cases that, in fact, contradict its position. First, the company attempts to distinguish the D.C. Circuit's decision in *Rodriguez* by claiming that the domestic conduct at issue there was "'committ[ing] a financial crime in the U.S.'" Resp. Br. 46–47 (quoting *Rodriguez*, 29 F.4th at 716–17). But the "financial crime" in question *was* "benefit[ing] financially

[4] As this case demonstrates, profiteering in the United States is not just an "incidental" effect of forced labor abroad. *Contra* Resp. Br. 45. The purpose of the venture here was to maximize profit by selling goods in the United States at American prices, without having to pay American workers American wages. Milwaukee Tool benefited by capitalizing on its well-known American brand name to import and sell cheaply made gloves in the United States. That is precisely what Congress sought to prohibit.

from human trafficking, violating 18 U.S.C. § 1589(b)." *Rodriguez*, 29 F.4th at 710, 716.[5] The "gravamen" of the 1589(b) claim, the D.C. Circuit explained, was domestic because whatever "wrongful conduct" the defendant "allegedly participated in abroad," it reaped the "financial benefit" in the United States. *Id.* at 716. The same is true here.

Milwaukee Tool (at 47 n.16) also points to *A.A. v. Omnicom Grp., Inc.*, 2026 WL 504904 (S.D.N.Y. 2026). But the section of *Omnicom* to which Milwaukee Tool cites is clear that it was not addressing a "theory of wrongdoing under Section 1589(b)." *Id.* at *19. It did not reject the principle that if the plaintiffs *had* alleged that the defendants financially benefited from forced labor in violation of subsection 1589(b)—and if that benefit was realized in the United States—that would be a domestic application of the statute. *See id.* After all, under subsection 1589(b), "the alleged financial activity *itself* g[ives] rise to a cause of action and [i]s itself wrong." *Id.* at *19. If that activity occurred in the United States, holding the defendant liable for it is a domestic application of the statute.

[5] The unpublished district decision in *Mia v. Kimberly-Clark Corp.*, 2025 WL 752564, at *8 (D.D.C. 2025), misreads *Rodriguez* in the same way, requiring some additional financial wrongdoing besides the specific crime that Congress identified.

### B. Milwaukee Tool's conduct related to subsection 1589(b)'s focus occurred domestically.

**1.** Milwaukee Tool financially benefited from forced labor in the United States. By its own admission, the company's alleged conduct all occurred in the United States. Resp. Br. 44, 47. Milwaukee Tool is a U.S. company with its headquarters in the U.S. App-14. It profited in the United States by importing gloves made with cheap forced labor into the United States and selling them to U.S. customers at U.S. prices to reap the profits. App-14, 37. It was therefore in the United States that Milwaukee Tool "benefit[ed][] financially … from participation in a venture which has engaged in" forced labor. 18 U.S.C. § 1589(b).

**2.** And even if subsection 1589(b) could be read to focus on participation—rather than profit—this lawsuit would still be a domestic application. Again, all of Milwaukee Tool's conduct occurred domestically. Milwaukee Tool is a U.S. company, run from the United States, that participated in the venture by importing the gloves to the United States and selling them here. App-14, 37.

Milwaukee Tool argues (at 48) that the complaint's allegations about Milwaukee Tool's participation in the venture are "insufficient to state a claim." But that is not an argument about whether Mr. Xu seeks a domestic application of the statute; it's a merits argument about whether he has sufficiently alleged "participation" under subsection 1589(b). The district court did not address this issue, SA-24, so this Court should remand for the district court to do so in the first instance,

*Hyatt Hotels Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 174 F.4th 535, 542 (7th Cir. 2026) (this is "a court of review, not first view").

In any case, Milwaukee Tool's merits argument also fails. Milwaukee Tool argues (at 48) that the complaint does not allege that the company directly participated in forcing Mr. Xu to labor. But this Court has already rejected the argument that to participate in a venture that uses forced labor, a defendant must participate in the forced labor itself. *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 559–61 (7th Cir. 2023). First, the venture itself "need not be primarily a" forced-labor venture. *Id.* at 556. It can be an otherwise-ordinary "commercial venture" that uses forced labor. *Id.* at 554. And, second, in accordance with the "ordinary understanding of culpable assistance to a wrongdoer," participation in the venture "requires only a desire to promote the wrongful venture's success." *Id.* at 559. A defendant that "facilitate[s] the venture's success" participates in the venture—even if the defendant does not directly facilitate the forced labor on which the venture relies. *Id.* at 560.

Mr. Xu alleges that Milwaukee Tool not only facilitated the venture's success; it was critical to it. Again, the purpose of the venture here was to maximize profit by selling goods in the United States at American prices, without having to pay American workers American wages. Milwaukee Tool gloves were manufactured with forced labor using Milwaukee Tool's proprietary technology and "bespoke manufacturing process." App-11, 21–27, 37, 47. And then Milwaukee Tool used its

"premium brand power" in the United States "to create a high-margin business" selling these gloves in the United States. App-36–37; Opening Br. 9–12. That's sufficient to allege participation. And, more relevant here, it is entirely domestic conduct.

In sum, Milwaukee Tool financially benefited from forced labor in the United States. And even ignoring subsection 1589(b)'s focus on benefiting and looking instead to participation, its conduct was still in the United States. This lawsuit therefore seeks a domestic application of the statute.

## II. Even if this were not a domestic application, the TVPRA applies extraterritorially to U.S. companies like Milwaukee Tool.

Even if this suit against a U.S. company for its U.S. conduct is somehow extraterritorial, it may still proceed. The TVPRA explicitly grants extraterritorial jurisdiction to U.S. courts when U.S. persons commit the offense of benefiting from forced labor—jurisdiction that extends to both civil and criminal enforcement. 18 U.S.C. § 1596; *see* Opening Br. 28–29. As courts interpreting the statute have repeatedly held, Congress addressed the participation of U.S. persons in the quintessentially international problem of trafficking by authorizing extraterritorial enforcement. Milwaukee Tool asks the Court to split with courts across the country and adopt an interpretation that is contrary to the text and history of the statute. This Court should decline to do so.

### A. The TVPRA expressly grants courts extraterritorial jurisdiction over trafficking offenses enforced civilly.

**1.** Milwaukee Tool's contention that the TVPRA does not apply extraterritorially runs into an immediate problem: The statute says otherwise. Section 1596 provides that "the courts of the United States have extra-territorial jurisdiction over *any* offense" committed by a U.S. person under section 1589. 18 U.S.C. § 1596(a) (emphases added). Milwaukee Tool concedes that this includes the offense of financially benefiting from forced labor. Unable to argue with the plain text of the statute, the company asks this Court to ignore it. According to Milwaukee Tool, because the provision uses the word "offense," it must be limited to criminal enforcement, and therefore does not apply here.

But, as the opening brief explains, the TVPRA uses the term "offense" to refer to *any* violation of the statute, regardless of whether it's civilly or criminally enforced. *See* Opening Br. 28–29. Indeed, Congress used the term "offense" in section 1595's civil cause of action *itself*. 18 U.S.C. § 1595(c)(2).[6] And the company's effort to explain away this provision only proves the point. The company asserts that the term

[6] Contrary to Milwaukee Tool's assertion (at 29), the argument is not that in using the word "offense" in the civil cause of action, Congress "silently revise[d]" the extraterritoriality provision. It's that by using "offense" to refer to TVPRA violations in the civil context, Congress "shed[ ] light on how [that word] is to be interpreted." *Motorola Sols., Inc. v. Hytera Commc'ns. Corp.*, 108 F.4th 485, 485–86 (7th Cir. 2024). In *Motorola* itself, this Court held that amendments in the Defend Trade Secrets Act made clear that a preexisting provision granting extraterritorial scope to "offense[s]" was not limited "only to criminal violations." *Id.*

"offense," as used in the civil cause of action provision, "refer[s] to the underlying, predicate acts, and not to the civil claims themselves." Resp. Br. 29. But that's the point: "[O]ffense" refers to the acts prohibited by the statute, without regard to whether the enforcement is civil or criminal. So when section 1596 states that "the courts of the United States have extraterritorial jurisdiction" over "*any* offense," it provides extraterritorial jurisdiction over any violation of the statute, regardless of whether it is civilly or criminally enforced.[7]

**2.** Milwaukee Tool throws out a hodgepodge of different arguments, but it cannot avoid this straightforward conclusion. First, the company tries to manufacture a distinction between an "offense" and a "violation." According to Milwaukee Tool, section 1595's civil cause of action uses the term "violation," while section 1596's extraterritoriality provision uses the term "offense." Resp. Br. 27. So, the company argues, "violations" must be civil, while "offenses" are criminal.

But that argument can't be squared with the text of the statute. The TVPRA uses "violation" and "offense" interchangeably in both the civil and criminal context. As explained above, the provision setting forth the civil cause of action provides that "a victim of a violation" of the statute may bring a civil cause of action, but it also

[7] To the extent Milwaukee Tool asks this Court to ignore the use of "offense" in section 1595's cause of action as a "red herring," Resp. Br. 29, courts don't normally "disregard the statutory text," *Carr v. United States*, 560 U.S. 438, 458 (2010). Nor will courts conclude that "the legislature was ignorant of the meaning of the language it employed." *BedRoc Ltd. v. United States*, 541 U.S. 176, 186–87 (2004).

provides that a civil cause of action may be brought by a "victim" of an "*offense*." 18 U.S.C. § 1595(a), (c)(2) (emphasis added). The TVPRA provides that a "violation" may be enforced civilly, *see id.*, but it also may be enforced criminally. *See, e.g.*, 18 U.S.C § 1589(d) (providing criminal sentencing enhancements "[i]f death results from a violation of this section" or "the violation" involves other aggravating conduct); *id.* § 1594(d) ("imposing [a] sentence on any person convicted of a violation of this chapter"). Milwaukee Tool says (at 27) that different words should be given different meanings. But that's "just a rule of thumb"; it doesn't apply where the statute itself makes clear that Congress used the words interchangeably. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156 (2013).

Next, the company contends that under the Supreme Court's decision in *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650 (2015), the term "offense" refers only to criminal enforcement. But *Kellogg Brown* recognized that "offense" *can* refer to civil violations. 575 U.S. at 659. And *Kellogg Brown* contained no analysis of the TVPRA itself; it just noted that the parties in the case before it had not identified any example in Title 18 *at that time*. *Id.* at 659. As this Court explained, this observation was "not a sweeping command that the word may never be used in title 18 to refer to a civil violation"—and it didn't preclude Congress from later clarifying that it had used "offense" to include civil enforcement in statutes "enacted after *Kellogg Brown*." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 485–86

(7th Cir. 2024). That's just what happened here: Congress amended section 1595's civil cause of action to use the term "offense" after *Kellogg Brown* was decided. *See* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, § 120, 129 Stat 227, 247. Nothing in *Kellog Brown* requires this Court to disregard that statutory text. *Motorola*, 108 F.4th at 485.

Milwaukee Tool (at 26) also contends that section 1596's extraterritoriality provision does not apply in civil cases because it does not expressly reference section 1595's civil cause of action. Numerous courts have rejected this argument as "illogical." *Ratha v. Phatthana Seafood Co.*, 2016 WL 11020222, at *6 (C.D. Cal. 2016); *Omnicom*, 2026 WL 504904, at *17; *U.S. ex rel. Hawkins v. ManTech Int'l. Corp.*, 752 F. Supp. 3d 118, 133 (D.D.C. 2024); *F.C. v. Jacobs Sols. Inc.*, 790 F. Supp. 3d 1158, 1181–82 (D. Col. 2025). Again, Section 1596 extends "extra-territorial jurisdiction over *any* offense … under section 1581, 1583, 1584, 1589, 1590, or 1591." 18 U.S.C. § 1596(a) (emphasis added). It would not have made sense to include an explicit reference to section 1595 on that list because section 1595 is not an offense; it's a cause of action. Op. Br. 40–41. More importantly, the extraterritoriality provision itself already makes clear that it provides jurisdiction over all listed offenses, regardless of what cause of action is used to enforce them.

Milwaukee Tool finds little more support from the fact that a subsection of section 1596's grant of extraterritorial jurisdiction uses the term "offender," which it

claims is a "uniquely criminal term." Resp. Br. 29–30. In ordinary English, "offender" has no such limitation: "one that violates a law, rule, or code of conduct: one that commits an offense." Offender, Merriam Webster Dictionary (2025); *see also Reid Hosp. & Health Care Servs., Inc. v. Conifer Revenue Cycle Sols., LLC*, 8 F.4th 642, 652 (7th Cir. 2021) ("Words are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense."). Nothing in the TVPRA suggests that it bears a unique meaning. In context, the term "offender" simply refers to someone who committed an "offense." *See supra* 14–15. The Defense of Trade Secrets Act's extraterritoriality provision also uses the term "offender," 18 U.S.C. § 1837(1), yet this Court held that it applies to civil claims. *See Motorola*, 108 F.4th at 486. The TVPRA is no different.[8]

Finally, Milwaukee Tool fares no better (at 30) relying on a subsection of section 1596's extraterritoriality provision that limits criminal prosecutions in the United States in the event of foreign prosecutions. 18 U.S.C. § 1596(b). The company claims that it would be incongruous to limit criminal prosecutions but not civil actions. But as Mr. Xu already explained in his opening brief, there was no need to add a similar limitation for civil actions, because section 1595's civil cause of action

[8] Milwaukee Tool (at 29) cites an irrelevant definition provision from a different statute that applies only "[a]s used in this chapter," which covers prison transfers. 18 U.S.C. § 4101(e). And even that definition is not limited to criminal convictions. *Id.*

*already* had one. Op. Br. 41 (citing 18 U.S.C. § 1595(b)). Milwaukee Tool never addresses this point.

Try as it might, Milwaukee Tool cannot change the statute's text. And that text is clear: United States courts have extraterritorial jurisdiction over "any offense" in violation of section 1589. Mr. Xu alleges such an offense. If needed, then, United States courts have extraterritorial jurisdiction over this lawsuit.

### B. Extraterritorial jurisdiction is confirmed by section 1595's direct incorporation of extraterritorial predicates.

If any more were needed beyond section 1596's express grant of extraterritorial jurisdiction to U.S. courts, it's confirmed by the civil cause of action in section 1595's direct and express incorporation of extraterritorial predicate offenses.

Milwaukee Tool attempts (at 23) to limit the text that could potentially support extraterritoriality in section 1595 to its use of the words "victims" and "perpetrators."[9] But the textual argument goes much further than that: By its terms section 1595 directly incorporates extraterritorial predicates, which the Supreme Court has held is an "obvious *textual* clue" of extraterritorial effect—a "clear, affirmative indication"

---

[9] The inclusion of those words *also* supports the conclusion that Congress intended the statute to apply extraterritorially, because the TVPRA employs both terms to refer to victims and perpetrators of trafficking across the globe. Op. Br. 33; *see Pfizer Inc. v. Gov't of India*, 434 U.S. 308, 314–15 (1978). Contrary to Milwaukee Tool's contention, the Supreme Court in *RJR Nabisco* confirmed that similar statutory language evidences extraterritorial intent. 579 U.S. at 352–53 & n.12.

that a provision "applies to foreign" conduct. *RJR Nabisco*, 579 U.S. at 338–39 (emphasis added).

Milwaukee Tool suggests that *RJR Nabisco* held that the direct incorporation of extraterritorial predicates is relevant only to criminal enforcement, not a civil cause of action. Resp. Br. 31–32. Far from it. *RJR Nabisco*'s analysis of RICO's civil cause of action did not jettison the Court's prior statements that incorporation is evidence of extraterritorial scope. Instead, the Court made clear that incorporation can be evidence that a civil cause of action applies extraterritorially—as long as there is "something more" besides the bare fact that the cause of action indirectly and incompletely applies to provisions "govern[ing] conduct in foreign countries." *RJR Nabisco*, 579 U.S. at 350.

As court after court has explained in the wake of *RJR Nabisco*, section 1595's civil cause of action has "something more" in spades. Instead of an attenuated, indirect relationship, section 1595 "*directly* incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates." *Roe v. Howard*, 917 F.3d 229, 241 (4th Cir. 2019) (emphasis added); *see also, e.g.*, *Jacobs*, 790 F. Supp. 3d at 1180–81; *Omnicom Grp.*, 2026 WL 504904, at *17; *Hawkins*, 752 F. Supp. 3d at 132. Compare that with RICO's civil cause of action, which "makes no reference to any extraterritorial provision whatsoever," instead relying on a chain of complex and attenuated cross-references. *Howard*,

917 F.3d at 243; *see also* Op. Br. 38. And unlike RICO, where the whole statute was "silent on extraterritorial jurisdiction," the TVPRA is "a unified statutory scheme of interlocking provisions that provides extraterritorial jurisdiction over specific predicate offenses." *Jacobs*, 790 F. Supp. 3d at 1181.

Not only that, but section 1595 grants a cause of action for *solely* extraterritorial offenses. Take section 1586, which prohibits "transportation of slaves from any foreign country or place to another." 18 U.S.C. § 1586. It would nullify Congress's extension of section 1595's civil cause of action to violations of section 1586 if civil suits could never be brought based on the uniquely extraterritorial conduct the provision targets. *See generally Nat'l Org. for Women, Inc. v. Scheidler*, 396 F.3d 807, 816 (7th Cir. 2005) (noting "well-worn canon of statutory interpretation under which a court should avoid" a reading that renders any "part of a statute meaningless").

Further, as this Court explained in *Motorola*, "RICO's private right of action" contained "limiting language" that significantly restricted the scope of the conduct covered by the right of action from the conduct covered by the underlying offenses. 108 F.4th at 483. In doing so, "Congress signaled that the civil remedy is not coextensive with [RICO's] substantive prohibitions," which undercut the notion that just because the substantive prohibitions were extraterritorial, the cause of action

must be as well. *RJR Nabisco*, 579 U.S. at 350.[10] The opposite is true with the TVPRA, where Congress amended and expanded the scope of section 1595's cause of action to ensure that "any violation of the human-trafficking chapter would give rise to civil liability" and that "*every* criminal act … ha[s] a civil-remedy counterpart." *Ratha v. Rubicon Res., LLC*, 168 F.4th 541, 554 (9th Cir. 2026) (en banc).

Finally, again, section 1595 expressly uses the term "offense"—the term that triggers the statute's extraterritorial scope—to refer to civil enforcement. *See* Op. Br. 13, 16, 19, 29. "[I]t is hard to imagine how Congress could have more clearly indicated" that the TVPRA applies extraterritorially, including when civilly enforced. *RJR Nabisco*, 579 U.S. at 340. Not only does the statute contain an explicit declaration of extraterritoriality, its civil cause of action directly incorporates extraterritorial predicates.

**C. Statutory context and history support this conclusion.**

Nor is that all. The broader statutory context and the statutory history provide further support for the conclusion that the TVPRA applies extraterritorially, whether civilly or criminally enforced.

[10] Milwaukee Tool (at 31–32) presents this discussion in *RJR Nabisco* as inconsequential, but this Court has already held otherwise: If a civil cause of action lacks such limitations and "define[s] the remedies more broadly than RICO's private right of action," this "distinguish[es]" it from the provision analyzed in *RJR Nabisco*. *Motorola*, 108 F.4th at 483.

**1.** The presumption against extraterritoriality reflects the presumption that "Congress generally legislates with domestic concerns in mind," such that courts should not assume that Congress considered extraterritorial conduct when it used otherwise broad language defining a statute's scope. *RJR Nabisco*, 579 U.S. at 336. For that reason, evidence that "Congress was concerned with actions taking place outside of the United States" in enacting the broader legislative framework supports the conclusion that Congress had extraterritorial conduct in mind when it used broad language to define the scope of a cause of action. *Motorola*, 108 F.4th at 483.

As the opening brief explained, the TVPRA has exactly the kinds of provisions that this Court in *Motorola* explained can "buttress[]" the conclusion that a statute applies extraterritorially: findings and statements of purpose regarding violations overseas, "references to extraterritorial conduct," and requirements that the government report to Congress about activities "outside of the United States." *Id.* at 482–83; *see* Op. Br. 34–36. Courts across the country have pointed to these provisions as further support for the conclusion that section 1595's cause of action applies to certain extraterritorial conduct involving U.S. persons. *See, e.g.*, *Howard*, 917 F.3d at 242. This is yet another significant difference from *RJR Nabisco*, where nothing in RICO suggested Congress wasn't following its ordinary course of legislating with only "domestic concerns in mind." 579 U.S. at 336; *see also id.* at 352–53 n.12 (noting lack of "explicit foreign-oriented language" in RICO).

Milwaukee Tool (at 35) asks this Court to disregard this evidence from the text of the statute on the grounds that it is limited to the initial 2000 statute. That's incorrect: Mr. Xu cited similar statements from subsequent amendments, *see* Op. Br. 6, 32–33, as have other courts, *see, e.g.*, *Howard*, 917 F.3d at 236 (citing Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193 § 2(2), 117 Stat. 2875). And Congress has included similar statements of concern about international trafficking and taken steps to address it across TVPRA amendments, including those that enacted the key provisions here. *See, e.g.*, Pub. L. No. 108-193, § 2(1), 117 Stat. 2875 (finding that "[t]rafficking in persons continues to victimize countless men, women, and children in the United States *and abroad*" (emphasis added)); Trafficking Victims Protection Act of 2005, Pub. L. No. 109-164, § 2(3), 119 Stat. 3558–3559 ("Since the enactment of the Trafficking Victims Protection Act of 2000, United States efforts to combat trafficking in persons have focused primarily on the international trafficking in persons, including the trafficking of foreign citizens into the United States."); Pub. L. No. 110-457, § 223, 122 Stat. 5044, 5071.

Milwaukee Tool argues that this statutory text cannot provide the "something more" that *RJR Nabisco* found lacking for RICO's civil cause of action. Resp. Br. 35. But Mr. Xu offers far more than just these statements of purpose, including numerous features of the TVPRA's text and structure that support section 1595's extraterritorial scope. *See supra* 14–22. And nothing in *RJR Nabisco* precludes these

"[c]ongressionally enacted legislative purposes and findings" that "are part of a statute's text" from providing evidence of congressional concern about overseas conduct that was missing from RICO's civil cause of action. *Motorola*, 108 F.4th at 482. Indeed, this statutory context makes the incorporation of extraterritorial predicates even stronger evidence of extraterritorial effect for the TVPRA than there was for RICO's *criminal* provision, since RICO itself contained no textual expressions of congressional concern about actions overseas. *RJR Nabisco*, 579 U.S. at 352 n.12.

**2.** Milwaukee Tool also has little answer for the TVPRA's statutory history. As Mr. Xu explained in his opening brief, Op. Br. 36, and other courts have held, "Congress has consistently amended the TVPA to reach and proscribe additional categories of foreign conduct." *Howard*, 917 F.3d at 242. That includes enacting section 1596's extraterritoriality provision at the same time as expanding the private right of action from a subset of violations to *all* TVPRA violations. Pub. L. No. 110-457, § 221(2)(a)(i), 122 Stat. 5044, 5067. This showed that "Congress intended every criminal act to have a civil-remedy counterpart," which would include extraterritorial criminal acts. *Ratha*, 168 F.4th at 554.

Milwaukee Tool barely mentions this *statutory* history, much less addresses it, instead focusing on *legislative* history. Resp. Br. 36. But these are different sources with significantly different weight. "[S]tatutory history" is "[t]he enacted lineage of a statute, including prior laws, amendments, codifications, and repeals." *United States v.*

*Vargas*, 74 F.4th 673, 689 (5th Cir. 2023) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 432, 440 (2012)). Such "[s]tatutory history is an important part" of the statute's "context." *United States v. Hansen*, 599 U.S. 762, 775 (2023). Legislative history, meanwhile, consists of "unenacted" legislative materials compiled during the legislative process. *Holbein v. TAW Enters., Inc.*, 983 F.3d 1049, 1055–56 (8th Cir. 2020). Thus, "statutory history, unlike legislative history, itself reflects the constitutional bicameralism and presentment process." *Hueso v. Barnhart*, 948 F.3d 324, 335 (6th Cir. 2020).

Contrary to Milwaukee Tool's assertion that "legislative history" "weighs heavily" here, Resp. Br. 36–37, "legislative history is … often murky, ambiguous, and contradictory," *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). While Milwaukee Tool relies on "selective quotation" from reports, *Exxon*, 545 U.S. at 569, other legislative history also demonstrates that Congress understood the relevant TVPRA amendments as addressing global problems. The bipartisan sponsors of the 2008 TVPRA amendments stated that it would "establish some powerful new legal tools, including increasing the jurisdiction of the courts," going on to describe the provisions as covering "*any* trafficking case … even if the conduct occurred in a different country." 154 Cong. Rec. S4799-800 (daily ed. May 22, 2008) (emphasis added). Nor were they alone. *See, e.g.*, 154 Cong. Rec. S10886-01 (Dec. 10, 2008) (statement of Sen. Patrick Leahy) ("[T]rafficking is a modern-day form of

slavery, involving victims who are forced, defrauded, or coerced into sexual or labor exploitation. These practices continue to victimize hundreds of thousands around the world.").

All told, the enacted statutory context and history provide strong support for what the text affirmatively says: that courts have extraterritorial jurisdiction over the offense of benefiting from participation in a forced-labor venture—whether criminally or civilly enforced.

### D. Milwaukee Tool's policy arguments cannot overcome statutory text and context.

Ultimately, Milwaukee Tool resorts to policy arguments, contending that applying section 1595 to (some) overseas conduct has the "potential" for "international friction." Resp. Br. 30. But the extraterritoriality inquiry already addresses these concerns by asking whether Congress has clearly expressed its judgment that a statute should apply to overseas conduct. *RJR Nabisco*, 579 U.S. at 335. And, in any event, the company's concerns are overblown. Notably, the Executive Branch, which is responsible for conducting foreign affairs, has consistently held, across administrations, that the TVPRA's civil cause of action applies extraterritorially. *See* Former Officials Br. at 16–29.

The TVPRA contains guardrails reflecting Congress's determination of the proper balance between preventing trafficking and international affairs. The extraterritoriality provision applies only when U.S. persons are involved in or benefit

from trafficking overseas. 18 U.S.C. § 1596(a)(1)–(2). That exercise of U.S. government control over U.S. persons does not pose anything like the comity concerns that Milwaukee Tool posits. The statute's limited extraterritorial scope does, however, serve the *domestic* goals that Congress identified. *See supra* 8. And as noted above, section 1595's cause of action also contains limitations on civil actions in the event of criminal prosecutions. 18 U.S.C. § 1595(b)(1).

Milwaukee Tool's policy arguments ignore the "stated purpose" of the statute: "to address the problem of human trafficking 'throughout the world.'" *Howard*, 917 F.3d at 242 (quoting Pub. L. No. 106-386, §§ 101–02, 114 Stat. 1464, 1466–69). The forced labor here was carried out by political prisoners who were imprisoned for their views. App-21–22. It involved grueling work in dangerous conditions for 11- to 13-hour days, with quotas enforced by beatings and electric rods. App-24–26. Milwaukee Tool's participation in this venture triggered a congressional inquiry, an order by Customs and Border Protection barring importation, and a major American retailer dropping Milwaukee Tool gloves. *See* Op. Br. 12.

Milwaukee Tool's reading of the statute would foreclose a civil suit against a U.S. company in U.S. courts even if the company *itself* had operated the forced-labor facility. Here, for example, it would mean that Mr. Xu would have no TVPRA claim against Milwaukee Tool even if the people who beat prisoners into making the gloves at issue were Milwaukee Tool employees sent to China to do so. That's hard to

square with a statute that not only repeatedly expressed concern about U.S. companies participating in forced labor overseas, but expressly includes a provision targeting profiteering from forced labor. *See, e.g.*, *Motorola*, 108 F.4th at 482 ("We cannot interpret federal statutes to negate their own stated purposes.").

Most fundamentally, Milwaukee Tool's policy arguments cannot override the statute's text and context. Congress was clear: The TVPRA applies extraterritorially. And, again, even if it didn't, this lawsuit is a domestic application of the statute—even on Milwaukee Tool's reading of the statute. So either way, the case may proceed.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

/s/ *Jennifer D. Bennett*
JENNIFER D. BENNETT
GUPTA WESSLER LLP
235 Montgomery Street
Suite 629
San Francisco, CA 94104
(415) 573-0336
*jennifer@guptawessler.com*

THOMAS SCOTT-RAILTON

GUPTA WESSLER LLP
1400 16th Street NW
Suite 225
Washington, DC 20036
(202) 888-1741
*thomas@guptawessler.com*

ADAM FARRA
TIMES WANG
FARRA & WANG PLLC
1543 Champa Street
Suite 400
Denver, CO 80202
(202) 505-5989

WILLIAM E. PARSONS
HAWKS QUINDEL, S.C.
409 E. Main Street
P.O. Box 2155
Madison, WI 53703
(608) 523-8478

October 5, 2026

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32(c) because this brief contains 6,953 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

October 5, 2026

*<u>/s/ Jennifer D. Bennett</u>*
Jennifer Bennett

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Seventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jennifer D. Bennett*
Jennifer D. Bennett